UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOE JOHNSON,                           )
                                       )
            Plaintiff,                 )
                                       )
    v.                                 )      Case Nos.
                                       )      TDC-22-2422
THINK COMPUTER CORPORATION             )      TDC-22-2573
    d/b/a PLAINSITE,                   )
                                       )
            Defendant.                 )

**AFFIRMATION OF AARON GREENSPAN**

1. My name is Aaron Greenspan. I make this affirmation for use in support of Think Computer Corporation's opposition to Joe Johnson's motion to remand this case to state court.

2. I am the sole owner of defendant Think Computer Corporation, which is a Delaware subchapter S corporation that has its principal place of business in California. I refer to the company throughout this affirmation as "Think."

3. The company's main activity is operating a website at plainsite.org, which is a repository for millions of state, local and federal government records, particularly court records. The records are accessible and indexed free of charge. Members of the public can gain access to enhanced search capabilities by registering for a paid account. PlainSite also gains revenue by running advertisements. Think owns a registered trademark, Registration No. 4,461,598 for the PLAINSITE mark.

4. Among many other records, PlainSite hosts court records from a large number of court dockets involving the plaintiff, Joe Johnson, who also litigates under the names Joseph Johnson and Joseph Johnson, Jr. Because Mr. Johnson has a common name, in some cases he is identified using his middle initial, R. In all, PlainSite's records reflect Johnson's involvement in more than one

hundred fifty civil and criminal dockets, mostly in Maryland, but also elsewhere.  Because Johnson

usually proceeds pro se, the papers that he files identify him by name and include his e-mail and

mailing addresses, including both post office boxes and street addresses, as well as his telephone

numbers, which he is required to place on the public record in connection with the litigation that he

initiates.

5.  The records hosted on PlainSite show that Johnson has been convicted several times of

crimes involving the making of false statements, including false statements and forged documents

in judicial proceedings.  His conviction in a Virginia state court was upheld on appeal.  See Exhibit

A.  He was convicted by a federal court in Virginia of making false statements to a court under oath,

in circumstances that included the submission of a notarized document purportedly sworn before a

notary who was not yet a notary at the time, and in which parts of the notarization had been altered.

The decision of the United States Court of Appeals for the Fourth Circuit, affirming his conviction

of these crimes, is attached as Exhibit B.   His latest conviction in federal court was reversed on the

ground that the United States failed to prove materiality, but Johnson's motion for a certificate of

innocence was rejected on the ground that he had certainly filed a forgery and had brought his

prosecution on himself.  See Exhibit C.  That ruling is currently on appeal.  In addition, Johnson

pleaded guilty to attempting to fraudulently obtain a loan from a credit union using a false social

security number and false statement of annual income; the Fourth Circuit's rejection of his appeal

from his conviction and sentence, describing the offenses for which he was convicted, is attached

as Exhibit D.

6.  Think first heard from Johnson in 2016, when he submitted a comment through PlainSite

complaining about the hosting of the docket in *Johnson v. Ashmore*, 2016 WL 3467052 (N.D. Tex.

June 8, 2016), *report and recommendation adopted*, 2016 WL 3406110 (N.D. Tex. June 21, 2016), *aff'd*, 681 Fed. Appx. 345 (5th Cir. 2017), and threatened to sue Think.  He repeated those threats in subsequent years, claiming that the hosting of the court records was an invasion of privacy in violation of California and federal law.

7. *Johnson v. Ashmore* was a lawsuit based on diversity jurisdiction in which Johnson made state law claims against two lawyers who had defended a previous lawsuit Johnson had filed.  In it, Johnson claimed that they had "made misrepresentations in connection with the settlement of that lawsuit." *Id.*, 2016 WL 3467052 at *1.  He sued them personally even after the trial court in the underlying case had rejected identical factual claims as an alleged basis for relief against the defendant whom the lawyers had been representing.

8. Responding on behalf of Think, I explained that the judicial records were in the public domain; that if the records contained sensitive personal information, it was up to him to ask the courts to seal or redact them; that the First Amendment protects Think's right to host judicial records; and that Johnson's supposed privacy-based causes of action were inapplicable.  Johnson did not make any effort to engage with the substance of the First Amendment or other legal arguments, but nonetheless reiterated his threat to sue, warning that if the records were not removed, "you will be subject to a civil lawsuit, and will be tied up in litigation for the next year or so litigating this issue."  Throughout the ensuing correspondence, Johnson never explained why he thought his purported state-law privacy claims could surmount the First Amendment right to host public judicial records.

9. Johnson mentioned in passing that he objected to his social security number being revealed on PlainSite.  I told him that I could not find that number anywhere on PlainSite, but that

if he pointed out where it appeared, Think would redact it. Johnson did not follow up with information about where his social security number allegedly appeared. I attach this e-mail correspondence as Exhibit E.

10. I attach as Exhibit F Johnson's complaint in *Johnson v. Ashmore* alleging diversity of citizenship, as well as the Civil Cover Sheet in which Johnson asserted that he was a citizen of a state other than Texas.

11. Think first received the summons and complaint in this case on September 6, 2022.

12. I noted Johnson's assertion that Think, having been served with "the July 20, 2022 notice by the Circuit Court," sought to remove this case "more than thirty days" after receiving the July 20 notice. Think did receive that paper in the mail, but it was not accompanied by a summons or complaint or, indeed, by any other documents noting the nature of the claims or the prayer for relief. Think never received a copy of any District Court complaint. The July 20, 2022 transfer notice was attached to the Notice of Removal that I sent to the Court, as well as to the Amended Notice of Removal, and appears in the docket on page 5 of Docket Item Number ("DN") 1-1 and page 2 of DN 6-1 in Case No. 8:22-cv-02422-TDC.

13. As soon as I received the summons and complaint, I began looking for a lawyer to defend Think. Think's revenues are not high enough to be able to afford private counsel charging a reasonably hourly rate, given the amount of time that a lawyer would have to expend opposing Mr. Johnson's exceptionally litigious practices. The one lawyer who gave me actual figures to defend Think estimated that he would need $50,000 to $90,000, which is more than Think's annual revenues for fiscal year 2021. Other lawyers whom I consulted made clear that the representation would be out of Think's financial reach, so we did not get to a discussion of actual numbers. I believe that

some lawyers are reluctant to represent Think because Johnson has pursued repeated meritless appeals and has sued his counterparties' lawyers personally for torts allegedly arising from their representations.

14. Once I saw the complaint, I concluded that Think would be best off defending itself in federal court. First, I had no doubt that Johnson is a citizen of Maryland, thus making the two parties completely diverse. Throughout the years from 1992 to the present, the dockets of the Circuit Court for Prince George's County have consistently listed addresses for Mr. Johnson in Maryland, whether post office boxes or street addresses. I attach a list of those addresses as Exhibit G. I attach as Exhibit H two pieces of 2022 correspondence filed in Mr. Johnson's court cases which associate him with street addresses in Maryland.

15. Moreover, Johnson's Maryland citizenship was the basis for his diversity suit in *Johnson v. Ashmore* (where he alleged that he is a Maryland "resident" but allowed the Court and the parties to assume that he is a Maryland citizen), as well as in *Johnson v. Wright*, Pennsylvania Eastern District Case No. 2:22-cv-02905-JS, where he sued a federal prosecutor and an FBI agent alleging that they had wrongly prosecuted him for filing a forged document in federal court despite allegedly knowing that one element of the crime, materiality, could not be shown. In that complaint, filed on July 5, 2022, Johnson alleged that he is a citizen of Maryland. Copies of the complaint the Pennsylvania case, and of the Civil Cover Sheet that Johnson filed in that case repeating his contention about his citizenship, are attached as Exhibit I.

16. In addition, I concluded that Johnson's claims effectively sought in excess of $75,000 in damages and other monetary relief. His complaint sought not only $25,000 in compensatory damages, but, in addition, general damages, punitive damages, and attorney fees. In researching

Think's potential exposure under such allegations, I learned that the punitive damage award alone could easily exceed $50,000, because a common multiplier for punitive damages is three times. Indeed, I understand the general due process rule to be that punitive damages should be no more than a single-digit number times more than compensatory damages, which would put the amount in controversy as high as $250,000.

17.   Furthermore, the Justice Department's Bureau of Justice Statistics has issued a study of punitive damages awarded in state courts.  A copy of that study is attached as Exhibit J.

18.   I believe that Think would be better off in federal court.  Johnson is not the only person who has filed a lawsuit against Think for hosting documents that the person would rather have hidden from the public.  Think was required to defend itself against such a lawsuit filed earlier this year. *Weiler v. Google, et al*, Case No. CV22963458 (Cuyahoga Cy. Com Pleas) (dismissed for failure to state a claim, but now on appeal), and Think regularly receives threats of such litigation. I believe that a federal court judgment would more effectively discourage copycat litigation. Moreover, although I saw no merit to Johnson's state-law claims, outside of his court complaints, Mr. Johnson himself asserted to me via e-mail that he challenged Think's interpretation of its First Amendment right of access to public judicial records as well as Think's constitutional and statutory right to host documents that are publicly available through the Internet.  Specifically, one week before he filed suit, Mr. Johnson wrote, "The First Amendment right to publish does not give Plainsite the unfettered right to disseminate or cause to be disseminated personal information without the risk of liability for its nefarious use." Given the existence of diversity jurisdiction, Think ought to be allowed to defend itself in federal court.

19.   Despite my best efforts, by late September, 2022, I had not yet found a lawyer who was

willing to represent Think on reasonable terms, and I was worried about the approaching removal deadline of October 6, 2022, 30 days after service of the summons and complaint on Think. Therefore, I mailed the Notice of Removal to the clerk of this Court, hoping to get the lawsuit against my company into federal court within the deadline, while continuing to search for counsel for the company. I sent it by Priority Mail; I sent a notice of removal by First-Class Mail to the state court and to Mr. Johnson.

20. The Court docketed the Notice of Removal, not showing me as the defendant personally, but showing Think Computer Corporation as the defendant, and showing that the Notice had been filed "o/b/o" the company—that is, on behalf of the defendant company.

21. After I mailed the notice, Think was able to retain Mr. Levy, who prepared an Amended Notice of Removal as counsel for Think, and found local counsel, to enable my company to file a Notice of Removal, appearing through counsel.

22. Think never received service of the First Amended Complaint and Second Amended Complaint that Mr. Johnson submitted to the state court. It obtained those documents only because it hired someone at additional expense to go to the clerk's office to look for all of the relevant state court filings, and to make sure that our new Notice of Removal, filed as Case No. 8:22-cv-02573-TDC, included all potentially relevant filings.

I hereby affirm under penalty of perjury that the foregoing is true and correct. Executed on November 2, 2022 in San Francisco, California.

*Aaron Greenspan*

# EXHIBIT A

COURT OF APPEALS OF VIRGINIA

Present:  Judge Bray, Senior Judges Duff and Overton
Argued at Alexandria, Virginia

JOSEPH JOHNSON, JR.

v.   Record No. 0348-98-4

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
JUDGE CHARLES H. DUFF
JUNE 22, 1999

FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Benjamin N. A. Kendrick, Judge

Leo R. Andrews, Jr., for appellant.

Steven A. Witmer, Assistant Attorney General
(Mark L. Earley, Attorney General, on
brief), for appellee.


Appellant contends that the trial court erred in admitting a

copy of a prior order where the original was lost or destroyed.

Appellant also contends that the trial court erred in entering an

order on February 6, 1997, which vacated an earlier order.  For

the following reasons, we affirm appellant's convictions.

I.

THE ORDERS IN CASES 93-321 and 93-322

A.  The 1993 Charges

On March 23, 1993, appellant appeared before Arlington County

Circuit Court Judge Paul F. Sheridan on Case No. 93-321, charging

_____

*Pursuant to Code § 17.1-413, recodifying Code § 17-116.010,
this opinion is not designated for publication.

appellant with statutory burglary, a felony.[1]  Appellant, appellant's attorney (Evans), and the Commonwealth's attorney presented Judge Sheridan with a "plea agreement memorandum" under which appellant agreed to plead guilty pursuant to <u>North Carolina v. Alford</u>, 400 U.S. 25 (1970), to the lesser-included offense of misdemeanor unlawful entry.  In exchange for his <u>Alford</u> plea, the Commonwealth moved "to nol pros" Case No. 93-322, involving grand larceny.  Without objection, Judge Sheridan <u>nolle prosequied</u> Case No. 93-322.

B.   The Expungement Petition and June 16, 1995 Hearing

On May 3, 1995, appellant filed a motion for expungement in which he alleged the following:

> That your petitioner, Joseph Johnson, . . .
>
> . . . was arrested on the 11th day of January, 1993, by the County of ARLINGTON Sheriff's Department for "Statutory Burglary and Grand Larceny" . . . .
>
> 2.   That your petitioner, Joseph Johnson, was innocent of any and all charges aforesaid.
>
> 3.   That on the 23th day of March, 1993, in the General Circuit Court of the County of ARLINGTON, Virginia, the Commonwealth of Virginia, by her Attorney for the Commonwealth of the County of ARLINGTON moved for a nolle prosequi of said charges, which motion was granted by the Court at that time.

---

[1]The facts that follow are contained in a March 23, 1993 transcript that was made a part of the appellate record.

There are no transcripts or orders regarding the expungement proceeding.  The only information about that proceeding is contained in the April 29, 1996 transcript from appellant's forgery trial.  At that trial, Sheila Norman, "the Assistant Commonwealth Attorney who handles expungements usually," testified that, on June 16, 1995, she learned through a circuit court judge that appellant's "expungement proceeding was on the docket" to be heard that day.  That was the first time Norman was advised of the petition.  After hearing conflicting arguments from appellant and Norman, the trial judge denied appellant's petition for expungement.

C.   The Show Cause Hearing in Case No. 93-321

On June 16, 1995, the same date as appellant's expungement hearing, appellant appeared before Judge Sheridan regarding "a show cause letter dated March 9, 1995."[2]  At that hearing, the Commonwealth asserted that appellant "still owes $1,500 in restitution."  Appellant averred that his probation was transferred "from Virginia to Maryland" where he had "been making minimum payments of $50 to the probation officer" there.

Appellant stated, "And now that I am aware that this probation has expired as of March 23, [1995] Your Honor, I would

---

[2]A copy of the transcript of that hearing is contained in the appellate record.

be willing to - actually I'm in the position within the next 30
days to pay off whatever balance that exists."

The trial judge indicated that the Virginia probation
office requested that appellant's probation be extended.  He
then ruled that he was "extend[ing] the probation to March 23,
1996 for lack of compliance" and because appellant's "probation
conditions weren't carried out within the time period."

D.  The April 26, 1996 Forgery and Uttering Trial

On August 21, 1995, appellant was indicted for forging and
uttering the order in Case No. 93-321, the order upon which
appellant relied to expunge his record and the case in which
Judge Sheridan extended probation two months earlier.  The
Commonwealth alleged that appellant visited the circuit court
clerk's office on June 7, 1995, and stole the original orders
from the file and the order book for Case No. 93-321 relating to
his 1993 misdemeanor conviction.  According to the Commonwealth,
appellant prepared a forged order for Case No. 93-321 indicating
that the charges were nolle prosequied.  The Commonwealth
alleged that appellant then substituted a photocopied forgery
for the original conviction order when he returned the file to
the clerk.  At appellant's trial, because the circuit court had
no original orders from which to make certified copies, the
Commonwealth sought to admit a copy of the conviction order
provided by appellant's probation officer.

Prior to the introduction of evidence at appellant's April 29, 1996 trial, appellant's attorney questioned how the Commonwealth intended to prove the contents of the original order that was allegedly stolen and replaced with a forgery. The Commonwealth explained that it intended to present a copy of the original order received from the file of appellant's probation officer, Carol Hawkins, and to establish its authenticity through the testimony of Hawkins and two circuit court assistants, Vickie Separis and Beth Davis.[3]  In support, the prosecutor made the following assertion:

> [The copy of the original order] will be Exhibit No. 1.  It is the actual conviction of the defendant.  Our evidence would show that circumstantially the defendant took it and destroyed it.  The way that I would prove to – intend to introduce it is because Vicki Separis recognizes it that this was the actual conviction order that had been in the file before it was given to the defendant.
>
> She also got a copy of – the copy that I am using was supplied by the probation office because they kept a file of his actual conviction order and then since then they have requested the book and page photographs entered from the Supreme Court and as I've gotten the actual conviction order and she has compared them, it is the same thing now.  And I am going to use the presumption of regularity as to judicial

---

[3]On August 31, 1998, we denied part of appellant's petition for appeal in which he presented an argument regarding the admissibility of testimony from Separis and Davis, and ruled that "Code § 19.2-271 was not applicable" to bar their testimony at trial.

proceedings which apply here and the
presumption that this is accurate and true.

The Commonwealth's attorney further asserted that she was "not trying to prove the contents" of the order. Instead, she merely intended to prove that appellant was convicted in Case No. 93-321 and that the case was not <u>nolle prosequied</u> as indicated in the alleged forgery.

Defense counsel objected, citing Code §§ 8.01-389(A) and 18.2-391(C) as methods and procedures by which the order might be made admissible had the Commonwealth sought to do so. The prosecutor explained that the order could not be authenticated and certified because "the original has been destroyed and they can't" certify a copy.

Defense counsel pointed out the procedure in Code § 8.01-394 for proving lost records and argued that the Commonwealth chose not to follow it. Following a brief recess, the following colloquy took place:

> THE COURT:  Is this the copy that you were referring to?  Have I been given –
>
> [THE PROSECUTOR]:  Your Honor, I was wrong. The defense attorney had it at the time, and when you asked if it had been certified, I thought that it had been.  It actually had – this is a copy that was given to the probation officer before all of this happened back in 1993 so that they could

start monitoring him and that was certified
at the time – from the original.[4]

THE COURT:  That changes things, doesn't it?

[DEFENSE COUNSEL]:  Well, sir, if that order
had a date – if the certification has a
date, I would agree with this Court.  But it
doesn't have –

THE COURT:  But [Code § 8.01-391]C doesn't
say that.  C doesn't say whether the
original is in existence or not provided
that such copy is authenticated as a true
copy by the Clerk or Deputy Clerk of such
Court and dated.  It doesn't say that.

The trial judge ruled as follows:

Well, I think this document as certified[5]
satisfies the statutory requirements and
your objection is overruled, Mr. King, and
your exception is noted.

The prosecutor then informed the trial court of other

documents she intended to introduce for admission.  She stated:

[T]he best way we should probably settle
this issue of the exception, is I have a
document that I will put in as
Commonwealth's Exhibit No. 2, will be a
photocopy of his actual nol pros order.
That also – that is not certified.  It is
missing out of the – the original is missing
out of the file I believe and so I would be
introducing it not just based on its
certification but because it is something

---

[4]Contrary to statements in the trial transcript, the copy of
the order provided by Hawkins and admitted as Commonwealth's
exhibit 1, contained no certification, no attestation, or any
indicia that it was a copy created from the original.

[5]As previously explained, there is no evidence that
Commonwealth's exhibit 1 was certified.  See supra note 4.

that has been recognized by the Clerk.   The
Clerk knows what it is.

        Then the third thing I am going to be
submitting is the fake order, the
constructed order.   And, of course, that can
never be certified.   It's false.   It is just
a piece of paper that was put in the file
. . . .

The following exchange ensued:

        [THE PROSECUTOR]:   Your Honor, if you think
        8.01, the section referred to was preventing
        from [sic] introducing the nol pros order,
        if it is not certified, I can ask that we
        - I can get - now that they have gotten the
        book and page from the Supreme Court, they
        can use that as an original I learned during
        the break from Ms. Separis.   They can use
        that as an original and I could produce a
        certified copy and have that in my exhibits.

        THE COURT:   I think you should do that.[6]

    Separis, a court assistant in the circuit court clerk's

office, testified that her duties include "providing . . .

administrative support" and photocopying.   Separis testified

that she saw appellant on June 7, 1995, when he "c[a]me into the

Clerk's office asking for copies of a file and [she] went to go

look for the file for him."   Separis gave the files to appellant

who "had them for probably fifteen to twenty minutes."   Because

of other activity in the office, Separis did not watch appellant

---

[6]Despite the trial judge's belief that it should be done, at
no time during the trial did the Commonwealth's attorney
introduce or offer "the nol pros order" and "book and page" that
she presented was received from the Supreme Court and that the
trial judge agreed should be done.

- 8 -

closely.  According to Separis, appellant "asked for certified copies of" the orders in the two cases, however, she "noticed that they were Xeroxed."  Separis testified as follows:

> When [appellant] asked for a certified copy, I told him that I needed to find the original in order to give him a certified copy because all this was was a copy and our office policy is not to give a certified copy of a copy.

Separis also noticed that "most of the contents of the file were copies" and that the returned file "was pretty thin." Appellant told Separis that "his name was Kevin Stevens," that an attorney named Vernon Evans "needed [the copies] right away for an expungement that was going to happen pretty soon," and that he, appellant, could be reached at Evans' office.  Separis also testified about a "book and page" collection in which the clerk's office maintains copies of every document.  The "book and page" collection is accessible to the public.  When Separis looked in "the book and page" compendium, the orders from the two cases "were mysteriously missing."  Separis later met with appellant's probation officer who provided her with a photograph of appellant and "the original that they received in the office from our office of the court orders that were provided in those cases."  Separis identified Commonwealth's exhibit 1, the copy of the order supplied by the probation officer, as "the original sentencing order from case CR 93-321," and Commonwealth's exhibit 2 as "the nol pros order that was in the case CR

93-322." The trial judge admitted the exhibits without further objections or comments.

Separis testified that, after viewing the photograph provided by Hawkins, she realized that appellant was the person who claimed to be Kevin Stevens. Separis also inspected the judgment lien books and "observed that there were several pages torn out," including a page containing a judgment written against appellant.

Circuit court assistant Beth Davis testified that she was typing an order relating to Probation Officer Hawkins' letter to the trial judge advising him of appellant's "nonpayment of restitution." Davis had attached Hawkins' letter to the two files numbered 93-321 and 93-322 and placed the files on the floor. When appellant entered the clerk's office looking for the files, Davis provided them to Separis. When appellant returned the files, "the probation officer's letter was gone." Davis testified about what occurred after appellant returned the files:

> Just at that time when I was looking for the
> probation officer's letter, the first thing
> I did was just open the top file to see if
> maybe it had been slid inside the file and
> that is when I realized at the time that the
> only contents of that file were all copies.
> There were no original signatures of
> anything that was there that I would assume
> would be there before.

Davis telephoned Probation Officer Hawkins and requested a copy of the missing letter to the judge to attach to the order.

Carol Hawkins testified that she was appellant's probation officer for his March 1993 conviction for which "[h]e received a twelve-month, all suspended sentence . . . and two years of probation with some special conditions." Hawkins identified the letter she wrote to the trial judge. The letter referenced appellant's name and "Case No.: CR93-321 & 322" and discussed his March 23, 1993 sentence and the fact that he had failed to pay court-ordered restitution. After the clerk's office contacted her, Hawkins delivered her entire file relating to appellant to the clerk's office.

Assistant Commonwealth's Attorney Norman testified that she represented the state in appellant's June 16, 1995 expungement proceeding. At that proceeding, Norman disagreed with appellant's contention that the charge was nolle prosequied. According to Norman, the trial judge dismissed the expungement petition after considering arguments from her and appellant. Norman also identified Commonwealth's exhibit 7, a document entitled "Motion to Lessen Sentence" filed on February 8, 1994, in which appellant wrote that "[o]n or about March 23rd, 1993, Defendant was sentenced a [sic] two (2) year probation, and with an order of restitution to be paid."

During the testimony of Separis, the trial court admitted
Commonwealth's exhibit 1.  The jury found appellant guilty of
both charges.

     E.  Admissibility of Commonwealth's Exhibit 1

       1.  The Commonwealth's 5A:18 Argument

The Commonwealth contends that appellant is barred from
arguing against the admissibility of the exhibit because he put
forth a different argument in his reply brief at the petition
stage.  In his petition, appellant contended, inter alia, that
Commonwealth's exhibit 1, the uncertified copy of the conviction
order contained in the probation officer's file, was not a true
copy pursuant to Code § 8.01-391(B) or (C).  This argument
encompassed both authentication and certification.  See Owens v.
Commonwealth, 10 Va. App. 309, 311, 391 S.E.2d 605, 605-06
(1990) (holding that "authenticated" and "certified" are
synonymous terms).  In our order dated August 31, 1998, we
granted an appeal on the issue of whether "the trial court
err[ed] by not requiring the Commonwealth to establish the
contents of [the] missing circuit court order without
satisfying[, inter alia, Code] Sections 8.01-389 and 391."
Those code sections relate to the authentication and
certification of an official document.  Because this issue was
before the trial court and argued in appellant's petition, we
will address the merits of the issue.

2.   Analysis and Discussion on the Merits

Code § 8.01-389 provides, in pertinent part, that "[t]he records of any judicial proceeding and any other official records of any court of this Commonwealth shall be received as prima facie evidence provided that such records are authenticated and certified by the clerk of the court where preserved to be a true record."   "Code § 8.01-389 'codifies as part of the official records exception to the hearsay rule judicial "records" which are properly authenticated.'"   Taylor v. Commonwealth, 28 Va. App. 1, 11, 502 S.E.2d 113, 117 (1998) (citation omitted).

Code § 8.01-391(C) provides:

> If any court or clerk's office of a court of this Commonwealth, of another state or country, or of the United States, or of any political subdivision or agency of the same, has copied any record made in the performance of its official duties, such copy shall be admissible into evidence as the original, whether the original is in existence or not, provided that such copy is authenticated as a true copy by a clerk or deputy clerk of such court.

The above-quoted statutes put forth the generally accepted method for admitting official documents, namely, that they be properly authenticated and/or certified as to their accuracy. Appellant correctly asserts that, absent authentication and/or certification, the Commonwealth was required to follow Code

§ 8.01-392 or Code § 8.01-394 to replace the lost conviction

order. Both cited code sections offer methods for replacing a

lost original. However, if the Commonwealth was able to

sufficiently authenticate the exhibit, it did not need to rely

on Code §§ 8.01-392 or 8.01-394.

Our review of the record reveals that the record does not

contain sufficient evidence authenticating Commonwealth's

exhibit 1. Neither Separis nor Davis testified that they were

custodians of the records or that they were personally familiar

with the original order.[7] Likewise, the Commonwealth offered no

evidence that Hawkins was the custodian of the records or other

evidence through Hawkins establishing the exhibit's

authenticity.

### 3. Harmless Error

Although the trial court erred in admitting the

unauthenticated document, we find such error harmless.

When improper evidence is offered to establish a fact

overwhelmingly established by other competent evidence, the

improper admission of that evidence constitutes harmless error.

See Hall v. Commonwealth, 12 Va. App. 198, 216, 403 S.E.2d 362,

---

[7]Although Separis identified Commonwealth's exhibit 1 as
"the original sentencing order from case CR 93-321," the
Commonwealth elicited no information establishing the basis of
her knowledge, her prior awareness that appellant was convicted
in that case, or her firsthand knowledge that the exhibit was
accurate.

373 (1991); <u>Williams v. Commonwealth</u>, 4 Va. App. 53, 74, 354

S.E.2d 79, 91 (1987).  The harmless error doctrine "enables an

appellate court . . . to ignore the effect of an erroneous

ruling when an error clearly has had no impact upon the verdict

or sentence in a case." <u>Hackney v. Commonwealth</u>, 28 Va. App.

288, 296, 504 S.E.2d 385, 389 (1998) (citation omitted).  An

error is harmless when a "'reviewing court, can conclude,

without usurping the jury's fact finding function, that, had the

error not occurred, the verdict would have been the same.'"

<u>Davies v. Commonwealth</u>, 15 Va. App. 350, 353, 423 S.E.2d 839,

840 (1992) (quoting <u>Lavinder v. Commonwealth</u>, 12 Va. App. 1003,

1005, 407 S.E.2d 910, 911 (1991) (<u>en</u> <u>banc</u>)).

      In prosecuting appellant for forging and uttering a public

record, the Commonwealth was required to prove that appellant

forged a public record, namely, the photocopy of the March 23,

1993 order for Case No. 93-321, and attempted to employ as true

that forged order.  <u>See</u> Code § 18.2-168.  Under the common law,

forgery "is defined as 'the false making or materially

altering'" of a document.  <u>Fitzgerald v. Commonwealth</u>, 227 Va.

171, 173-74, 313 S.E.2d 394, 395 (1984) (quoting <u>Bullock v.

Commonwealth</u>, 205 Va. 558, 561, 138 S.E.2d 261, 263 (1964)).  To

convict appellant, the Commonwealth merely had to prove that the

original order for Case No. 93-321 reflected appellant's

conviction and that appellant altered the photocopied order in

Case No. 93-321 to reflect that the charge was nolle prosequied.
Thus, the precise contents of the original order were not at
issue; all the Commonwealth had to prove was an original
conviction in Case No. 93-321.  This fact could be established
by circumstantial evidence.

"'Circumstantial evidence is as competent and is entitled
to as much weight as direct evidence, provided it is
sufficiently convincing to exclude every reasonable hypothesis
except that of guilt.'"  Patrick v. Commonwealth, 27 Va. App.
655, 662, 500 S.E.2d 839, 843 (1998) (quoting Coleman v.
Commonwealth, 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983)).  When
relying on circumstantial evidence, the Commonwealth need only
exclude hypotheses of innocence that flow from the evidence, not
those that flow from the imagination of defense counsel.  See
id.

The record contains a copy of the March 23, 1993 transcript
from appellant's trial in Case No. 93-321.  At that proceeding,
appellant entered an Alford plea after which the trial judge
found appellant "guilty in 93-321 of the lesser included offense
of unlawful entry in an indictment originally charging him with
statutory burglary."

The record also contains a copy of the June 16, 1995
transcript from appellant's show cause hearing in Case Numbers
93-321 and 93-322.  The trial judge explained on the record that

the hearing was initiated by Probation Officer Hawkins' March 9, 1995 letter informing him that appellant had failed to pay the court-ordered restitution.    Hawkins identified Commonwealth's exhibit 4 as a copy of the letter sent to the trial judge.    At the top of the letter, Hawkins referenced Case Numbers 93-321 and 93-322.    At the hearing, appellant admitted he had not completed the special term of his probation.

Moreover, on February 8, 1994, appellant filed a "Motion to Lessen Sentence" in the trial court.    He referenced his motion with Case Numbers CR93-321 and CR93-322.    In that motion, appellant wrote the following:

> On or about March 23rd, 1993, Defendant was
> sentenced a [sic] two (2) year probation,
> and with an order of restitution to be paid.

Finally, Assistant Commonwealth's Attorney Norman testified that, at the June 16, 1995 expungement proceeding, she told appellant that Case Number 93-321 had not been nolle prosequied. At that time, she told appellant that "it is [presently] across the hall on the court's docket for a revocation hearing."

The record contains substantial circumstantial evidence establishing that the missing order in Case Number 93-321 was an order of conviction, not an order of nolle prosequi.    Because sufficient evidence established that the original order was a conviction order, the Commonwealth did not need to have the original order admitted or recreated to prevail.    Accordingly,

- 17 -

the admission of the unauthenticated copy of Commonwealth's
exhibit 1 was harmless error.

II.

THE FEBRUARY 6, 1997 ORDER

A.  Background

On April 29, 1996, at the conclusion of the evidence, the
jury found appellant guilty of forgery and uttering and fixed
punishment at two years for each offense.  The trial judge
sentenced appellant at that time to "two years in the
penitentiary" for each conviction and ruled that "[t]hese two
sentences will run consecutive to each other."  The final order
was entered on June 14, 1996 and was silent as to how the
sentences were to run.

On September 4, 1996, appellant filed a "Motion to Modify
Sentence."  In his motion, appellant stated that he "has not
been transferred to the Department of Corrections as of the date
of this motion, and pursuant to section 19.2-303, Code of
Virginia, this Court maintains jurisdiction over the judgments
in the above cases to modify the terms of the sentencing
orders."

In a letter to Circuit Court Judge Newman dated December
19, 1996, and entered in appellant's circuit court file on
December 20, 1996, appellant wrote the following:

I have been transferred to the Department of
Corrections on September 11, 1996, and the

- 18 -

ability to correspond with the Court has
been impaired.

(Emphasis added.)

On September 19, 1996, the trial judge entered an order

stating that the two sentences imposed for forgery and uttering

"are hereby directed to run concurrent."

On February 6, 1997, the trial judge entered an order

vacating and setting aside the September 19, 1996 order.  The

trial judge explained that the "order of September 19, 1996 was

entered in error."

B.   Discussion and Analysis

Code § 19.2-303 provides, in pertinent part:

> If a person has been sentenced for a felony
> to the Department of Corrections but has not
> actually been transferred to a receiving
> unit of the Department, the court which
> heard the case, if it appears compatible
> with the public interest and there are
> circumstances in mitigation of the offense,
> <u>may, at any time before the person is
> transferred to the Department, suspend or
> otherwise modify the unserved portion of
> such a sentence</u>.

(Emphasis added.)

"By its explicit terms, [Code § 19.2-303] permits a trial

judge to retain jurisdiction to suspend or modify a sentence

beyond the twenty-one day limit of Rule 1:1 <u>only if the person

sentenced for a felony has not been transferred to the

Department of Corrections</u>." <u>D'Alessandro v. Commonwealth</u>, 15

Va. App. 163, 168, 423 S.E.2d 199, 202 (1992) (emphasis added).

- 19 -

"[T]he burden of proving appellate jurisdiction rests upon the appellant." Id.

The record contains no documents or transcripts showing that a hearing was conducted on either motion prior to entry of the orders.  "It is basic that an appellant has the primary responsibility of ensuring that a complete record is furnished to an appellate court so that the errors assigned may be decided properly." Ferguson v. Commonwealth, 10 Va. App. 189, 194, 390 S.E.2d 782, 785, aff'd in part, rev'd in part, 240 Va. ix, 396 S.E.2d 675 (1990).

Not only did appellant fail to establish that the trial court had jurisdiction over his case on September 19, 1996, when it entered the order, the record shows that appellant was transferred to the Department of Corrections on September 11, 1996, eight days before entry of the first order.  In the absence of proof that appellant had not been transferred to the custody of the Department of Corrections, and in light of proof to the contrary, appellant failed to prove on this record that the trial judge had authority to act on September 19, 1996.  See D'Alessandro, 15 Va. App. at 168, 423 S.E.2d at 202.  Because the trial court lacked jurisdiction to enter the September 19, 1996 order, that order was void.  Accordingly, the February 6, 1997 order vacating the void order was also void.

- 20 -

For the reasons stated, appellant's convictions are affirmed.

<u>Affirmed.</u>

# EXHIBIT B

325 F.3d 205
United States Court of Appeals,
Fourth Circuit.

UNITED STATES of America,
Plaintiff–Appellee,
v.
Joseph JOHNSON, Jr.,
Defendant–Appellant.
No. 02–4425.

|

Argued: Feb. 27, 2003.

|

Decided: April 9, 2003.

Synopsis
Defendant was convicted, following bench trial, in the United States District Court for the Eastern District of Virginia, Robert E. Payne, J., of making false declarations before a court, in connection with petition for habeas corpus and response to motion for more definite statement. Defendant appealed. The Court of Appeals, Wilkinson, Circuit Judge, held that: (1) statute criminalizing the making of false material declarations in any proceeding before or ancillary to any court of the United States was not limited to only live testimony; (2) filing of federal habeas petition constituted a "proceeding before a court," within meaning of statute; and (3) superseding indictment was not based on prosecutorial vindictiveness.

Affirmed.

Attorneys and Law Firms

*206 ARGUED: Frances Hemsley Pratt, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant. Michael Cornell Wallace, Assistant United States Attorney, Richmond, Virginia, for Appellee. ON BRIEF: Frank W. Dunham, Jr., Federal Public Defender, Michael S. Nachmanoff, Assistant Federal Public Defender, Alexandria, Virginia, for Appellant. Paul J. McNulty, United States Attorney, Richmond, Virginia, for Appellee.
Before WIDENER, WILKINSON, and NIEMEYER, Circuit Judges.

Affirmed by published opinion. Judge WILKINSON wrote the opinion, in which Judge WIDENER and Judge NIEMEYER joined.

OPINION

WILKINSON, Circuit Judge.

Joseph Johnson, Jr. was convicted in a bench trial on two counts of violating 18 U.S.C. § 1623, which criminalizes the making of false declarations before a court. Johnson filed two documents with the district court that contained false material declarations: a petition for habeas corpus under 28 U.S.C. § 2254 and a court ordered response to the state's Fed.R.Civ.P. 12(e) motion for a more definite statement. *207 We hold that both of the submissions constitute "proceedings before ... any court" under 18 U.S.C. § 1623 and affirm the judgment.

I.

On April 21, 1993, Joseph Johnson, Jr. pled guilty to unlawful entry in the Circuit Court for Arlington, Virginia. He received a suspended sentence and was placed on probation. In April 1996, Johnson violated the terms of his probation. His previously suspended sentence was revoked, and Johnson failed to file a timely appeal.

Johnson filed his first federal habeas petition challenging his 1993 conviction in September 1998 in the district court of Virginia. However, on April 24, 1996, Congress passed the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which amended 28 U.S.C. § 2244 to establish a one year period of limitations for the filing of a petition for writ of habeas corpus by a person in custody pursuant to the judgment of a state court. 28 U.S.C. § 2244(d)

(2003). Because Johnson's state court conviction was final prior to the enactment of AEDPA, Johnson had one full year after the enactment of AEDPA, that is until April 24, 1997, to file a federal habeas petition. *See id.; Brown v. Angelone,* 150 F.3d 370, 375 (4th Cir.1998). The district court therefore denied and dismissed his September 1998 petition as barred by the statute of limitations.

Johnson then filed a second habeas petition challenging his 1993 conviction. Although the petition was not filed until March 28, 2000, it was dated March 7, 1997, and notarized by Latisha Jackson, Prince George's County, Maryland, on March 24, 1997. In the petition, Johnson was required to answer a question asking whether, "[o]ther than a direct appeal from the judgment of conviction and sentence, [has the petitioner] previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?" Johnson answered "no."

Under 28 U.S.C. § 2244, a petitioner cannot file a second or successive habeas application without first obtaining an order from the appropriate court of appeals authorizing him to do so. 28 U.S.C. § 2244(b)(3)(A) (2003). Because Johnson had not obtained such an order, the government moved to dismiss the petition as successive. Johnson responded that the March 2000 petition was not successive because it was actually delivered to prison authorities "as early as March, 1997" and was thus technically filed before the September 1998 petition.

The state then filed a motion requesting a more definite statement. *See* Fed.R.Civ.P. 12(e).

Specifically, the state requested that Johnson set forth more precise details regarding when the March 2000 petition was delivered to prison authorities, the facility where Johnson was confined when he delivered the petition, and the name of the official to whom the petition was delivered. The court granted the state's motion.

Johnson submitted, under penalty of perjury, a more definite statement to the court. In it, Johnson declared that he delivered the March 2000 petition for writ of habeas corpus to prison authorities at the Prince George's County Detention Center, Upper Marlboro, Maryland, in March 1997, but that the petition was somehow misplaced. Johnson said he then refiled a copy of the March 1997 petition in March 2000.

The district court rejected Johnson's argument and denied the petition as successive under 28 U.S.C. § 2244(b)(3)(A). In doing so, the court pointed out that after Jackson notarized Johnson's March 2000 petition, Johnson had apparently altered *208 the date and location where the petition was filed. Johnson thereafter made sworn misrepresentations as to when and where he submitted the March 2000 petition. Due to such misconduct, the court referred the matter to the United States Attorney for appropriate action.

On December 18, 2001, the United States indicted Johnson on two counts of making a false declaration in violation of 18 U.S.C. § 1623.[1] Johnson filed a motion to dismiss the indictment, arguing that it constituted vindictive prosecution. The court dismissed Johnson's motion as without merit.

1    The government initially indicted Johnson for mail fraud under 18 U.S.C. § 1341. After realizing that Johnson's conduct did not violate the mail fraud statute, the government issued a superseding indictment charging him with violation of 18 U.S.C. § 1623.

During the bench trial, the government introduced evidence indicating that in March 1997, when Johnson alleges the March 2000 petition was notarized by Latisha Jackson, Jackson was not yet a notary. The government also introduced evidence that Jackson had never been a notary in the state of Maryland, where the petition was allegedly notarized. Upon hearing this evidence, the court examined the original March 2000 petition and made specific findings that the notarial certification had been altered as to both the date and location.

Despite these findings, Johnson argued that he should not be convicted under § 1623 because the filing of the habeas petition and the response to the government's 12(e) motion did not constitute "proceeding[s] before or ancillary to any court or grand jury of the United States." The court rejected Johnson's argument and convicted him of both counts, reasoning that there can be nothing "more in a proceeding or ancillary to a proceeding than a document that actually initiates the proceeding ...." Johnson appeals.

II.

Section 1623 criminalizes the making of false declarations before a grand jury or court. Under § 1623,

Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both.

Johnson argues that the false declarations here do not fall under § 1623 because they were not made in "any proceeding before or ancillary to any court or grand jury of the United States."

"In analyzing a statute, we begin by examining the text." *Carter v. United States,* 530 U.S. 255, 271, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000). In doing so, we must assume that Congress used the words in the statute as they are ordinarily understood. If the language is unambiguous, we need look no further. *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 240–41, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). However the Supreme Court has recognized that statutory construction "is a holistic endeavor." *United Savings Assoc. of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). We thus employ the traditional tools of statutory interpretation, examining language in the context *209 of the statute as a whole, *United States Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.,* 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993); the overall statutory scheme, *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 220–21, 106 S.Ct. 2485, 91

L.Ed.2d 174 (1986); and other relevant enactments, *United States v. Stewart,* 311 U.S. 60, 64, 61 S.Ct. 102, 85 L.Ed. 40 (1940).

Johnson admits that the term "in a proceeding before" "normally would encompass the initiation of litigation." "Proceeding" is defined as "[t]he regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment." Black's Law Dictionary 1221 (7th ed.1999). Despite this clear and well accepted understanding of the term, Johnson interprets the statute to reach only "those proceedings actually conducted in front of a court ...."

Johnson's interpretation of the statute, however, defies not only a plain understanding of the language at issue, but would render much of the statute meaningless. It is a well settled canon of statutory construction that "a statute should be interpreted so as not to render one part inoperative." *Colautti v. Franklin,* 439 U.S. 379, 392, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979). And limiting the reach of "proceeding before ... any court" to live testimony would do just that. Section 1623 covers not only false oral declarations but also false representations made "in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28."[2] We cannot interpret the statute to cover only live testimony before a court or grand jury when the statute explicitly contemplates the submission of written documents to a court or grand jury.

2  Section 1746 provides that when "any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same ... such matter may, with like force and effect, be supported ... by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated ...." 28 U.S.C. § 1746 (2003).

We also cannot accept the view that the filing of a petition with a court, which commences the action and triggers the formalities of judicial process, does not constitute a "proceeding before" a court. The Federal Rules of Civil Procedure state that a "civil action is commenced by filing a complaint with the court," Fed.R.Civ.P. 3, and proceed to define the style of the complaint. *See* Fed.R.Civ.P. 8. Similarly, the Federal Rules of Criminal Procedure are invoked by the submission of a written complaint "before a magistrate judge." Fed.R.Crim.P. 3. And the filing of a § 2254 petition triggers both federal habeas corpus rules and the Federal Rules of Civil Procedure. *See* Rules Governing Section 2254 Cases in the United States District Courts, 1, 11. Indeed, we cannot conceive how a filing that implicates so many rules of procedure cannot be considered part of a proceeding before a court.

A reading of the statute in the context of related enactments reinforces our interpretation. Johnson cites to 28 U.S.C. § 1826 and 18 U.S.C. § 6002, which contain similar statutory

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

language, to support his narrow reading of "proceeding before ... any court." Section 1826 permits a court to order confinement of a witness whenever a "witness in any proceeding before or ancillary to any court or grand jury ... refuses ... to comply with an order of the court to testify or provide other information ...." *210 28 U.S.C. § 1826 (2003). Section 6002 is a general immunity provision that applies "[w]henever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to a court or grand jury of the United States ...." 18 U.S.C. § 6002 (2003). Both of these provisions appear to contemplate live oral testimony before a court or grand jury, or in a deposition. See Dunn v. United States, 442 U.S. 100, 111, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979). In both §§ 1826 and 6002, Congress used the terms "witness" and "testimony." When read together, those terms imply oral testimony. But those terms are noticeably absent from § 1623. Indeed, through the explicit inclusion in § 1623 of material misrepresentations made in declarations, certificates, verifications, and statements, Congress made clear that it also intended to cover written declarations.

Finally, Johnson argues that if a false material declaration is not made in the presence of a court it must at least be made in a proceeding that is as formal as a deposition. Because Johnson wrote the false statements while he was in prison, Johnson argues that they were not drafted in sufficiently formal conditions to warrant prosecution under § 1623. See Dunn, 442 U.S. 100, 99 S.Ct. 2190, 60 L.Ed.2d 743.

In Dunn, the Court considered whether § 1623 reached an oral statement given under oath in an attorney's office. A transcript of the statement was later submitted to the court as an attachment to a motion to dismiss. Id. at 103, 99 S.Ct. 2190. Johnson's case, however, not only has different facts from Dunn; it does not even involve the same portion of the statute. The Court made clear that its decision in Dunn turned solely on "the scope of the term ancillary proceeding in § 1623 ...." Id. at 102, 99 S.Ct. 2190. Johnson's case does not implicate the "ancillary proceeding" portion of the statute because Johnson made false material statements directly in a proceeding before the court.

Moreover, Johnson filed his declarations with the court. This is in contrast to the attorney's office statement in Dunn, which may or may not have been used in a judicial proceeding. In Dunn, the Court was troubled by the prospect that "any statements made under oath for submission to a court, whether given in an attorney's office or in a local bar and grill, fall within the ambit of § 1623." Id. at 107, 99 S.Ct. 2190. It made clear that its interpretation of the term "proceeding" carried a "somewhat more formal connotation." Id. It is beyond question that the filing of a habeas petition with a court, or the filing of a court ordered response to a motion, satisfy the formality requirements underscored by the Court in Dunn. Both submissions constitute "proceedings before ... any court" under § 1623.

III.

Next, Johnson argues that his conviction must be vacated because the superseding indictment charging him with violating § 1623 constituted vindictive prosecution. A criminal defendant faces a substantial burden in bringing a

vindictive prosecution claim. A "presumption of regularity" attends decisions to prosecute. _United States v. Armstrong,_ 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). To establish prosecutorial vindictiveness, a defendant must show through objective evidence that "(1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus." _United States v. Wilson,_ 262 F.3d 305, 314 (4th Cir.2001).

Johnson fails to meet either standard here. After Johnson filed a motion to *211 dismiss the mail fraud indictment, _see_ 18 U.S.C. § 1341, the government acknowledged that the mail fraud statute did not apply. The government's filing of more appropriate charges under § 1623 on the same set of operative facts does not constitute evidence of vindictive prosecution. There is no evidence that the government filed the superseding indictment for any reason other than to bring proper charges. We therefore affirm the district court's dismissal of this claim.

IV.

For the foregoing reasons, the judgment of the district court is

_AFFIRMED._

All Citations

325 F.3d 205

# EXHIBIT C

2022 WL 1592445
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

UNITED STATES of America
v.
Joseph R. JOHNSON, Jr.
CRIMINAL ACTION NO. 19-367

|

Filed 05/19/2022

Attorneys and Law Firms

Linwood C. Wright, Jr., Assistant US Attorney, United States Attorney's Office, Philadelphia, PA, for United States of America.

MEMORANDUM

Bartle, District Judge

*1 Joseph R. Johnson, Jr. has filed a motion for a certificate of innocence pursuant to the Unjust Conviction and Imprisonment Act, 28 U.S.C. § 2513. Our Court of Appeals reversed his convictions for making a false statement to the court in violation of 18 U.S.C. § 1001 and for aggravated identity theft under 18 U.S.C. § 1028A. It directed entry of judgment of acquittal. The basis for the Court of Appeals' decision was the failure of the Government to prove the materiality element for the false statement offense. United States v. Johnson, 19 F.4th 248 (3d Cir. 2021).

I

The evidence presented at trial, taken in the light most favorable to the Government, established the following facts.

On or about October 26, 2015, a Philadelphia based attorney named Dolores M. Troiani filed a complaint for defamation in the United States District Court for the Eastern District of Pennsylvania on behalf of Andrea Constand against the former Montgomery County District Attorney, Bruce Castor. See Constand v. Castor, Civil Action No. 15-5799 (E.D. Pa. Oct. 26, 2015). The case was assigned to the Honorable Eduardo C. Robreno.

On January 3, 2016, Troiani received three emails with various attachments from the email address of devoutplayerhater@yahoo.com. These emails threatened the release of certain personal information of Constand, who had previously accused former actor and comedian Bill Cosby of sexual assault. Evidence presented at trial also established that an individual employing the username "Devout Player Hater" generated several internet postings voicing support for Bill Cosby and questioning the motives of Cosby's accusers.

On February 1, 2016, an unknown individual hand-delivered to the Clerk's Office in the Eastern District of Pennsylvania an envelope containing a document that read "PRAECIPE

TO ATTACH EXHIBIT "A" TO PLAINTIFF'S COMPLAINT." The praecipe appeared to be signed by Troiani. The attachments to the praecipe mirrored the attachments to the series of January 3, 2016 emails to Troiani that were generated from the devoutplayhater@yahoo.com account. Troiani testified at trial that she had neither submitted nor authorized the filing of the document in question and had not signed it. She immediately informed Judge Robreno of the fraudulent document, and he struck it from the record as a fraud.

Yahoo provided subscriber records for the "devoutplayerhater" email, which included an Internet Protocol ("IP") address used to establish the account. Evidence was also presented of records from Verizon, the Internet Service Provider ("ISP") for the IP address. Verizon identified devoutplayerhater's subscriber username as "jjohnson531@dslextreme.com." Verizon revealed that during the relevant time frame, the subscriber account had been maintained by a third-party ISP, IKANO d/b/a DSL Extreme.

DSL Extreme provided records associated with its registered customer "jjohnson531," who was identified as Joe Johnson, with an alternate email address jjohnson531@gmail.com and a residential address of 2600 Brinkley Road, Fort Washington, Maryland. Maryland Department of Motor Vehicles ("DMV") records identify Joe Johnson of 2600 Brinkley Road, # 611, Fort Washington, Maryland, with a date of birth of May 31, 1970. The photograph on the DMV records for Joe Johnson depicts defendant Johnson.

*2 The Government also presented records from the United States Courts' electronic document filing system, Public Access to Court Electronic Records ("PACER") for a registered user named Joseph Johnson, Jr. with a username of "jjohnson531." Johnson admitted to FBI special agent Kurt Kuechler prior to his arrest that he had a PACER account. The "jjohnson531" account had accessed the Constand docket at issue before and after the praecipe was filed. The "devoutplayerhater" email account was deleted shortly after "jjohnson531" accessed Judge Robreno's February 2, 2016 order striking the praecipe as fraudulent.

The Government also identified another IP address used by the "jjohnson531" PACER account to access the Constand docket as belonging to Alion Science and Technology, where defendant Johnson was employed. Alion confirmed that the IP address was registered to it and connected Johnson's employee profile at Alion with the PACER access. Alion also provided Johnson's internet history, which showed that Johnson had searched for the words "Cosby" and "Constand" over 10,000 times.

The original envelope including its contents, which was received by the Clerk's Office, was sent to the Federal Bureau of Investigation ("FBI") for fingerprint analysis. The FBI's analysis revealed the presence of at least six fingerprints belonging to "Joseph Johnson Jr."

on the envelope and on the adhesive side of the tape used to affix the address label to the envelope.

On June 28, 2019 Johnson was arrested by the FBI. During processing, Johnson was fingerprinted and provided his May 31, 1970 birthdate. Johnson's fingerprints matched the fingerprints recovered from the envelope and adhesive tape recovered in this investigation.

Johnson was indicted under 18 U.S.C. § 1001 for making a false statement to the United States District Court for the Eastern District of Pennsylvania and under 18 U.S.C. § 1028A for using the identity belonging to another person in connection with making the false statement. The Court of Appeals characterized the evidence before the Grand Jury as "piled high in hand." Johnson, 19 F.4th at 254.

Johnson was found guilty by a jury and sentenced to thirty-two months in prison. Thereafter, as noted above, the Court of Appeals reversed his conviction and directed the entry of a judgment of acquittal. As a result, he was released from prison. The Court of Appeals determined that the Government had not proven the element of materiality of the false statement as required under 18 U.S.C. § 1001. The conviction under § 1028A for aggravated identity theft fell as the result of the failure of proof under § 1001. The issue of lack of proof of materiality was first raised on appeal. The Court of Appeals held that waiver was not applicable since plain error had occurred. Id. at 263.

## II

Under 28 U.S.C. § 1495, a person "unjustly convicted of an offense against the United States and imprisoned" may file a claim for damages in the Court of Federal Claims. Nonetheless, said person must first obtain a certificate of innocence. To do so, that person must prove under 28 U.S.C. § 2513 that: (1) "[h]is conviction has been reversed or set aside on the ground that he is not guilty of the offense of which he was convicted"; (2) "[h]e did not commit any of the acts charged or his acts ... in connection with such charge constituted no offense against the United States"; and (3) "he did not by misconduct or neglect cause or bring about his own prosecution."[1]

1    The statute contains other provisions which are not relevant here.

The Government, in opposing Johnson's motion for a certificate of innocence, argues that Johnson cannot establish that his own misconduct did not cause or did not bring about his own prosecution.

*3 The persuasive case law provides that the misconduct to which the statute refers includes and is not separate from the conduct charged. Thus if the underlying conduct of the defendant, although ultimately insufficient to convict, caused or brought about his prosecution, he is not entitled to a certificate of innocence. United

States v. Graham, 608 F.3d 164, 175 (4th Cir. 2010); United States v. Valle, 467 F. Supp. 3d 194, 204-05 (S.D.N.Y. 2020). Contra Betts v. United States, 10 F.3d 1278 (7th Cir. 1993).

Slip Copy, 2022 WL 1592445

There is no doubt that the Government proved that Johnson committed all the elements necessary for conviction under 28 U.S.C. § 1001 except for materiality. It was clearly his misconduct in the filing of a false document on the docket of this court which caused or brought about his prosecution. The reversal of his conviction does not alter this fact. As the Court of Appeals aptly stated in the conclusion of its opinion:

> Johnson's conduct was not just a waste of public time and resources. It disrupted the administration of justice, interfered with the orderly work of the federal courts, and flouted the respect due to judges and attorneys sworn to uphold the law. Much more than a warning about our internet-addicted culture, Johnson's actions are a reminder that respect for the rules that support the law is inseparable from the rule of law itself.

Johnson, F.4th at 263.

Johnson has come forward with no proof that his misconduct did not cause or bring about his prosecution. As a result, it is not necessary to be concerned about the other requirements of § 2513. The motion of Joseph J. Johnson, Jr. for certificate of innocence will be denied.

All Citations

# EXHIBIT D

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee.

v.

No. 96-4868

JOSEPH JOHNSON, JR., a/k/a Joseph R.
Johnson, a/k/a Joe Johnson,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, District Judge.
(CR-96-180-A)

Submitted: April 30, 1998

Decided: June 24, 1998

Before HAMILTON, LUTTIG, and MICHAEL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

James K. Bredar, Federal Public Defender, Beth M. Farber, Chief
Assistant Federal Public Defender, Baltimore, Maryland, for Appel-
lant. Thomas Gerard Connolly, OFFICE OF THE UNITED STATES
ATTORNEY, Alexandria, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

Joseph Johnson, Jr., pled guilty to providing false statements to a financial institution in violation of 18 U.S.C. § 1014 (1994). Johnson received a sentence of twenty-one months' imprisonment and three years of supervised release. He appeals his conviction and sentence. Johnson's attorneys have filed a brief in accordance with Anders v. California, 386 U.S. 738 (1967), raising four issues but stating that in their view there are no meritorious issues for appeal.* The issues raised by Johnson's counsel are without merit. After a review of the record, we affirm the judgment.

Johnson first alleges that the Interstate Agreement on Detainers Act (IAD) was violated when he was returned to state custody after he had been placed in federal custody in connection with the federal charges pending in this case. At the time that the federal charges in this case were instituted, Johnson was serving a state sentence. The Government issued a writ to bring him into federal custody for arraignment. The Government then filed a motion to remand Johnson into temporary federal custody while this case was pending under the Interstate Agreement on Detainers Act, 18 U.S.C. app. 2 (1994). The district court granted the motion. Johnson then filed a motion for a transportation order requesting that he be returned to the state system so that he could continue to earn good time credits while awaiting trial. The court granted the motion.

By filing the motion for a transportation order requesting that he be returned to the state system, Johnson waived any rights or protec-

---

*Johnson has been informed of his right to file a pro se supplemental brief, but failed to file a timely brief after being granted two extensions by the court. The court denied a third extension. We deny Johnson's motion for leave to file his untimely pro se supplemental brief.

2

tions that he may have had under the IAD. A prisoner waives his
rights when he requests treatment in a manner inconsistent with the
provisions of Article IV(c) or (e) of the IAD. See United States v.
Odom, 674 F.2d 228, 230 (4th Cir. 1982); Webb v. Keohane, 804 F.2d
413, 414-15 (7th Cir. 1986) (noting that all circuits that have reached
the issue have held that rights under the IAD are waived by a prison-
er's request to be returned to his original place of imprisonment). In
addition, other circuits have held that a defendant who pleads guilty
also waives any claim he would have had under the IAD. See Baxter
v. United States, 966 F.2d 387, 389 (8th Cir. 1992); Kowalak v.
United States, 645 F.2d 534, 537 (6th Cir. 1981).

Johnson next alleges that the district court erred in refusing to
allow him to withdraw his guilty plea. During the sentencing proceed-
ing, Johnson made an oral pro se motion to withdraw his guilty plea.
In support of his motion, Johnson asserted that: (1) the Government
threatened to enhance his sentence if he insisted upon a jury trial, (2)
he feared the consequence of not pleading guilty because he was
already serving a five-year sentence, (3) his attorney told him that he
would receive a two-point enhancement for perjury if he went to trial,
(4) but for his counsel's errors, he would have insisted upon a jury
trial, (5) if he knew that the court would consider during sentencing
an offense he committed during the pendency of the federal charges
he would not have pled guilty, and (6) he was not guilty of the offense
in count one. The court denied the motion and found that all John-
son's claims were "palpably false," and that during the Fed. R. Crim.
P. 11 hearing, Johnson answered questions regarding coercion and did
not raise these issues.

Rule 32(d) of the Federal Rules of Criminal Procedure governs a
motion to withdraw a guilty plea. Johnson bears the burden to show
a fair and just reason for the withdrawal. See United States v. Moore,
931 F.2d 245, 248 (4th Cir. 1991). Factors relevant to establishing a
fair and just reason include:

> (1) whether the defendant has offered credible evidence that
> his plea was not knowing or not voluntary, (2) whether the
> defendant has credibly asserted his legal innocence, (3)
> whether there has been a delay between the entering of the
> plea and the filing of the motion, (4) whether defendant has

3

had close assistance of competent counsel, (5) whether with-
drawal will cause prejudice to the government, and (6)
whether it will inconvenience the court and waste judicial
resources.

Id. This court reviews the denial of a motion to withdraw a guilty plea
for abuse of discretion. See United States v. Lambert, 994 F.2d 1088,
1093 (4th Cir. 1993). The district court's factual findings in support
of its decision to deny the motion will be overturned only if they are
clearly erroneous. See United States v. Suter , 755 F.2d 523, 525 (7th
Cir. 1985).

Johnson did not offer any evidence of threats, fear, coercion, his
counsel's errors, or his innocence. Further, Johnson should have
known about these issues at the time of the Rule 11 colloquy. He did
not assert any of these claims during the hearing and acknowledged
that he was entering into the agreement knowingly and voluntarily.
We therefore find that Johnson did not meet his burden of demon-
strating a fair and just reason for the withdrawal. See Moore, 931 F.2d
at 248.

Third, Johnson alleges that the district court erred in finding that
the fraudulent activity alleged in the dismissed counts of the indict-
ment was relevant conduct for the purposes of the loss determination
in sentencing. Johnson pled guilty to count one in the indictment. The
loss calculation used at sentencing was based upon conduct forming
the charges in counts four and five, which were dismissed after the
court accepted the guilty plea. The court found that Johnson commit-
ted all the acts charged in the indictment, and Johnson did not object
to the findings.

District courts may take "relevant conduct" into account in deter-
mining a defendant's sentence whether or not the defendant has been
convicted of the charges constituting the relevant conduct. See U.S.
Sentencing Guidelines Manual § 1B1.3 (1997); United States v.
Jones, 31 F.3d 1304, 1316 (4th Cir. 1994). Whether the government
has met its burden of proof is a question of fact reviewed for clear
error. See Jones, 31 F.3d at 1316 (citing United States v. Daughtrey,
874 F.2d 213, 217 (4th Cir. 1989)). In assessing relevant conduct, the
sentencing court should consider "`such factors as the nature of the

4

defendant's acts, his role, and the number and frequency of repetitions of those acts, in determining whether they indicate a behavior pattern.'" United States v. Mullins, 971 F.2d 1138, 1144 (4th Cir. 1992) (quoting United States v. Santiago, 906 F.2d 867, 872 (2d Cir. 1990)).

All of the conduct attributed to Johnson for sentencing purposes was committed solely by him and showed a similarity of method and purpose. In addition, Johnson committed the acts within a few months of each other. Johnson pled guilty to attempting to fraudulently obtain a loan from a credit union using a false social security number and statement of annual income. The conduct in count four involved Johnson applying for an automobile loan using a false social security number, date of birth, and the same false earning statement as in count one. Count five involved a similar scheme with similar misrepresentations, but made over the phone. Based upon these factors, we find that the court did not clearly err in finding that counts four and five should be included as relevant conduct.

Finally, Johnson alleges that the district court erred in refusing to decrease his offense level based upon acceptance of responsibility. Johnson pled guilty after the opening statements in his trial. We review the district court's determination regarding acceptance of responsibility for clear error. See United States v. Curtis, 934 F.2d 553, 557 (4th Cir. 1991) (citing United States v. Harris, 882 F.2d 902, 905 (4th Cir. 1989)). The district court judge has great discretion in applying this adjustment. See United States v. White, 875 F.2d 427, 430-31 (4th Cir. 1989). In determining whether the defendant is qualified for the reduction, the district court should consider whether the defendant truthfully admits the conduct comprising the offenses of conviction. See USSG § 3E1.1, comment. (n.1(a)); United States v. Martinez, 901 F.2d 374, 377 (4th Cir. 1990). Timeliness of acceptance is a factor to consider. See United States v. Jones, 31 F.3d 1304, 1315 (4th Cir. 1994). Entering a guilty plea does not automatically entitle a defendant to a reduction for acceptance of responsibility. See Harris, 882 F.2d at 905. In this case, Johnson pled guilty only after his trial began and then attempted to withdraw it during sentencing. Thus, we find that the district court did not clearly err in refusing to grant the reduction.

We deny Johnson's counsel's motion for leave to withdraw. This court requires that counsel inform his or her client, in writing, of the

5

client's right to petition the Supreme Court of the United States for further review. If the client requests that a petition be filed, but counsel believes that such a petition would be frivolous, then counsel may move in this court for leave to withdraw from representation. Counsel's motion must state that a copy thereof was served on the client.

We deny Johnson's motion to expedite as moot. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

<u>AFFIRMED</u>

6

# EXHIBIT E

**From:** **Joseph Johnson** JJohnson531@gmail.com
**Subject:** PlainSite Request 3B42IKT (7667)
**Date:** September 15, 2016 at 9:54 AM
**To:** PlainSite help@plainsite.org

PlainSite Request 3B42IKT (7667)
---------------------------------

First Name: Joseph
Last Name: Johnson
Organization:

Phone: +1 240 605 9921
E-Mail: JJohnson531@gmail.com

URL: http://www.plainsite.org/dockets/index.html?id=7909680

What kind of action would you like us to take?
Suppression

Please provide the details of your request.
Please remove the personal email and phone number that appears on this site for the above referenced docket as it is being used for an improper purpose.
Thanks!

How would you rate PlainSite?
Excellent

Is there anything that we could do to improve?


-------------------------
http://www.plainsite.org

**From:** **PlainSite Help Line** help@plainsite.org
**Subject:** PlainSite Request 3B42IKT Response
**Date:** September 15, 2016 at 2:10 PM
**To:** Joseph Johnson JJohnson531@gmail.com



# PlainSite Request 3B42IKT Response

Thank you for getting in touch with us about your docket on PlainSite. After reviewing the details of your request and the associated docket, we have come to the following decision:

**Your request regarding *Johnson v. Ashmore et al* has been denied.**

Based on our research, the following factors were used to make this determination:

> There is a presumption of public access to court records and you have not identified a compelling privacy interest. "'Historically, courts have recognized a 'general right to inspect and copy public records and documents, including judicial records and documents." *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 & n.7 (1978)). 'This right is justified by the interest of citizens in 'keep[ing] a watchful eye on the workings of public agencies." *Id.* (quoting *Nixon*, 435 U.S. at 598). Access to judicial records, however, is not absolute. *Id.* A party seeking to seal a pleading or a dispositive motion (as well as any attached exhibits) must show that there are 'compelling reasons' to do so and that outweigh the public's interest in disclosure." See also *Doe v. Lee*, Docket No. 23, and *Eng v. Pacermonitor.com et al.*

If you do not agree with our decision, please keep in mind that you still may have several options, including filing a motion, such as a motion to seal, before the court or administrative agency responsible for the records in question. Typically individuals are not required to hire lawyers to file such motions, and examples are available on PlainSite.

You can also consult our Privacy Policy to learn more about why public access to government records is important, and how we make our decisions.

Best regards,

The PlainSite Team

From: **J Johnson** jjohnson531@gmail.com
Subject: RE: PlainSite Request 3B42IKT Response
Date: September 15, 2016 at 2:18 PM
To: PlainSite Help Line help@plainsite.org

Please be advised that if this is not removed from your website, which contains personal identifying information, you will be subject to a civil lawsuit, and will be tied up in litigation for the next year or so litigating this issue.

**From:** PlainSite Help Line [mailto:help@plainsite.org]
**Sent:** Thursday, September 15, 2016 5:10 PM
**To:** Joseph Johnson <JJohnson531@gmail.com>
**Subject:** PlainSite Request 3B42IKT Response



PlainSite Request 3B42IKT Response

Thank you for getting in touch with us about your docket on PlainSite. After reviewing the details of your request and the associated docket, we have come to the following decision:

**Your request regarding _Johnson v. Ashmore et al_ has been denied.**

Based on our research, the following factors were used to make this determination:

- There is a presumption of public access to court records and you have not identified a compelling privacy interest. "'Historically, courts have recognized a 'general right to inspect and copy public records and documents, including judicial records and documents.'' _Kamakana v. City & County of Honolulu_, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting _Nixon v. Warner Communications, Inc._, 435 U.S. 589, 597 & n.7 (1978)). 'This right is justified by the interest of citizens in 'keep[ing] a watchful eye on the workings of public agencies.'' _Id._ (quoting _Nixon_, 435 U.S. at 598). Access to judicial records, however, is not absolute. _Id._ A party seeking to seal a pleading or a dispositive motion (as well as any attached exhibits) must show that there are 'compelling reasons' to do so and that outweigh the public's interest in disclosure." See also _Doe v. Lee_, Docket No. 23, and _Eng v. Pacermonitor.com et al_.

If you do not agree with our decision, please keep in mind that you still may have several options, including filing a motion, such as a motion to seal, before the court or administrative agency responsible for the records in question. Typically individuals are not required to hire lawyers to file such motions, and examples are available on PlainSite.

You can also consult our Privacy Policy to learn more about why public access to

government records is important, and how we make our decisions.

Best regards,

The PlainSite Team

Think Computer Corporation / 20560 Shelburne Road / Shaker Heights, OH 44122-1941
/ http://www.thinkcomputer.com

**From:** **PlainSite Help Line** help@plainsite.org
**Subject:** Re: PlainSite Request 3B42IKT Response
**Date:** September 15, 2016 at 2:21 PM
**To:** J Johnson jjohnson531@gmail.com

Mr. Johnson,

I suggest you read the precedent linked to in the response below before attempting to file suit. We would bring Rule 11 sanctions against you, you'd owe us money, and the case would be dismissed immediately.

If there actually is sensitive information in documents that you'd like to have redacted, let us know (or fix the documents on PACER), but seeing as how we don't even link to any non-paywalled documents in your case yet, I can't see how that could be the case.

Aaron

PlainSite | http://www.plainsite.org

On Sep 15, 2016, at 5:18 PM, J Johnson <jjohnson531@gmail.com> wrote:

Please be advised that if this is not removed from your website, which contains personal identifying information, you will be subject to a civil lawsuit, and will be tied up in litigation for the next year or so litigating this issue.

**From:** PlainSite Help Line [mailto:help@plainsite.org]
**Sent:** Thursday, September 15, 2016 5:10 PM
**To:** Joseph Johnson <JJohnson531@gmail.com>
**Subject:** PlainSite Request 3B42IKT Response



PlainSite Request 3B42IKT Response

Thank you for getting in touch with us about your docket on PlainSite. After reviewing the details of your request and the associated docket, we have come to the following decision:

**Your request regarding _Johnson v. Ashmore et al_ has been denied.**

Based on our research, the following factors were used to make this determination:

- There is a presumption of public access to court records and you have not identified a compelling privacy interest. "'Historically, courts have recognized a 'general right to inspect and copy public records and documents, including judicial records and documents." _Kamakana v. City & County of Honolulu_, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting _Nixon v. Warner Communications, Inc._, 435 U.S. 589, 597 & n.7 (1978)). 'This right is justified by the interest of citizens in 'keep[ing] a watchful eye on the workings of public agencies." _Id._ (quoting _Nixon_, 435 U.S. at 598). Access to judicial records, however, is not absolute. _Id._ A party seeking to seal a pleading or a dispositive motion (as well as any attached exhibits) must show that there are 'compelling reasons' to do so and that outweigh the public's interest in disclosure." See also _Doe v. Lee_, Docket No. 23, and _Eng v. Pacermonitor.com et al._

If you do not agree with our decision, please keep in mind that you still may have several options, including filing a motion, such as a motion to seal, before the court or administrative agency responsible for the records in question. Typically individuals are not required to hire lawyers to file such motions, and examples are available on PlainSite.

You can also consult our Privacy Policy to learn more about why public access to government records is important, and how we make our decisions.

Best regards,

The PlainSite Team

Think Computer Corporation / 20560 Shelburne Road / Shaker Heights, OH 44122-1941 / http://www.thinkcomputer.com

**From:** **J Johnson** jjohnson531@gmail.com
**Subject:** RE: PlainSite Request 3B42IKT Response
**Date:** September 15, 2016 at 2:29 PM
**To:** PlainSite Help Line help@plainsite.org

Aaron,

It would be up to the court to decide whether or not if your business has published personal identifying information in violation of state and Federal law. You or your attorneys may argue the case that you site in defense of the suit if you should fail to take appropriate action to remove the personal identifying information from your site.

**From:** PlainSite Help Line [mailto:help@plainsite.org]
**Sent:** Thursday, September 15, 2016 5:21 PM
**To:** J Johnson <jjohnson531@gmail.com>
**Subject:** Re: PlainSite Request 3B42IKT Response

Mr. Johnson,

I suggest you read the precedent linked to in the response below before attempting to file suit. We would bring Rule 11 sanctions against you, you'd owe us money, and the case would be dismissed immediately.

If there actually is sensitive information in documents that you'd like to have redacted, let us know (or fix the documents on PACER), but seeing as how we don't even link to any non-paywalled documents in your case yet, I can't see how that could be the case.

Aaron

PlainSite | http://www.plainsite.org

On Sep 15, 2016, at 5:18 PM, J Johnson <jjohnson531@gmail.com> wrote:

Please be advised that if this is not removed from your website, which contains personal identifying information, you will be subject to a civil lawsuit, and will be tied up in litigation for the next year or so litigating this issue.

**From:** PlainSite Help Line [mailto:help@plainsite.org]
**Sent:** Thursday, September 15, 2016 5:10 PM
**To:** Joseph Johnson <JJohnson531@gmail.com>
**Subject:** PlainSite Request 3B42IKT Response



PlainSite Request 3B42IKT Response

Thank you for getting in touch with us about your docket on PlainSite. After reviewing the details of your request and the associated docket, we have come to the following decision:

**Your request regarding *Johnson v. Ashmore et al* has been denied.**
Based on our research, the following factors were used to make this determination:

- There is a presumption of public access to court records and you have not identified a compelling privacy interest. "'Historically, courts have recognized a 'general right to inspect and copy public records and documents, including judicial records and documents." *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 & n.7 (1978)). 'This right is justified by the interest of citizens in 'keep[ing] a watchful eye on the workings of public agencies." *Id.* (quoting *Nixon*, 435 U.S. at 598). Access to judicial records, however, is not absolute. *Id.* A party seeking to seal a pleading or a dispositive motion (as well as any attached exhibits) must show that there are 'compelling reasons' to do so and that outweigh the public's interest in disclosure." See also *Doe v. Lee*, Docket No. 23, and *Eng v. Pacermonitor.com et al*.

If you do not agree with our decision, please keep in mind that you still may have several options, including filing a motion, such as a motion to seal, before the court or administrative agency responsible for the records in question. Typically individuals are not required to hire lawyers to file such motions, and examples are available on PlainSite.

You can also consult our Privacy Policy to learn more about why public access to government records is important, and how we make our decisions.

Best regards,
The PlainSite Team

Think Computer Corporation / 20560 Shelburne Road / Shaker Heights, OH 44122-1941 / http://www.thinkcomputer.com

**From:** **PlainSite Help Line** help@plainsite.org
**Subject:** Re: PlainSite Request 3B42IKT Response
**Date:** September 15, 2016 at 2:34 PM
**To:** J Johnson jjohnson531@gmail.com

Mr. Johnson,

You are incorrect. The court would never need to make that determination. Court records are public domain. We have a First Amendment right to publish them. It's that simple.

Aaron

PlainSite I http://www.plainsite.org

**From:** **J Johnson** jjohnson531@gmail.com
**Subject:** RE: PlainSite Request 3B42IKT Response
**Date:** September 15, 2016 at 2:56 PM
**To:** PlainSite Help Line help@plainsite.org

Aaron,

You have no First Amendment right to publish someone's name, social security number, date of birth and other personal identifying information. It is a violation of federal and State law...It is that plain and simple, and if you wish to continue to take the position that you have without retracting the information from your website, the only avenue to resolve this dispute is to litigate it before a court and spend the next year or so litigating this issue.

**From:** PlainSite Help Line [mailto:help@plainsite.org]
**Sent:** Thursday, September 15, 2016 5:34 PM
**To:** J Johnson <jjohnson531@gmail.com>
**Subject:** Re: PlainSite Request 3B42IKT Response

Mr. Johnson,

You are incorrect. The court would never need to make that determination. Court records are public domain. We have a First Amendment right to publish them. It's that simple.

Aaron

PlainSite | http://www.plainsite.org

**From:** **PlainSite Help Line** help@plainsite.org
**Subject:** Re: PlainSite Request 3B42IKT Response
**Date:** September 15, 2016 at 3:00 PM
**To:** J Johnson jjohnson531@gmail.com

Mr. Johnson,

Again, you are incorrect. We have every right to publish your name and contact information because you are the plaintiff in a federal lawsuit. We will redact your SSN if you can point us to it, though it is your responsibility as a litigant to redact court filings. (Note "I understand that, if I file, I must comply with the redaction rules." at https://ecf.txnd.uscourts.gov/cgi-bin/login.pl, which you must check to file at all.)

Regardless, I don't see your SSN or your date of birth anywhere on our site. No laws are being violated.

Aaron

PlainSite I http://www.plainsite.org

From: **J Johnson** jjohnson531@gmail.com
Subject: RE: PlainSite Request 3B42IKT Response
Date: September 15, 2016 at 3:01 PM
To: PlainSite Help Line help@plainsite.org

Aaron,

What is your phone number and address?

**From:** PlainSite Help Line [mailto:help@plainsite.org]
**Sent:** Thursday, September 15, 2016 6:00 PM
**To:** J Johnson <jjohnson531@gmail.com>
**Subject:** Re: PlainSite Request 3B42IKT Response

Mr. Johnson,

Again, you are incorrect. We have every right to publish your name and contact information because you are the plaintiff in a federal lawsuit. We will redact your SSN if you can point us to it, though it is your responsibility as a litigant to redact court filings. (Note "I understand that, if I file, I must comply with the redaction rules." at https://ecf.txnd.uscourts.gov/cgi-bin/login.pl, which you must check to file at all.)

Regardless, I don't see your SSN or your date of birth anywhere on our site. No laws are being violated.

Aaron

PlainSite I http://www.plainsite.org

**From:** **J Johnson** jjohnson531@gmail.com 📎
**Subject:** RE: PlainSite Request 3B42IKT Response
**Date:** September 17, 2016 at 3:09 AM
**To:** PlainSite Help Line help@plainsite.org

Aaron,

Please verify that the below is accurate for service of process:

AARON GREENSPAN
1132 BORANDA AVENUE
MOUNTAIN VIEW CA 94040-3145



Please also confirm that Think Computer Corporation is a privately held Delaware corporation with its principal place of business at 1132 Boranda Avenue, Mountain View, Santa Clara County, CA 94040.

And finally, please confirm the service location as:





**From:** J Johnson [mailto:JJohnson531@gmail.com]
**Sent:** Thursday, September 15, 2016 6:01 PM
**To:** 'PlainSite Help Line' <help@plainsite.org>
**Subject:** RE: PlainSite Request 3B42IKT Response

Aaron,

What is your phone number and address?

**From:** PlainSite Help Line [mailto:help@plainsite.org]
**Sent:** Thursday, September 15, 2016 6:00 PM
**To:** J Johnson <jjohnson531@gmail.com>
**Subject:** Re: PlainSite Request 3B42IKT Response

Mr. Johnson,

Again, you are incorrect. We have every right to publish your name and contact information because you are the plaintiff in a federal lawsuit. We will redact your SSN if you can point us to it, though it is your responsibility as a litigant to redact court filings. (Note "I understand that, if I file, I must comply with the redaction rules." at https://ecf.txnd.uscourts.gov/cgi-bin/login.pl, which you must check to file at all.)

Regardless, I don't see your SSN or your date of birth anywhere on our site. No laws are being violated.

Aaron

PlainSite I http://www.plainsite.org

**From:** **Joseph Johnson** JJohnson531@gmail.com
**Subject:** PlainSite Request 5UMA6Q3 (13557)
**Date:** March 14, 2018 at 7:55 AM
**To:** PlainSite help@plainsite.org

PlainSite Request 5UMA6Q3 (13557)
------------------------------------

First Name: Joseph
Last Name: Johnson
Organization:

Phone: +1 240 605 9921
E-Mail: JJohnson531@gmail.com

Docket URL: http://www.plainsite.org/dockets/index.html?id=7909680

What kind of action would you like us to take?
Suppression

Please provide the details of your request.
The information that you are publishing about the above reference case includes private information such as phone number and email address that has been used multiple times to commit IDENTITY THEFT. It is requested that you take this information down from your website to prevent further misuse of this private information.

How would you rate PlainSite?
Excellent

Is there anything that we could do to improve?

DNS Hostname: nat19.alionscience.com
IP Address: 205.167.170.19

-------------------------
http://www.plainsite.org

**From:** **Joseph Johnson** JJohnson531@gmail.com
**Subject:** PlainSite Request 73S4WXC (16464)
**Date:** February 5, 2019 at 3:55 AM
**To:** PlainSite help@plainsite.org

PlainSite Request 73S4WXC (16464)
-----------------------------------

First Name: Joseph
Last Name: Johnson
Organization:

Phone: +1 240 605 9921
E-Mail: JJohnson531@gmail.com

Docket URL: http://www.plainsite.org/dockets/index.html?id=7909680

What kind of action would you like us to take?
Suppression

Please provide the details of your request.
Your website including the information contained on it about the undersigned, is being used for improper purposes including fraud and spam. It is therefore requested that you suppress any and all information contained in your database pertaining to Johnson v. Ashmore et al, Case No. 3:15-cv-02475 in the Texas Northern District Court.

How would you rate PlainSite?
Excellent

Is there anything that we could do to improve?

DNS Hostname: 172.58.187.5
IP Address: 172.58.187.5

-------------------------
http://www.plainsite.org

Case 8:22-cv-02422-TDC   Document 28-1   Filed 11/02/22   Page 65 of 140

**From:** jjohnson531@gmail.com
**Subject:** NOTICE OF INTENT TO SUE
**Date:** June 1, 2019 at 4:30 PM
**To:** aarong@thinkcomputer.com,  nsg@pop.cwru.edu
**Cc:** domains@thinkcomputer.com,  finance@thinkcomputer.org,  sales@keenepromostore.com,  judith.greenspan@swbell.net,
j.greenspan@keenepromostore.com,  jgreenspan@keeneadvertising.com,  jgreenspan@keenepromotions.com

May 30, 2019


AARON JACOB GREENSPAN
340 S. Lemon Avenue, Apartment 6720
Walnut, CA   91789

And

Neil Sanford Greenspan
Judith Keene Greenspan
20560 Shelburne Rd
Shaker Heights, OH 44122-1941


Dear Mr. Aaron, Neil, and Ms. Judith Greenspan,
The purpose of this email is to advise you that within the next several weeks the undersigned
intends to initiate litigation against Think Computer Corporation and Think Computer Foundation
arising out of a matter within the jurisdiction of the District Court of Maryland for Prince George's
County. Should you wish to discuss a pre-suit resolution of this matter, please contact the
undersigned on or before June 12, 2019.


Sincerely,


Joe Johnson
Post Office Box 441572
Fort Washington, MD   20749

**From:** **PlainSite Help Line** help@plainsite.org
**Subject:** Re: NOTICE OF INTENT TO SUE
**Date:** June 1, 2019 at 8:38 PM
**To:** jjohnson531@gmail.com

Mr. Johnson,

It would be helpful if you could identify the issue you believe you have grounds to sue over.

Thank you,

Aaron

PlainSite l https://www.plainsite.org

On Jun 1, 2019, at 7:30 PM, jjohnson531@gmail.com wrote:

May 30, 2019

AARON JACOB GREENSPAN
340 S. Lemon Avenue, Apartment 6720
Walnut, CA   91789

And

Neil Sanford Greenspan
Judith Keene Greenspan
20560 Shelburne Rd
Shaker Heights, OH 44122-1941

Dear Mr. Aaron, Neil, and Ms. Judith Greenspan,
The purpose of this email is to advise you that within the next several weeks the undersigned intends to initiate litigation against Think Computer Corporation and Think Computer Foundation arising out of a matter within the jurisdiction of the District Court of Maryland for Prince George's County. Should you wish to discuss a pre-suit resolution of this matter, please contact the undersigned on or before June 12, 2019.

Sincerely,

Joe Johnson
Post Office Box 441572
Fort Washington, MD   20749

**From:** **Joe Johnson** jjohnson531@gmail.com
**Subject:** PlainSite Request B400MWD (25747)
**Date:** May 18, 2022 at 4:26 AM
**To:** PlainSite help@plainsite.org

PlainSite Request B400MWD (25747)
-----------------------------------

First Name: Joe
Last Name: Johnson
Organization:

Phone: +1 301 686 0531
E-Mail: JJohnson531@gmail.com

Docket URL: http://www.plainsite.org/dockets/index.html?id=7909680

What kind of action would you like us to take?
Suppression

Please provide the details of your request.
The following URLs that is under the control of the Plainsite and/or Think Computer Corporation contain Personal Identifiable Information ("PII"), including, name, address, telephone number, date of birth, email address and other PII that has been compromised and used for a nefarious purpose over the internet to commit identity fraud, including, attempts to use all of the PII elements to fraudulent establish credit.

Pursuant to the Privacy Act of 1974 It is requested that the following URLs be blocked from further access:

https://www.plainsite.org/dockets/2mtfa6i1c/texas-northern-district-court/johnson-v-ashmore-et-al/

How would you rate PlainSite?
Poor

Is there anything that we could do to improve?

DNS Hostname: 172.58.157.122
IP Address: 172.58.157.122

-------------------------
http://www.plainsite.org

**From:** **Security Operations** jjohnson531@gmail.com
**Subject:** Removal/Blocking of URLs
**Date:** May 18, 2022 at 4:45 AM
**To:** PlainSite Help Line help@plainsite.org

The following URLs that is under the control of the Plainsite and/or Think Computer Corporation contain Personal Identifiable Information ("PII"), including, name, address, telephone number, date of birth, email address and other PII that has been compromised and used for a nefarious purpose over the internet to commit identity fraud, including, attempts to use all of the PII elements to fraudulent establish credit.

Pursuant to the Privacy Act of 1974, it is requested that the following URL be blocked from further access:

https://www.plainsite.org/dockets/2mtfa6i1c/texas-northern-district-court/johnson-v-ashmore-et-al/

**From:** **PlainSite Help Line** help@plainsite.org
**Subject:** PlainSite Request B400MWD Response
**Date:** June 5, 2022 at 8:59 PM
**To:** Joe Johnson JJohnson531@gmail.com



# PlainSite Request B400MWD Response

Thank you for getting in touch with us about your docket on PlainSite. After reviewing the details of your request and the associated docket, we have come to the following decision:

**Your request regarding *Johnson v. Ashmore et al* has been denied.**

Based on our research, the following factors were used to make this determination:

> There is a presumption of public access to court records and you have not identified a compelling privacy interest. "'Historically, courts have recognized a 'general right to inspect and copy public records and documents, including judicial records and documents." *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 & n.7 (1978)). 'This right is justified by the interest of citizens in 'keep[ing] a watchful eye on the workings of public agencies." *Id.* (quoting *Nixon*, 435 U.S. at 598). Access to judicial records, however, is not absolute. *Id.* A party seeking to seal a pleading or a dispositive motion (as well as any attached exhibits) must show that there are 'compelling reasons' to do so and that outweigh the public's interest in disclosure." See also *Doe v. Lee*, Docket No. 23, and *Eng v. Pacermonitor.com et al.*
>
> Your case is popular and has received numerous hits, and is therefore of public interest.
>
> Your case is at, or went to, the appellate stage or higher.

If you do not agree with our decision, please keep in mind that you still may have several options, including filing a motion, such as a motion to seal, before the court or administrative agency responsible for the records in question. Typically individuals are not required to hire lawyers to file such motions, and examples are available on PlainSite.

You can also consult our Privacy Policy to learn more about why public access to government records is important, and how we make our decisions.

Best regards,

The PlainSite Team

**From:** **Joe Johnson** jjohnson531@gmail.com
**Subject:** RE: PlainSite Request B400MWD Response
**Date:** June 6, 2022 at 6:42 AM
**To:** PlainSite Help Line help@plainsite.org

Pursuant to TITLE 1.81.5. California Consumer Privacy Act of 2018, I am requesting to opt-out – meaning, advising you to stop selling my personal information.

The California Consumer Privacy Act is extensive and provides for civil liability for any business that fails to comply.

Specifically, section 1798.100 of the California Consumer Privacy Act provides that:

(a) A consumer shall have the right to request that a business that collects a consumer's personal information disclose to that consumer the categories and specific pieces of personal information the business has collected.

Moreover, section 1798.100 of the California Consumer Privacy Act describes the General Duties of Businesses that Collect Personal Information. Finally, as relevant here, section 1798.105 of the California Consumer Privacy Act states that:

1. A consumer shall have the right to request that a business delete any personal information about the consumer which the business has collected from the consumer.

2. A business that collects personal information about consumers shall disclose, pursuant to Section 1798.130, the consumer's rights to request the deletion of the consumer's personal information.

3. A business that receives a verifiable consumer request from a consumer to delete the consumer's personal information pursuant to subdivision (a) of this section shall delete the consumer's personal information from its records and direct any service providers to delete the consumer's personal information from their records.

Accordingly, it is once again requested that the following URL be blocked from further access as it contains Personal Identifiable Information ("PII"), including, name, address, telephone number, date of birth, email address and other PII that has been compromised and used for a nefarious purpose over the internet to commit identity fraud, including, attempts to use all of the PII elements to fraudulent establish credit:

https://www.plainsite.org/dockets/2mtfa6i1c/texas-northern-district-court/johnson-v-ashmore-et-al/

In addition, pursuant to California law, it is requested that you cease and desist selling any of this personal information.

**From:** PlainSite Help Line <help@plainsite.org>
**Sent:** Sunday, June 5, 2022 11:59 PM
**To:** Joe Johnson <JJohnson531@gmail.com>
**Subject:** PlainSite Request B400MWD Response

**Subject:** PlainSite Request B400MWD Response



PlainSite Request B400MWD Response

Thank you for getting in touch with us about your docket on PlainSite. After reviewing the details of your request and the associated docket, we have come to the following decision:

**Your request regarding _Johnson v. Ashmore et al_ has been denied.**

Based on our research, the following factors were used to make this determination:

- There is a presumption of public access to court records and you have not identified a compelling privacy interest. "'Historically, courts have recognized a 'general right to inspect and copy public records and documents, including judicial records and documents." _Kamakana v. City & County of Honolulu_, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting _Nixon v. Warner Communications, Inc._, 435 U.S. 589, 597 & n.7 (1978)). 'This right is justified by the interest of citizens in 'keep[ing] a watchful eye on the workings of public agencies." _Id_. (quoting _Nixon_, 435 U.S. at 598). Access to judicial records, however, is not absolute. _Id_. A party seeking to seal a pleading or a dispositive motion (as well as any attached exhibits) must show that there are 'compelling reasons' to do so and that outweigh the public's interest in disclosure." See also _Doe v. Lee_, Docket No. 23, and _Eng v. Pacermonitor.com et al_.
- Your case is popular and has received numerous hits, and is therefore of public interest.
- Your case is at, or went to, the appellate stage or higher.

If you do not agree with our decision, please keep in mind that you still may have several options, including filing a motion, such as a motion to seal, before the court or administrative agency responsible for the records in question. Typically individuals are not required to hire lawyers to file such motions, and examples are available on PlainSite.

You can also consult our Privacy Policy to learn more about why public access to government records is important, and how we make our decisions.

Best regards,

The PlainSite Team

Think Computer Corporation / 340 S. Lemon Avenue #6720 / Walnut, CA 91789 / http://www.thinkcomputer.com

**From:** **PlainSite Help Line** help@plainsite.org
**Subject:** Re: PlainSite Request B400MWD Response
**Date:** June 6, 2022 at 6:46 AM
**To:** Joe Johnson jjohnson531@gmail.com

Mr. Johnson,

The CCPA does not apply to us, nor does it apply to court records. We have a First Amendment right to publish and we are not selling your personal information.

Aaron

PlainSite | https://www.plainsite.org

On Jun 6, 2022, at 6:45 AM, Joe Johnson <jjohnson531@gmail.com> wrote:

Pursuant to TITLE 1.81.5. California Consumer Privacy Act of 2018, I am requesting to opt-out – meaning, advising you to stop selling my personal information.

The California Consumer Privacy Act is extensive and provides for civil liability for any business that fails to comply.

Specifically, section 1798.100 of the California Consumer Privacy Act provides that:

(a) A consumer shall have the right to request that a business that collects a consumer's personal information disclose to that consumer the categories and specific pieces of personal information the business has collected.

Moreover, section 1798.100 of the California Consumer Privacy Act describes the General Duties of Businesses that Collect Personal Information. Finally, as relevant here, section 1798.105 of the California Consumer Privacy Act states that:

1. A consumer shall have the right to request that a business delete any personal information about the consumer which the business has collected from the consumer.

2. A business that collects personal information about consumers shall disclose, pursuant to Section 1798.130, the consumer's rights to request the deletion of the consumer's personal information.

3. A business that receives a verifiable consumer request from a consumer to delete the consumer's personal information pursuant to subdivision (a) of this section shall delete the consumer's personal information from its records and direct any service providers to delete the consumer's personal information from their records.

Accordingly, it is once again requested that the following URL be blocked from further access as it contains Personal Identifiable Information ("PII"), including, name, address, telephone number, date of birth, email address and other PII that has been compromised and used for a nefarious purpose over the internet to commit identity fraud, including, attempts to use all of the PII elements to fraudulent establish credit:

https://www.plainsite.org/dockets/2mtfa6i1c/texas-northern-district-court/johnson-v-ashmore-et-al/

In addition, pursuant to California law, it is requested that you cease and desist selling any of this personal information.

**From:** PlainSite Help Line <help@plainsite.org>
**Sent:** Sunday, June 5, 2022 11:59 PM
**To:** Joe Johnson <jjohnson531@gmail.com>
**Subject:** PlainSite Request B400MWD Response



PlainSite Request B400MWD Response

Thank you for getting in touch with us about your docket on PlainSite. After reviewing the details of your request and the associated docket, we have come to the following decision:
**Your request regarding _Johnson v. Ashmore et al_ has been denied.**
Based on our research, the following factors were used to make this determination:

- There is a presumption of public access to court records and you have not identified a compelling privacy interest. "'Historically, courts have recognized a 'general right to inspect and copy public records and documents, including judicial records and documents." _Kamakana v. City & County of Honolulu_, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting _Nixon v. Warner Communications, Inc._, 435 U.S. 589, 597 & n.7 (1978)). 'This right is justified by the interest of citizens in 'keep[ing] a watchful eye on the workings of public agencies.'" _Id._ (quoting _Nixon_, 435 U.S. at 598). Access to judicial records, however, is not absolute. _Id._ A party seeking to seal a pleading or a dispositive motion (as well as any attached exhibits) must show that there are 'compelling reasons' to do so and that outweigh the public's interest in disclosure." See also _Doe v. Lee_, Docket No. 23, and _Eng v. Pacermonitor.com et al_.
- Your case is popular and has received numerous hits, and is therefore of public interest.
- Your case is at, or went to, the appellate stage or higher.

If you do not agree with our decision, please keep in mind that you still may have several options, including filing a motion, such as a motion to seal, before the court or administrative agency responsible for the records in question. Typically individuals are not required to hire lawyers to file such motions, and examples are available on PlainSite.
You can also consult our Privacy Policy to learn more about why public access to government records is important, and how we make our decisions.
Best regards,
The PlainSite Team

Think Computer Corporation / 340 S. Lemon Avenue #6720 / Walnut, CA 91789 / http://www.thinkcomputer.com

**From:** **Joe Johnson** jjohnson531@gmail.com
**Subject:** RE: PlainSite Request B400MWD Response
**Date:** June 6, 2022 at 7:23 AM
**To:** PlainSite Help Line help@plainsite.org

The First Amendment right to publish does not give Plainsite the unfettered right to disseminate or cause to be disseminated personal information without the risk of liability for its nefarious use.

**From:** PlainSite Help Line <help@plainsite.org>
**Sent:** Monday, June 6, 2022 9:46 AM
**To:** Joe Johnson <jjohnson531@gmail.com>
**Subject:** Re: PlainSite Request B400MWD Response

Mr. Johnson,

The CCPA does not apply to us, nor does it apply to court records. We have a First Amendment right to publish and we are not selling your personal information.

Aaron

PlainSite I https://www.plainsite.org

On Jun 6, 2022, at 6:45 AM, Joe Johnson <jjohnson531@gmail.com> wrote:

Pursuant to TITLE 1.81.5. California Consumer Privacy Act of 2018, I am requesting to opt-out – meaning, advising you to stop selling my personal information.

The California Consumer Privacy Act is extensive and provides for civil liability for any business that fails to comply.

Specifically, section 1798.100 of the California Consumer Privacy Act provides that:

(a) A consumer shall have the right to request that a business that collects a consumer's personal information disclose to that consumer the categories and specific pieces of personal information the business has collected.

Moreover, section 1798.100 of the California Consumer Privacy Act describes the General Duties of Businesses that Collect Personal Information. Finally, as relevant here, section 1798.105 of the California Consumer Privacy Act states that:

1. A consumer shall have the right to request that a business delete any personal information about the consumer which the business has collected from the consumer.

1. A business that collects personal information about consumers shall disclose, pursuant to Section 1798.130, the consumer's rights to request the deletion of the consumer's personal information.

1. A business that receives a verifiable consumer request from a consumer to delete the consumer's personal information pursuant to subdivision (a) of this section shall delete the consumer's personal information from its records and direct any service providers to delete the consumer's personal information from their records.

Accordingly, it is once again requested that the following URL be blocked from further access as it contains Personal Identifiable Information ("PII"), including, name, address, telephone number, date of birth, email address and other PII that has been compromised and used for a nefarious purpose over the internet to commit identity fraud, including, attempts to use all of the PII elements to fraudulent establish credit:

https://www.plainsite.org/dockets/2mtfa6i1c/texas-northern-district-court/johnson-v-ashmore-et-al/

In addition, pursuant to California law, it is requested that you cease and desist selling any of this personal information.

**From:** PlainSite Help Line <help@plainsite.org>
**Sent:** Sunday, June 5, 2022 11:59 PM
**To:** Joe Johnson <JJohnson531@gmail.com>
**Subject:** PlainSite Request B400MWD Response



PlainSite Request B400MWD Response

Thank you for getting in touch with us about your docket on PlainSite. After reviewing the details of your request and the associated docket, we have come to the following decision:
**Your request regarding _Johnson v. Ashmore et al_ has been denied.**
Based on our research, the following factors were used to make this determination:

- There is a presumption of public access to court records and you have not identified a compelling privacy interest. "'Historically, courts have recognized a 'general right to inspect and copy public records and documents, including judicial records and documents." _Kamakana v. City & County of Honolulu_, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting _Nixon v. Warner Communications, Inc._, 435 U.S. 589, 597 & n.7 (1978)). 'This right is justified by the interest of citizens in 'keep[ing] a watchful eye on the workings of public agencies." _Id._ (quoting _Nixon_, 435 U.S. at 598). Access to judicial records, however, is not absolute. _Id._ A party seeking to seal a pleading or a dispositive motion (as well as any attached exhibits)

must show that there are 'compelling reasons' to do so and that outweigh the public's interest in disclosure." See also *Doe v. Lee*, Docket No. 23, and *Eng v. Pacermonitor.com et al.*

- Your case is popular and has received numerous hits, and is therefore of public interest.
- Your case is at, or went to, the appellate stage or higher.

If you do not agree with our decision, please keep in mind that you still may have several options, including filing a motion, such as a motion to seal, before the court or administrative agency responsible for the records in question. Typically individuals are not required to hire lawyers to file such motions, and examples are available on PlainSite.

You can also consult our Privacy Policy to learn more about why public access to government records is important, and how we make our decisions.

Best regards,

The PlainSite Team

Think Computer Corporation / 340 S. Lemon Avenue #6720 / Walnut, CA 91789 / http://www.thinkcomputer.com

**From:** **PlainSite Help Line** help@plainsite.org
**Subject:** Re: PlainSite Request B400MWD Response
**Date:** June 6, 2022 at 7:28 AM
**To:** Joe Johnson jjohnson531@gmail.com

Mr. Johnson,

If you would like us to redact any personal information you feel is putting you at risk, please identify its location. I do not see any on the docket or in the complaint.

Aaron

PlainSite | https://www.plainsite.org

On Jun 6, 2022, at 7:25 AM, Joe Johnson <jjohnson531@gmail.com> wrote:

The First Amendment right to publish does not give Plainsite the unfettered right to disseminate or cause to be disseminated personal information without the risk of liability for its nefarious use.

**From:** PlainSite Help Line <help@plainsite.org>
**Sent:** Monday, June 6, 2022 9:46 AM
**To:** Joe Johnson <jjohnson531@gmail.com>
**Subject:** Re: PlainSite Request B400MWD Response

Mr. Johnson,

The CCPA does not apply to us, nor does it apply to court records. We have a First Amendment right to publish and we are not selling your personal information.

Aaron

PlainSite | https://www.plainsite.org

On Jun 6, 2022, at 6:45 AM, Joe Johnson <**jjohnson531@gmail.com**> wrote:

Pursuant to TITLE 1.81.5. California Consumer Privacy Act of 2018, I am requesting to opt-out – meaning, advising you to stop selling my personal information.

The California Consumer Privacy Act is extensive and provides for civil liability for any business that fails to comply.

Specifically, section 1798.100 of the California Consumer Privacy Act provides that:

(a) A consumer shall have the right to request that a business that collects a consumer's personal information disclose to that consumer the categories and specific pieces of personal information the business has collected.

Moreover, section 1798.100 of the California Consumer Privacy Act describes the General Duties of Businesses that Collect Personal Information. Finally, as relevant here, section 1798.105 of the California Consumer Privacy Act states that:

1. A consumer shall have the right to request that a business delete any personal information about the consumer which the business has collected from the consumer.

1. A business that collects personal information about consumers shall disclose, pursuant to Section 1798.130, the consumer's rights to request the deletion of the consumer's personal information.

1. A business that receives a verifiable consumer request from a consumer to delete the consumer's personal information pursuant to subdivision (a) of this section shall delete the consumer's personal information from its records and direct any service providers to delete the consumer's personal information from their records.

Accordingly, it is once again requested that the following URL be blocked from further access as it contains Personal Identifiable Information ("PII"), including, name, address, telephone number, date of birth, email address and other PII that has been compromised and used for a nefarious purpose over the internet to commit identity fraud, including, attempts to use all of the PII elements to fraudulent establish credit:

https://www.plainsite.org/dockets/2mtfa6i1c/texas-northern-district-court/johnson-v-ashmore-et-al/

In addition, pursuant to California law, it is requested that you cease and desist selling any of this personal information.

**From:** PlainSite Help Line <help@plainsite.org>
**Sent:** Sunday, June 5, 2022 11:59 PM
**To:** Joe Johnson <JJohnson531@gmail.com>
**Subject:** PlainSite Request B400MWD Response



PlainSite Request B400MWD Response

Thank you for getting in touch with us about your docket on PlainSite. After reviewing the details of your request and the associated docket, we have come to the following decision:
**Your request regarding *Johnson v. Ashmore et al* has been denied.**
Based on our research, the following factors were used to make this determination:
- There is a presumption of public access to court records and you have not identified a compelling privacy interest. "'Historically, courts have

privacy interest."   Historically, courts have recognized a 'general right to inspect and copy public records and documents, including judicial records and documents." *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 & n.7 (1978)). 'This right is justified by the interest of citizens in 'keep[ing] a watchful eye on the workings of public agencies." *Id*. (quoting *Nixon*, 435 U.S. at 598). Access to judicial records, however, is not absolute. *Id*. A party seeking to seal a pleading or a dispositive motion (as well as any attached exhibits) must show that there are 'compelling reasons' to do so and that outweigh the public's interest in disclosure." See also *Doe v. Lee*, Docket No. 23, and *Eng v. Pacermonitor.com et al*.

- Your case is popular and has received numerous hits, and is therefore of public interest.
- Your case is at, or went to, the appellate stage or higher.

If you do not agree with our decision, please keep in mind that you still may have several options, including filing a motion, such as a motion to seal, before the court or administrative agency responsible for the records in question. Typically individuals are not required to hire lawyers to file such motions, and examples are available on PlainSite.

You can also consult our Privacy Policy to learn more about why public access to government records is important, and how we make our decisions.

Best regards,
The PlainSite Team

Think Computer Corporation / 340 S. Lemon Avenue #6720 / Walnut, CA 91789 /
http://www.thinkcomputer.com

# EXHIBIT F

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS 2015 JUL 27  PM 2: 47
### DALLAS DIVISION

DEPUTY CLERK RAN_____

| | |
|---|---|
| JOSEPH JOHNSON, JR.<br>POST OFFICE BOX 441572<br>FORT WASHINGTON, MD   20749 | §<br>§<br>§<br>§ |
| **Plaintiff,** | §<br>§<br>§ |
| | § **3 - 15 CV - 2 4 7 5 K** |
| **Vs.** | §<br>§ **CIVIL NO.** _____ |
| | § |
| ALISON RAE ASHMORE<br>Aka, ALISON RAE NEWHOUSE<br>8340 CABRERA DRIVE<br>DALLAS, TEXAS  75228 | §<br>§<br>§<br>§<br>§ |
| **And** | §<br>§ |
| CRAIG WILLIAM BUDNER<br>6506 LAKEHURST AVENUE<br>DALLAS, TEXAS    75230 | §<br>§<br>§<br>§<br>§ |
| **Defendants.** | § |

## COMPLAINT

COMES NOW the Plaintiff, Joseph Johnson, Jr., complaining of Defendants, Alison Rae

Ashmore and Craig William Budner, individually, and would respectfully show as follows:

### I.    PARTIES

1.    Plaintiff, Joseph Johnson, Jr., is a resident of Prince George's County in Fort

Washington, Maryland.

2.    Defendant, Alison Rae Ashmore, aka, Alison Rae Newhouse (hereinafter,

"Ashmore") is a citizen and resident of Dallas County in Dallas, Texas and, at all times relevant,

engaged in unlawful conduct with co-Defendant, Craig William Budner and others to commit the

acts and omissions giving rise to this Complaint.

3. Defendant, Craig William Budner (hereinafter, "Budner") is a citizen and resident of Dallas County in Dallas, Texas and, at all times relevant, engaged in unlawful conduct with co-Defendant, Ashmore to also commit the acts and omissions giving rise to this Complaint.

## II. JURISDICTION AND VENUE

4. This Court has diversity jurisdiction under 28 U.S.C. §1332 in that the parties appear to have true diversity of citizenship and the amount in controversy exceeds $75,000 exclusive of interest and cost.

5. Venue is proper in this Court pursuant to 28 U.S.C. §1391, *et seq.* in that both of the Defendants reside in this district, and all or a substantial part of Plaintiff's cause of action arose in Dallas County, Texas.

## III. FACTS COMMON TO ALL COUNTS

Prior to September 9, 2011, Plaintiff had a civil suit pending in the United States District Court, Northern District of Texas, (the "Texas suit"), against ACS Education Solutions, LLC and Affiliated Computer Services, Inc., (collectively, the "Xerox parties"), arising out of the mishandling of certain student loans. Based upon information and belief, the Defendants were hired by the Xerox parties to represent them in the Texas suit.

Sometime on April 22, 2011, Defendants moved for judgment in the Texas suit on behalf of the Xerox parties, and shortly thereafter, on or around August 19, 2011, while said motion was pending, Plaintiff received a telephone call from Defendant, Ashmore who told him that she had a settlement offer from the Xerox parties and that time was really of the essence. Six days later, on August 25, 2011, and while said motion remained pending in the Texas suit, Plaintiff received another telephone call from Defendant, Ashmore.

Defendant, Ashmore, fraudulently purporting to act based on the desires and/or instructions of the Xerox parties, falsely represented to the Plaintiff that the Xerox parties had agreed to pay him $10,950.00 in exchange for him dismissing the Texas suit with prejudice and providing the Xerox parties with a full and complete release of all claims and a covenant not to sue them, or any of their parents, subsidiaries, and/or affiliates for any claims regarding the mishandling of Plaintiff's student loans. Defendant, Ashmore also stated affirmatively in that telephone call that "we have an agreement"; as if it had been authorized by the Xerox parties, when in fact, she knew it had not. Plaintiff also received a signed letter ("Letter Agreement") from Defendant, Ashmore wherein she reiterated the same false representations that she had made to Plaintiff earlier that same day during her telephone conversation. *See*, **Exhibit** A. Defendants told Plaintiff that if he accepted the terms of the Letter Agreement then he should sign and return a copy of the Agreement to Defendant, Ashmore, and that upon signing, the "agreement shall become binding on [Plaintiff] and [the Xerox parties] ..." *See*, **Exhibit** B.

Plaintiff accepted the terms of the purported Letter Agreement, executed it and returned it to the Defendants on August 25, 2011. Plaintiff would later discovery to his detriment that the Xerox parties had not authorized the Agreement as a "final, enforceable settlement agreement", that the Defendants were acting outside and beyond the scope of their authority and representation of the Xerox parties when they sent the purported Agreement to the Plaintiff as a final, valid and binding Agreement, that the Defendants had tricked Plaintiff into believing that the Texas suit had been settled pursuant to the Agreement, that on September 9, 2011, an adverse judgment had been entered against him in the Texas suit and that the Xerox parties had refused to ratify the unauthorized Agreement.

As a result of the Defendants' fraudulent conduct, Plaintiff sustained damages.

## IV.  STATEMENT OF CLAIMS

Therefore, it has become necessary to bring this suit to collect a legal debt of money damages owing to Plaintiff due to the Defendants' actions. Defendants' actions constitute, among other things, breach of implied warranty of authority.

### COUNT I
### (Breach of Implied Warranty of Authority)

6.      At all times relevant, a dispute arose between Plaintiff and the Xerox parties regarding, among other things, the mishandling of certain student loans. Based upon information and belief, the Defendants were hired by the Xerox parties to represent them in the Texas suit.

7.      At all times relevant, the Defendants were acting outside of the scope of their authority and beyond the scope of their representation of the Xerox parties, and in doing so, between August 19, 2011 and August 25, 2011, the Defendants repeatedly and fraudulently misrepresented that they had the authority to enter into a valid and enforceable written agreement to contractually bind the Xerox parties to a settlement of the Texas suit, pursuant to which the Defendants falsely asserted that the Xerox parties had agreed to pay the Plaintiff $10,950.00 in exchange for the dismissal of the Texas suit and a covenant not to sue.

8.      At all times relevant, when the Defendants made these representations they knew that they lacked the authority to enter into any valid and enforceable agreement to settle the Texas suit on behalf of the Xerox parties, that the Xerox parties had not agreed to pay the Plaintiff $10,950.00 to settle the Texas suit and had not otherwise authorized the agreement. Despite having this knowledge, the Defendants falsely represented to the Plaintiff that they had the authority to make the contract on behalf of the Xerox parties, when no such authority existed.

9.    Defendants explicitly warranted that they had the authority to contract to compromise and settle the Texas suit on the terms and for the amount offered on behalf of the Xerox parties in the Letter Agreement. Plaintiff and the Defendants ultimately reached an agreement to settle the Texas suit for $10,950.00.

10.    On August 14, 2013, Plaintiff discovered that the Defendants had no authority to act on behalf of the Xerox parties or to enter into, execute or accept the Agreement as a binding, valid and enforceable agreement on behalf of the Xerox parties, that the Agreement was not authorized by the Xerox parties and that the Xerox parties had refused to ratify the Agreement.

11.    Based upon the foregoing, the Defendants breached their implied warranty of authority, and as a direct and proximate result, Plaintiff has been damaged and the Defendants are liable to the Plaintiff for breach of implied warranty, *viz.*, that the Defendants had the power to bind the principal.

## COUNT II
### (Fraud/Intentional Misrepresentation)

14.    Plaintiff repeats each and every factual allegation contained in the preceding paragraphs of this complaint as if set forth at length herein.

14.    At all times relevant, the Defendants were acting outside of the scope of their authority and beyond the scope of their representation of the Xerox parties, and in doing so, between August 19, 2011 and August 25, 2011, the Defendants repeatedly and fraudulently misrepresented that they had the authority to enter into a valid and enforceable written agreement to contractually bind the Xerox parties to a settlement of the Texas suit, pursuant to which the Defendants falsely asserted that the Xerox parties had agreed to pay the Plaintiff $10,950.00 in exchange for the dismissal of the Texas suit and a covenant not to sue.

5

15.     Plaintiff justifiably relied upon the Defendants' representations, accepted the terms of the Agreement and executed it on August 25, 2011. The defendants' representation that they had the authority to enter into a valid and enforceable written agreement to contractually bind the Xerox parties to a settlement of the Texas suit and that the Xerox parties had authorized the agreement as a binding, valid and enforceable agreement was a material representation that the Defendants knew was false.

16.     The defendants made the false representations for purpose of influencing Plaintiff's decision and fraudulently inducing him to refraining from acting in reliance upon their representations, and Plaintiff in fact did rely with justification upon the misrepresentation, and to his detriment refrained from taking any action to avoid an adverse judgment from being entered against him in the Texas suit.

17.     As a result, Plaintiff sustained damages in the form of an adverse judgment and the benefits under the otherwise valid agreement.

## COUNT III
### (Negligence)

18.     Plaintiff repeats each and every factual allegation contained in the preceding paragraphs of this complaint as if set forth at length herein.

19.     At all times relevant, the Defendants were acting outside of the scope of their authority and beyond the scope of their representation of the Xerox parties, and in doing so, between August 19, 2011 and August 25, 2011, the Defendants falsely represented to the Plaintiff that they had the authority to enter into a valid and enforceable written agreement to contractually bind the Xerox parties to a settlement of the Texas suit, pursuant to which the Defendants falsely asserted that the Xerox parties had agreed, among other things, to pay the Plaintiff $10,950.00 in exchange for the dismissal of the Texas suit and a covenant not to sue.

20.     The defendants had a duty toward the Plaintiff to exercise reasonable care to avoid foreseeable injury and to refrain from making contracts for which they had not been granted authority to make. Defendants explicitly warranted that they had the authority to contract to compromise and settle the Texas suit on the terms and for the amount offered on behalf of the Xerox parties in the Agreement. Plaintiff and the Defendants ultimately reached an agreement to settle the Texas suit for $10,950.00.

21.     On or around August 14, 2013, Plaintiff discovered that the Defendants had no authority to act on behalf of the Xerox parties or to enter into, execute or accept the Agreement as a binding, valid and enforceable agreement on behalf of the Xerox parties, that the Agreement was not authorized by the Xerox parties and that the Xerox parties had refused to ratify the unauthorized Agreement.

22.     The defendants were negligent and breached their duty by failing to exercise reasonable care to avoid foreseeable injury to the Plaintiff and by making a contract for which they had not been granted authority to make.

23.     As a result, Plaintiff sustained damages in the form of pecuniary losses, consequential and other compensable damages to be proven at trial.

## COUNT IV
### (Common Law Fraud and Fraudulent Misrepresentation)

24.     Plaintiff repeats each and every factual allegation contained in the preceding paragraphs of this complaint as if set forth at length herein.

25.     At all times relevant, the Defendants were acting beyond and outside of the scope of their authority, and their conduct constitute fraud and fraudulent misrepresentations under Texas common law.

26. Defendants made material representations to the Plaintiff that were false. When the Defendants made the representations, they either knew that they were false or they made the representations recklessly and without knowledge of the truth.

27. Defendants intended that the Plaintiff act or refrain from acting and rely on their false and material representations. Plaintiff did, in fact, reasonably rely on the Defendants' false and material representations and did so to his detriment.

28. Defendants wrongfully and fraudulently acquired Plaintiff's acquiesce for the dismissal of Texas suit with prejudice by fraudulently tricking him into falsely believing that they had been given the authority to enter into a valid and enforceable written agreement to contractually bind the Xerox parties to a settlement of the Texas suit. The defendants acted intentionally and maliciously for purpose of obtaining a dismissal and an adverse judgment in the Texas suit against the Plaintiff.

29. Plaintiff has suffered damages as a direct and proximate result of the Defendants' fraudulent conduct, and in addition to significant actual damages, Plaintiff also seeks exemplary damages for the Defendants ' fraudulent conduct.

## COUNT V
### (Civil Conspiracy to Commit Fraud)

30. Plaintiff repeats each and every factual allegation contained in the preceding paragraphs of this complaint as if set forth at length herein.

31. At all times relevant, beginning on or around August 19, 2011, and continuing thereafter, the Defendants met, conferred and communicated with each other on a continuous basis and ultimately engaged by agreement and/or understanding to take unlawful actions against the Plaintiff including breach of implied warranty of authority as more fully described above.

8

32.     At all times further relevant, all acts described herein were taken and/or performed by the Defendants outside of and beyond the scope of their authority and for their own personal benefit and/or personal motives.

33.     The defendants, and each of them, met, conferred and communicated with each other on a continuous basis and ultimately engaged by agreement and/or understanding to take unlawful and fraudulent actions against the Plaintiff for purpose of tricking the Plaintiff into, among other things, dismissing or obtaining the dismissal of the Texas suit through their intentional misrepresentations, fraudulent and deceptive acts, as more fully described in the preceding paragraphs of this complaint.

34.     As a direct result of the conspiracy and the Defendants' wrongful conduct directed towards the Plaintiff, the Plaintiff has suffered actual legal damages, and as more fully described above, the Defendants' actions were and continue to be unlawful. The defendants' conspiracy has been ongoing since on or around August 19, 2011 and Plaintiff continues to suffer emotionally as a direct result of the Defendants' conduct. The conduct of the Defendants has been sufficiently outrageous so as to entitle Plaintiff to an award of punitive damages.

**COUNT VI**
(Intentional Infliction of Emotional Distress)

35.     Plaintiff repeats each and every factual allegation contained in the preceding paragraphs of this Complaint as if set forth at length herein.

36.     Defendants deliberately and intentionally engaged in unlawful conduct during the course of their dealings with the Plaintiff. Defendants knew that they lacked the authority to enter into a valid and enforceable written agreement to contractually bind the Xerox parties, and acted beyond and outside of the scope of their authority to cause emotional harm to the Plaintiff.

9

37. The defendants deliberately and intentionally asserted false representations of material fact and encouraged others, known and unknown, to engage in unlawful conduct to cause emotional harm to be inflicted upon the Plaintiff.

38. All of the Defendants' conduct described in the preceding paragraphs were extreme and outrageous and was done intentionally, recklessly, and in deliberate disregard of a high degree of probability that emotional distress would result to the Plaintiff.

39. The defendants knew that their conduct would or could cause emotional distress upon the Plaintiff, and in fact, it did cause emotional distress upon the Plaintiff. The defendants' conduct was malicious, willful, deliberate and intentional and was done with malice and spiteful for the sole purpose of inflicting severe emotional distress upon the Plaintiff.

40. As a result, Plaintiff has suffered loss of sleep, headaches, severe mental pain, and depression and will continue to suffer, severe and extreme emotional distress including loss of sleep and headaches.

## V.  DAMAGES

### A.  ACTUAL DAMAGES

Regarding the causes of action and conduct alleged above, Plaintiff sustained pecuniary losses that were proximately caused by the Defendants' conduct. Plaintiff's damages exceed the minimum jurisdictional limits of this Court and are in excess of $75,000.00.

### B.  PUNITIVE DAMAGES

Because the Defendants' conduct constitutes fraud and intentional misrepresentation, Plaintiff is entitled to Punitive damages in an amount to be determined at trial.

## C.   ATTORNEY'S FEES

Plaintiff is entitled to reasonable attorney's fees necessary to prosecute this action. Texas law recognizes that contingency fees can be reasonable and necessary under the circumstances. Under these circumstances, a reasonable attorney's fee of 40% of the entire recovery should be assessed against the Defendants.

## VII.   JURY DEMAND

Plaintiff demands a trial by jury on each and every issue raised herein.

Respectfully submitted,

Joseph Johnson, Jr.
Post Office Box 441572
Fort Washington, MD   20749
(240) 605-9921

EXHIBIT A



# K&L|GATES

K&L Gates LLP
1717 Main Street
Suite 2800
Dallas, TX 75201-7342

T 214.939.5500    www.klgates.com

August 25, 2011

Alison R. Ashmore
D 214.939.5976
F 214.939.5849
alison.ashmore@klgates.com

**Via e-mail (jjohnson531@gmail.com), Federal Express,
and CMRRR #7003 2260 0007 5811 7579**

Joe Johnson, Jr.
2600 Brinkley Road PH 1005
Fort Washington, MD 20744

Re:    *Johnson v. Affiliated Computer Services, Inc. and ACS Education Solutions, LLC,*
Civil Cause No. 3:10-CV-2333, in the United States District Court for the
Northern District of Texas

## CONFIDENTIAL SETTLEMENT COMMUNICATION

Mr. Johnson,

Per my telephone conversations with you of today, it is our understanding
that the above-referenced lawsuit has settled under the following terms (in addition
to those terms ordinarily attendant):

1.    Defendants will make a one-time total payment to you of $10,950.00,
all of which, except $350.00, will be used to make a payment by you on
the outstanding balance of your student loans within thirty (30)
calendar days of the date on the check;

2.    In exchange for the payment by Defendants, you will provide a full
and complete release of any and all claims you may have against ACS,
ACSES, and all of their parents, subsidiaries, and affiliates and you
agree to never sue ACS, ACSES, or any of their parents, subsidiaries,
and/or affiliates for any alleged claims regarding the handling of your
student loans;

DA-3202522 v1

# K&L|GATES

Joe Johnson, Jr.
August 25, 2011
Page 2

3.    The agreement shall be confidential, except the agreement may be disclosed as necessary to enforce the agreement in a court of law or other proceeding; and

4.    The pending lawsuit shall be dismissed with prejudice as to both ACS and ACSES, for a final resolution of the above-referenced lawsuit.

If this does not accurately state the material terms to which our clients have agreed, please contact me immediately so that we can discuss any issues.

I will prepare the Confidential Settlement Agreement that memorializes the terms of our agreement in further detail.

Very truly yours,

Alison R. Ashmore

AGREED as set forth above:

Joseph Johnson, Jr.

EXHIBIT B



# K&L|GATES

K&L Gates LLP
1717 Main Street
Suite 2800
Dallas, TX 75201-7342

T 214.939.5500    www.klgates.com

August 24, 2011

Alison R. Ashmore
D 214.939.5976
F 214.939.5849
alison.ashmore@klgates.com

**Via e-mail (jjohnson531@gmail.com), Federal Express,
and CMRRR #7006 3450 0003 6178 7904**

Joe Johnson, Jr.
2600 Brinkley Road PH 1005
Fort Washington, MD 20744

Re:   *Johnson v. Affiliated Computer Services, Inc. and ACS Education Solutions, LLC,*
      Civil Cause No. 3:10-CV-2333, in the United States District Court for the
      Northern District of Texas

## CONFIDENTIAL SETTLEMENT COMMUNICATION

Mr. Johnson,

I received your settlement letter dated August 22, 2011, which I passed on to my clients for their consideration. Your letter goes in to great detail regarding your position, which has been stated numerous times, and to which I do not believe it is necessary to respond in detail here. It suffices to state that Defendants disagree with your position. The documents ACSES produced to you in this case readily show that all of your claims are without merit. ACSES fulfilled any alleged obligations it had to the U.S. Department of Education. All paperwork that ACSES received from you was properly handled without delay or interference. The Secretary of Education clearly disagreed with your assessment that you "established" that "[you] were enrolled in a training program that specifically and exclusively prepared [you] for employment as a paralegal" when he denied your request for discharge. The fact that your request was denied by the Secretary is not evidence of interference with your request by Defendants.

Nevertheless, Defendants would like to avoid expending further time and expense in litigation and are therefore interested in reaching a settlement agreement with you. Defendants ACS and ACSES offer the following terms of settlement:

DA-3201320 v1

K&L GATES

Joe Johnson, Jr.
August 24, 2011
Page 2

1. Defendants will make a one-time payment to you of $6,275. Of that amount, $5,275 must be paid by you on the outstanding balance of your student loans within thirty (30) calendar days of the date on the check. The remaining $1,000 is yours to keep and spend as you see fit (which may include coverage of your out-of-pocket expenses in the litigation);

2. In exchange for the payment by Defendants, you will provide a full and complete release of any and all claims you may have against ACS, ACSES, and all of their parents, subsidiaries, and affiliates and you shall promise never to sue ACS, ACSES, or any of their parents, subsidiaries, and/or affiliates for any alleged claims regarding the handling of your student loans;

3. The agreement shall be confidential, except the agreement may be disclosed as necessary to enforce the agreement in a court of law or other proceeding; and

4. The pending lawsuit shall be dismissed with prejudice as to both ACS and ACSES.

If you accept these terms, please sign below and return a copy of this letter to me. Upon your signing, this agreement shall become binding on you and Defendants and the above terms shall be memorialized in further detail among the parties in a Confidential Settlement Agreement.

This offer shall remain open until 2:00 pm (central time) on Thursday, August 25, 2011.

Very truly yours,

Alison R. Ashmore

JS 44-TXND (Rev. 12/12)

# CIVIL COVER SHEET 3-15 CV - 2475 K

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Joseph JOHNSON, Jr.<br>Post Office Box 441572<br>Fort Washington, MD 20749 | Alison Rae Ashmore, 8340 Cabrera Drive, Dallas, TX 75228<br>and<br>Craig William Budner, 6506 Lakehurst Avenue, Dallas, TX 75230 |

**(b)** County of Residence of First Listed Plaintiff **Prince George's**

*(EXCEPT IN U.S. PLAINTIFF CASES)*

RECEIVED

RAP

JUL 27 2015

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

County of Residence of First Listed Defendant **Dallas**

*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question
*(U.S. Government Not a Party)*

☐ 2 U.S. Government Defendant

☒ 4 Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☒ 190 Other Contract | ☐ 360 Other Personal | ☐ 380 Other Personal Property Damage | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| | | | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:
Breach of Implied Warranty of Authority

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. | DEMAND $<br>75,000.00 | CHECK YES only if demanded in complaint:<br>JURY DEMAND: ☒ Yes ☐ No |
|---|---|---|---|

## VIII. RELATED PENDING OR CLOSED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 07/24/2015 | Joseph Johnson, Jr. |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____



Joseph Johnson, Jr.
Post Office Box 441572
Fort Washington, MD 20749-1572

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**CERTIFIED MAIL**

7014 1200 0001 6852 6258

U.S. POSTAGE
PAID
TEMPLE HILLS, MD
JUL 23, 15
AMOUNT
**$5.31**
00031299-08

75242

UNITED STATES
POSTAL SERVICE

1000

RECEIVED
RA
JUL 2 7 2015
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

United States District Court
Civil Clerk's Office
1100 Commerce Street, Room 1452
Dallas, TX 75242

# EXHIBIT G

List of Johnson Addresses

8/28/1992 (CAL92-15672): 607 Audrey Lane, #202, Forest Heights, MD 20745
1/14/1993 (CAL93-00849): Unknown, Chapel Oaks, MD 20743
3/15/1994 (CAL94-03765): Penthouse 202, Forest Heights, MD 20745
12/1/1994 (CAL94-24509): 607 Audrey Lane, #202, Forest Heights, MD 20745
12/8/1994 (CAL94-24894): Penthouse 301, Oxon Hill, MD 20745
2/22/1996 (CAL96-03519): 607 Audrey Lane, #202, Oxon Hill, MD 20745
10/8/2003 (CAL03-21550): 607 Audrey Lane, #102, Oxon Hill, MD 20745
12/19/2005 (CAL05-27384): 607 Audrey Lane, #102, Oxon Hill, MD 20745
5/2/2008 (CAL08-13015): 2600 Brinkley Road, Fort Washington, MD 20744
11/17/2009 (CAL09-36433): 2600 Brinkley Road, Fort Washington, MD 20744
12/11/2009 (CAL09-39521): 2600 Brinkley Road, Fort Washington, MD 20744
3/1/2020 (CAL10-05778): 2600 Brinkley Road, Fort Washington, MD 20744
11/16/2010 (CAL10-35570): 2600 Brinkley Road, PH 1005, Fort Washington, MD 20744
3/7/2011 (CAL11-05792): 2600 Brinkley Road PH 1005, Fort Washington, MD 20744
5/25/2011 (CAL11-13184): 2600 Brinkley Road PH 1005, Fort Washington, MD 20744
8/31/2012 (CAL12-26946): P.O. Box 441572, Fort Washington, MD 20744
3/11/2014 (CAL14-05640): Post Office Box 441572, Fort Washington, MD 20749
6/12/2014 (CAL14-13690): Post Office Box 441572, Fort Washington, MD 20749--1572
7/14/2014 (CAL14-17920): P.O. Box 441572, Fort Washington, MD 20744
9/18/2014 (CAL14-25579): POB 441572, Ft Washington, MD 20749
1/9/2015 (CAL15-00121): Post Office Box 441572, Fort Washington, MD 20749--1572
1/22/2015 (CAL15-00456): POB 441572, Ft Washington, MD 20749
6/5/2015 (CAL15-18282): 2600 Brinkley Road, Apt 611, Fort Washington, DC, 20744
7/6/2015 (CAL15-16904): Post Office Box 441572, Fort Washington, MD 20749
9/1/2015 (CAL15-25037): Post Office Box 441572, Fort Washington, MD 20749--1572
9/23/2015 (CAL15-25507): P.O. Box 441572, Fort Washington, MD
6/21/2016 (CAL16-26537): POB 441572, Ft Washington, MD 20749
8/4/2017 (CAL17-18881): Post Office Box 441572, Fort Washington, MD 20749--1572
8/4/2017 (CAL17-18882): Post Office Box 441572, Fort Washington, MD 20749
9/4/2018 (CAL18-31474): P.O. Box 441572, Fort Washington, MD 20749
8/30/2019 (CAL19-28386): Post Office Box 441572, Fort Washington, MD 20749
7/20/2022 (CAL22-21996): P.O. Box 441572, Fort Washington, MD
7/20/2022 (CAL22-21998): Post Office Box 441572, Fort Washington, MD 20749
7/22/2022 (CAL22-22085): PO Box 441572, Fort Washington, MD 20749
8/1/2022 (CAL22-23064): PO Box 441572, Fort Washington, MD 20749

# EXHIBIT H

August 26, 2022

The Honorable Juan R. Sánchez
United States District Court for the Eastern District of Pennsylvania
James A. Byrne United States Courthouse
601 Market Street, Room 14613
Philadelphia, PA 19106

      Re:   *Johnson v. Wright et al.*, Civil No. 22-cv-2905 (E.D. Pa.)

Dear Chief Judge Sánchez:

This letter is written in response to opposing counsel's August 16, 2022 letter regarding the United States' Motion to Set Response Deadline and Extend Page Limit (ECF No. 10).

Opposing counsel informed the Court that footnote 1 of the brief supporting its Motion reported that neither the U.S. Attorney's Office for the District of Maryland, the U.S. Attorney's Office for the Eastern District of Pennsylvania, nor the Attorney General's Office had a record of service, and that counsel learned that the Attorney General's Office did receive a copy of the complaint on or about July 24, 2022.

The undersigned merely informs the court that he is fully aware of the obligations and requirements set-forth under Rule 4(m) of the Federal Rules of Civil Procedure, which require that a defendant be served within 90 days after the complaint is filed. The original complaint in this action was filed on July 5, 2022 in the United States District Court for the District of Maryland and then transferred to this Court on July 20, 2022 and docketed on July 29, 2022. Thus, the time to serve the defendants is not until October 5, 2022.

Contemporaneously with this correspondence, a summons has been requested from the clerk of the court for each named defendant. The undersigned takes no position on the motion and its merits (or lack thereof), ECF No. 10, filed by opposing counsel.

                    Respectfully,

                    *Joe Johnson*
                    Joe Johnson
                    11550 Livingston Road Unit 441572
                    Fort Washington, MD  20749

Cc:   Rebecca S. Melley, Opposing Counsel
       (via email, Rebecca.Melley@usdoj.gov)

Case 2:22-cv-02905-JS   Document 16-1   Filed 10/10/22   Page 2 of 2
Case 8:22-cv-02422-TDC   Document 28-1   Filed 11/02/22   Page 104 of 140
U. S. Department of Justice

Federal Bureau of Prisons

*Northeast Regional Office*

*Via Certified and Return Receipt Mail*

U.S. Custom House-7th Floor
2nd & Chestnut Streets
Philadelphia, PA 19106

February 11, 2022

Mr. Joseph Johnson
6535 Hilmare Drive
District Heights, MD    20747

     RE:   Administrative Claim No. TRT-NER-2021-06309
          Reg. No. 40996-083

Dear Mr. Johnson:

    Administrative Claim No. TRT-NER-2021-06309, properly received
in this office on June 25, 2021, has been accepted and considered
for settlement as provided by the Federal Tort Claims Act (FTCA),
28 U.S.C. § 2672, under authority delegated to me by 28 C.F.R. §
543.30. You seek $200,000.00 for a personal injury claim.
Specifically, you allege on or after December 23, 2020, FCI
Schuylkill failed to follow health and safety protocols resulting
in you contracting COVID-19.

    An investigation, including a review of your medical records,
reflects there is not sufficient evidence to substantiate the
allegations of this claim.  FCI Schuylkill followed national
guidelines in prevention, testing, and treatment for COVID-19.  You
tested negative for COVID-19 on March 2, 2021 and March 17, 2021.
You were quarantined and monitored appropriately, and were
asymptomatic. Your medical records reflect you received appropriate
medical assessments and treatment for your medical conditions.
There is no evidence you experienced a compensable loss as the
result of negligence on the part of any Bureau of Prisons employee.
Accordingly, your claim is denied.

    If you are dissatisfied with this decision, you may bring an
action against the United States in an appropriate United States
District Court within six (6) months of the date of this letter.

                    Sincerely,

                    Darren Howard
                    Regional Counsel

cc:  J. Sage, Warden, FCI Schuylkill

# EXHIBIT I

FILED _____ ENTERED
_____ LODGED _____ RECEIVED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JUL  5 2022

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY _____ DEPUTY

|  |  |
|---|---|
| **JOE JOHNSON**<br>11550 LIVINGSTON ROAD UNIT 441572<br>FORT WASHINGTON, MD   20749<br><br>Plaintiff,<br><br>VS.<br><br>**LINWOOD CLINTON WRIGHT JR.**<br>436 DRESHERTOWN ROAD<br>FORT WASHINGTON, PA     19034<br><br>And<br><br>**KURT LEONARD KUECHLER**<br>86 CANNON PLACE<br>ORELAND, PA      19075<br><br>And<br><br>**UNITED STATES OF AMERICA**<br>Serve: Attorney General of the United States<br>950 PENNSYLVANIA AVENUE, NW<br>WASHINGTON, D.C.   20530-0001<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORIGINAL COMPLAINT

COMES NOW, the Plaintiff, Joe JOHNSON, and represent to the Court, that:

## JURISDICTION

1.      This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. §1332,

in that there is true diversity of citizenship as the Plaintiff is a citizen of the State of Maryland and

Defendants Linwood Clinton Wright Jr. ("Wright") and Kurt Leonard Kuechler ("Kuechler") are

citizens of the State of Pennsylvania, and the amount in controversy exceeds the sum of $75,000,

exclusive of interest and cost.

2.      This Court also has jurisdiction pursuant to the Federal Tort Claims Act ("FTCA"),

28 U.S.C. §1346, in that the claims alleged against Defendant United States of America in this

action arises out of the negligent or wrongful acts and omissions of employees of the Government

while acting within the scope of his or her office or employment.

3.      This Court further has jurisdiction over the subject matter and parties pursuant to

28 U.S.C. §1331, as this case involves questions of federal law. This Court also has jurisdiction

pursuant to 28 U.S.C. §1343 because Plaintiff seek damages for violation of his civil rights.

## PARTIES

4.      Plaintiff is a citizen of the State of Maryland residing in Prince George's County.

5.      Defendant Wright is a citizen of the State of Pennsylvania, and is currently residing

at 436 Dreshertown Road, Fort Washington, Pennsylvania in Montgomery County, and is being

sued personally for his involvement in this action. Service of process may be made upon Defendant

Wright personally or upon Anita E. Wright at the same place of abode as the Defendant.

6.      Defendant Kuechler is a citizen of the State of Pennsylvania, and is currently

residing at 86 Cannon Place, Oreland, Pennsylvania in Montgomery County, and is also being

sued personally for his involvement in this action. Service of process may be made upon Defendant

Kuechler personally or upon Anna K. Kuechler at the same place of abode as the Defendant

7.      Defendant United States of America is sued under the Federal Tort Claims Act for

the negligent, wrongful acts and omissions of employees of the SCP Schuylkill, an agency of the

Defendant, while acting within the scope of their office and employment.

2

## **FACTS COMMON TO ALL COUNTS**

On June 27, 2019, Defendant Wright made a charging decision to go before a federal grand jury sitting in the Eastern District of Pennsylvania to obtain a two-count indictment charging a Joseph R. Johnson, Jr. with one count of false statements and aiding and abetting, in violation of 18 U.S.C. §§1001 and 2, and one count of aggravated identity theft and aiding and abetting, in violation of 18 U.S.C. §§1028A and 2, arising out of an alleged false filing that allegedly occurred in the Federal District Court in the Eastern District of Pennsylvania on or about February 1, 2016. Defendant Wright knew or should have known that there was no evidence of "materiality" which was a necessary and required element to constitute a federal crime under 18 U.S.C. §§1001.

Based upon information and belief, during the course of his investigation, Defendant Kuechler, fabricated evidence that was intended to link the Plaintiff to the alleged false filing by planting the Plaintiff's fingerprints on pieces of tape on the outside of the envelope containing the false filing, and then manufacturing a document that was described as "Devout Player Hater Internet Post (2001 Honda Accord EX V6 power steering)" which was purportedly an internet posting that the Plaintiff allegedly authored that never existed. During the course of the trial, Defendant Wright, having direct and specific knowledge or who should have had knowledge of the fabricated and manufactured evidence, elicited and suborned perjured testimony from Defendant Kuechler about the false evidence and proffered the fabricated evidence into evidence at the Plaintiff's trial to establish a causal link between Plaintiff, the Devout Player Hater character, and the purported false filing. On November 14, 2019, a petit jury relied on the fabricated and manufactured evidence to convict the Plaintiff of the baseless charges, and on February 28, 2020, Plaintiff was sentenced to 32 months imprisonment. On March 13, 2020, Plaintiff's timely amended notice of appeal was received by the United States Court of Appeals for the Third Circuit.

Beginning on August 10, 2020, Plaintiff began serving the term of imprisonment at the Schuylkill Federal Prison Camp in Minersville, PA, and while confined there, Plaintiff was exposed to extremely dangerous prison conditions. Specifically, the novel coronavirus also known as SARS-nCoV-2 that causes COVID-19, a deadly respiratory infection for which no known cure or vaccine was then and there available. On March 11, 2020, prior to arriving at the Schuylkill Federal Prison Camp, the World Health Organization had declared COVID-19 a global pandemic. At that time, the United States registered 1,267 of the 118,000 confirmed global cases and 38 of the 4,291 deaths. The virus was highly infectious and spreads primarily through close contact with an infected person (who may be asymptomatic), including through respiratory droplets produced when the infected person coughs, sneezes, or talks. The virus can also spread through contact with a contaminated surface. It was universally recognized that COVID-19 posed a particularly tough challenge for the incarcerated citizenry. Social distancing and rigorous personal hygiene were important combatants to the virus but those housed in prisons, like the Plaintiff was, had to eat, sleep, talk, and tend to their every personal need in each other's close physical space. COVID-19 was especially deadly for the detained population because they were disproportionately more likely to suffer from chronic medical conditions. In recognition of this stark reality, the Center for Disease Control ("CDC") on March 23, 2020, issued guidance for officials operating detention facilities to help stop the spread of COVID-19.

The guidance included detailed recommendations about proper hygiene and cleaning practices, social distancing, evaluating symptoms, and the use of medical isolation and quarantine. The CDC's guidelines provided a useful benchmark in determining whether the Facility's policies and procedures were appropriate and the BOP adopted and incorporated those guidelines into its mandatory procedures that all facilities were required to follow but did not.

4

Thus, the standard precautions to prevent the spread of the virus in a correctional setting, such as SCP Schuylkill, include: limiting operational entrances and exists to the facilities and restricting transfers of detained persons unless necessary to prevent overcrowding; performing pre-intake screening for temperature checks for incoming detainees to identify and address both symptomatic individuals and asymptomatic individuals who had recent close contact to a known COVID-19 case; increasing cleaning and disinfecting frequency for high touch areas; encouraging all staff and detainees to wear a cloth face covering as much as possible; reinforcing healthy hygiene practices amongst the detainee population; providing soap, running water, cloth face masks, and tissues to detainees; implementing "social distancing" strategies to increase the physical space between incarcerated persons, knowing 6-feet distance is not always possible in a correctional setting; suspending or limiting activities that would likely involve participants being in "closer contact than they are in their housing environment;" and performing daily temperature checks in housing units where COVID-19 cases have been identified.

The CDC further recommended that management in a correctional facility: (a) provide no-touch receptacles; (b) alcohol-based sanitizer where permissible based on security restrictions"; (c) education on mask wear and symptoms; (d) suspend or modify visitation programs where able, promote non-contact visits, and require visitors to wear cloth face coverings and perform verbal screening and temperature checks upon entry; and (e) display educational signage in multiple languages. The CDC also prescribes quarantine and isolation practices for infected detainees as well as testing and contact tracing whenever feasible. Numerous factors can increase a person's risk of severe illness if he/she contracts the virus. The following medical conditions put a person at increased risk of severe illness from COVID-19: cancer, chronic kidney diseases, chronic obstructive pulmonary disease, weakened immune system from organ transplant, obesity,

5

pregnancy, sickle cell disease, smoking, and type 2 diabetes mellitus. Persons who have the following medical conditions might be at an increased risk: asthma, cerebrovascular disease, cystic fibrosis, hypertension, immuno-compromised state, neurologic conditions, liver diseases, pulmonary fibrosis, thalassemia, type 1 diabetes mellitus. Finally, racial, and ethnic minorities may also be at an increased risk due to societal inequities, such as access to health care and poorer living conditions. In recognition of the CDC's guidance, the Federal Bureau of Prisons ("BOP") purportedly took the following steps to combat the virus. On March 13, 2020, the BOP modified the operations in accordance with its "COVID-19 Action Plan." Initially, all social visits, inmate movement, and official staff travel were supposed to be suspended for thirty days. Contractors who enter any BOP facility were supposed to be screened for the virus, and initially admission was supposed to be limited to contractors who performed essential services, and enhanced health screenings for staff in areas of "sustained community transmission" was supposed to be conducted and all new inmates were supposed to be screened for virus "exposure risk factors and symptoms." Any inmate who was asymptomatic but had a risk of exposure was supposed to be quarantined. The quarantine period was supposed to be for a minimum of fourteen days or until cleared by medical staff, and new inmates who were symptomatic were supposed to be placed in isolation until they tested negative for the virus or were cleared by medical staff. In addition, group gatherings were supposed to be limited to permit social distancing as much as possible, all staff and inmates were supposed to be issued face masks, and all staff and inmates were supposed to be encouraged to wear face masks when social distancing could not be achieved.

The BOP did not institute a policy requiring staff to wear face masks until August 27, 2020, and even that guidance contemplated religious exemptions, medical exemptions, and outright refusals to comply with the mask mandate.

Furthermore, BOP employees were permitted to continue working after potential exposure to COVID-19 which allowed the virus to spread throughout the facility. The BOP, and employees at SCP Schuylkill were aware of the risks posed by COVID-19 as early as January 2020. Moreover, BOP COVID-19 Pandemic Response Plan prescribed the course of action for all BOP employees at SCP Schuylkill to follow to prevent the spread of contagious diseases such as the deadly coronavirus into prison facilities but employees at SCP Schuylkill failed to follow it. Despite being fully cognizant of the risks posed by the virus, employees at SCP Schuylkill failed to follow any of the basic recommendations of the CDC, or otherwise, follow the BOP mandatory COVID-19 Pandemic Response Plan to prevent the spread of the virus into the SCP Schuylkill facility.

As of November 10, 2020, the BOP COVID-19 statistics were as follows: (1) 2,455 inmates and 981 staff had confirmed positive tests; (2) 17, 067 inmates and 1,543 staff had recovered and (3) 135 inmates and 2 staff had died. FCI Schuylkill – where the Plaintiff was housed at the adjacent satellite camp, SCP Schuylkill – had as of November 11, 2020, 4 positive cases among staff, as well as 1 inmate and 1 staff member who had recovered. FCI Schuylkill later became the epic-center for the coronavirus as employees were permitted and/or required to continue working after being exposed to the virus which caused it to spread into the facility. On August 10, 2020, Plaintiff was placed in the custody and care of the BOP, and was housed at the SCP Schuylkill satellite camp to begin serving the federal sentence. At the time of his arrival, Plaintiff was about 5 feet 6, weighed about 180 pounds with a BMI of more than 30. Employees at SCP Schuylkill knew that a BMI of 30 or higher puts one in the "obese" category per the CDC, and that with a BMI of at least 30, Plaintiff was obese and at risk of getting severely sick. Employees at SCP Schuylkill also knew that the Plaintiff's obesity, his race, and being an ethnic minority placed him at a higher risk of severe illness or death if he were to be exposed to and contracted COVID-19.

7

Prior to December of 2020, Plaintiff tested negative for the COVID-19 virus. In late December of 2020, a massive COVID-19 outbreak occurred in the main FCI Schuylkill campus that resulted in at least 160 inmates testing positive for COVID-19. On December 23, 2020, the COVID-19 outbreak made its way to SCP Schuylkill and inmates as well as staff tested positive for the virus. Despite the fact that the main FCI Schuylkill institution was the epic-center of the coronavirus, Plaintiff was forced into quarantine or transferred for housing to a facility at a much higher security level than he should have been exposed to. Plaintiff initially tested negative for the virus on December 23, 2020 before being quarantined, and while was housed at the epic-center of the virus, Plaintiff was exposed to the coronavirus. Employees at SCP Schuylkill failed to take any precautionary measures to prevent or stop the spread of the virus and continued working after being exposed to the virus, and as a result of this persistent course of action, on March 2, 2021, and again on September 1, 2021, Plaintiff was exposed to and placed at risk of contracting the coronavirus virus after multiple individuals as well as staff tested positive for having COVID-19 at SCP Schuylkill. On June 25, 2021, Plaintiff submitted an Administrative Tort Claim to the BOP pursuant to the Federal Tort Claims Act for exposure to dangerous prison conditions as a result of the failure of employees at SCP Schuylkill to, among other things, follow mandatory health and safety protocols to prevent the spread of a contagious disease. Meanwhile, on November 23, 2021, Plaintiff's convictions and sentence were reversed on the ground that he was not guilty of the offense of which he was unjustly convicted and the alleged conduct for which he had been falsely accused constituted no offense against the United States. Significantly, in reversing his unjust conviction, the Third Circuit noted that "Johnson's behavior wasted public time and resources and distracted court officials from their work. But only Congress enjoys the authority to turn conduct into a federal crime." *United States v. Johnson*, 19 F.4th 248, 263 (3rd Cir. 2021).

8

Citing *Berger v. United States*, 295 U.S. 78, 88 (1935), the Third Circuit painstakingly commented on the Government's conduct in bringing the prosecution as follows:

> "for bad acts to constitute crimes, at trial the Government must prove each element beyond a reasonable doubt. This is because the Government, through the United States Attorney, "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."" "That ancient guarantee was not honored."

*Id.*

On January 4, 2022, in accordance with the November 23, 2021 published opinion and the December 9, 2021 judgment of the Court of Appeals for the Third Circuit, the district court entered a final judgment of acquittal. By letter dated February 11, 2022, Plaintiff's Administrative Claim was denied by the BOP. *See* **Exhibit** A. Plaintiff now brings this action to seek redress.

## COUNT ONE: AGAINST DEFENDANT WRIGHT
### (Malicious Prosecution)

8.    Plaintiff adopts and incorporates each and every factual allegation contained in the preceding paragraphs as set-forth herein.

9.    On or about June 27, 2019, Defendant Wright, without any probable cause, instituted or caused to be instituted, a criminal proceeding against the Plaintiff that falsely accused Plaintiff of having made a "materially" false statement, in violation of 18 U.S.C. §1001, and aggravated identity theft in connection with the purported "materially" false statement, in violation of 18 U.S.C. §1028A. Defendant Wright knew or should have known that there were no evidence that the Plaintiff had made a "materially" false statement, and therefore did not commit aggravated identity theft in connection with the purported false statement as "materiality" was a necessary and required element to constitute probable cause and a federal crime under 18 U.S.C. §1001.

9

10.     Defendant Wright instituted or caused to be instituted the criminal proceeding against the Plaintiff with malice and for a purpose other than bringing the Plaintiff to justice.

11.     Pursuant to the Defendant's false accusations, on June 28, 2019, Plaintiff was arrested, booked, fingerprinted, photographed, and detained. Plaintiff was subsequently convicted and sentenced to 32 months imprisonment, and on August 10, 2020, the Plaintiff began serving the sentence. Upon conclusion of the criminal proceedings and appeal, on November 23, 2021, Plaintiff's convictions and sentence were reversed, and Plaintiff was acquitted and discharged of all of the charges that Defendant Wright instituted or caused to be instituted against the Plaintiff.

12.     As a result of Defendant Wright's conduct and actions, Plaintiff has suffered and will continue to suffer severe mental anguish, loss of reputation, and other compensable damages.

## COUNT TWO: AGAINST DEFENDANT WRIGHT
### (Negligence)

13.     Plaintiff adopts and incorporates each and every factual allegation contained in the preceding paragraphs as set-forth herein.

14.     At all times relevant, Defendant Wright owed the Plaintiff a duty to, inter alia, refrain from prosecuting a charge that he know is not supported by probable cause, including, a duty to seek justice within the bounds of the law. Defendant Wright knew, or should have known, that the Plaintiff had committed no crime in that he did not make a "materially" false statement as the Defendant falsely claimed, and that Congress require both falsity and "materiality" to impose liability under 18 U.S.C. §1001. Defendant Wright breached his duty to the Plaintiff by prosecuting a charge that he knew or should have known was not supported by probable cause and by failing to seek justice other than to merely convict the Plaintiff of the baseless charges.

15.     As a result of the Defendant's conduct and actions, Plaintiff has suffered and will continue to suffer severe mental anguish, loss of reputation, and other compensable damages.

## COUNT THREE: AGAINST DEFENDANT WRIGHT
(Defamation)

16.     Plaintiff adopts and incorporates each and every factual allegation contained in the preceding paragraphs as set-forth herein.

17.     On or about June 28, 2019, and continuing thereafter, Defendant Wright made or caused to be made unprivileged false statements of fact to third parties, known and unknown, to the effect that the Plaintiff had, among other things, made a "materially" false statement.

18.     Defendant's statements that the Plaintiff had made a "materially" false statement were complete fabrications, were untrue and defamatory *per se*. Plaintiff did not make any "materially" false statement. Defendant Wright made the false and defamatory statements with malice for the sole purpose of impugning the Plaintiff of having committed a federal crime for which he was liable to be punished under Federal law. In making the defamatory statements, *Defendant* Wright acted intentionally, maliciously, willfully and with the intent to cause and inflict injury upon the Plaintiff.

19.     Defendant Wright knew or should have known that his statements were false, and willfully and deliberately published them or caused them to be published with actual knowledge that they were false or with reckless disregard of whether they were false or not. Defendant Wright either knew that the statements were false or conducted no investigation concerning the truth or veracity of the defamatory statements with the sole purpose of impugning the Plaintiff of having committed a federal crime for which the Plaintiff was liable, and in fact was unjustly punished.

20.     As a result, Plaintiff has sustained damages, and has suffered and continues to suffer mental anguish and personal humiliation, and other compensable damages.

## COUNT FOUR: AGAINST DEFENDANTS WRIGHT AND KUECHLER
(False Arrest)

21.     Plaintiff adopts and incorporates each and every factual allegation contained in the preceding paragraphs as set-forth herein.

22.     On or about June 27, 2019, Defendant Wright, without any probable cause, instituted or caused to be instituted, a criminal proceeding against the Plaintiff that falsely accused Plaintiff of having made a "materially" false statement, in violation of 18 U.S.C. §1001, and aggravated identity theft in connection with the purported "materially" false statement, in violation of 18 U.S.C. §1028A.

23.     Defendants Wright and Kuechler knew or should have known that there was no evidence that the Plaintiff had made a "materially" false statement, and therefore did not commit aggravated identity theft in connection with the purported false statement as "materiality" was a necessary and required element to constitute a federal crime under 18 U.S.C. §1001.

24.     On June 28, 2019, Plaintiff was arrested in connection with the criminal proceeding, and on November 24, 2021, Plaintiff was released on the ground that he was innocent and had not committed any crime against the United States.

25.     As a result of the Defendants' conduct and actions, Plaintiff has suffered, and will continue to suffer, severe mental anguish, medical and other related expenses, and loss of income, and other compensable damages.

## COUNT FIVE: AGAINST DEFENDANTS WRIGHT AND KUECHLER
(False Imprisonment)

26.     Plaintiff adopts and incorporates each and every factual allegation contained in the preceding paragraphs as set-forth herein.

27.     On or about June 27, 2019, Defendant Wright, without any probable cause, instituted or caused to be instituted, a criminal proceeding against the Plaintiff that falsely accused Plaintiff of having made a "materially" false statement, in violation of 18 U.S.C. §1001, and aggravated identity theft in connection with the purported "materially" false statement, in violation of 18 U.S.C. §1028A. Defendant Wright and Kuechler knew or should have known that there was no evidence that the Plaintiff had made a "materially" false statement, and therefore did not commit aggravated identity theft in connection with the purported false statement as "materiality" was a necessary and required element to constitute a federal crime under 18 U.S.C. §1001.

28.     On June 28, 2019, Plaintiff was restrained in connection with the criminal proceeding, and on November 24, 2021, Plaintiff was released on the ground that he was innocent and had not committed any crime against the United States in that the Defendants knew, or should have known, that there was no evidence that the Plaintiff actually made a "materially" false statement to be liable for violation of 18 U.S.C. §1001, and therefore did not commit aggravated identity theft in connection with the purported false statement.

29.     Defendants' actions caused the Plaintiff to be unlawfully deprived of his liberty and Plaintiff was detained against his will for more than 29 months.

30.     As a result of the Defendants' conduct and actions, Plaintiff suffered damage by being unlawfully held against his will for an extended period of time.

### COUNT SIX: AGAINST DEFENDANTS WRIGHT AND KUECHLER
#### (Civil Rights Violation)

31.     Pleading further and in the alternative, Defendants Wright and Kuechler while acting under color of Federal law, violated the Plaintiff's civil rights to procedural due process by planting, fabricating, and manufacturing evidence to secure the Plaintiff's unjust conviction.

32.     Specifically, on or about June 27, 2019, Defendant Wright, without probable cause, instituted or caused to be instituted, a criminal proceeding against Plaintiff that falsely accused him of making a "materially" false statement, in violation of 18 U.S.C. §1001, and aggravated identity theft in connection with the purported false statement, in violation of 18 U.S.C. §1028A, arising out of an alleged false filing that allegedly occurred in the Federal District Court in the Eastern District of Pennsylvania on or about February 1, 2016.

33.     Based upon information and belief, during the course of his investigation, Defendant Kuechler, planted the Plaintiff's fingerprints on pieces of tape affixed to the outside of the envelope containing the filing for the sole purpose and intent to link Plaintiff to the false filing.

34.     Based upon further information and belief, during the course of his investigation, Defendant Kuechler, also fabricated other evidence that was intended for the sole purpose and intent to link Plaintiff to the alleged false filing by creating and manufacturing a document described as "Devout Player Hater Internet Post (2001 Honda Accord EX V6 power steering)" which was purportedly an internet posting that the Plaintiff allegedly authored that never existed.

35.     During the course of the trial, Defendant Wright, having knowledge or who should have had knowledge of the fabricated and manufactured evidence, elicited and suborned perjured testimony from Defendant Kuechler about the false evidence and proffered the fabricated and manufactured document into evidence at the Plaintiff's trial to establish a causal link between the Plaintiff, the Devout Player Hater character, and the purported false filing. On November 14, 2019, a petit jury relied on the fabricated and manufactured evidence to convict the Plaintiff of the baseless charges, and on February 28, 2020, Plaintiff was sentenced to 32 months imprisonment.

36.     On November 23, 2021, Plaintiff's convictions and sentence were reversed on the ground that he was not guilty of the offense of which he was unjustly convicted.

37.     As a result of the Defendants' unlawful actions, Plaintiff was falsely arrested, unjustly convicted, and imprisoned in violation of his civil rights to procedural due process.

## COUNT SEVEN: AGAINST DEFENDANTS WRIGHT AND KUECHLER
### (Intentional Infliction of Emotional Distress)

38.     Plaintiff adopts and incorporates each and every factual allegation contained in the preceding paragraphs as set-forth herein.

39.     Defendants Wright and Kuechler deliberately and intentionally fabricated, manufactured and proffered at trial evidence that it knew or should have known was false and would be relied on by the jury to wrongly convict the Plaintiff. This conduct was perpetrated by the Defendants beyond the scope of their employment. Defendant is liable for all of the acts committed by its agents, servants, and employees within the scope of their employment.

40.     Defendant Wright and Kuechler's conduct as described in the preceding paragraphs was extreme and outrageous and was done intentionally, recklessly, in bad faith and in deliberate disregard of a high degree of probability that emotional distress would result to the Plaintiff.

41.     Defendants Wright and Kuechler knew or should have known that their conduct would or could cause emotional distress upon the Plaintiff, and in fact it did cause emotional distress upon the Plaintiff. Defendants Wright and Kuechler's conduct as described in the preceding paragraphs was malicious, willful, deliberate, and intentional and was done for the sole purpose of inflicting severe emotional distress upon the Plaintiff.

42.     As a result, Plaintiff has suffered physical harm due to the Defendants' extreme and outrageous conduct, including, but not limited to loss of sleep, headaches, severe mental pain, depression and will continue to suffer severe and extreme emotional distress, loss of sleep, headaches, severe mental pain, and depression as a result of the Defendant's employees' conduct.

## COUNT EIGHT: AGAINST DEFENDANT UNITED STATES
### (Negligence)

43.     Plaintiff adopts and incorporates each and every factual allegation contained in the preceding paragraphs as set-forth herein.

44.     At all times relevant, Plaintiff was confined at SCP Schuylkill in Minersville, PA serving a federal sentence.

45.     Pursuant to 18 U.S.C. §4042, Defendant owed Plaintiff a legal duty of care, as a federal prisoner in its custody to, among other things, "provide suitable quarters, and provide for the safe keeping, care and subsistence of all persons charged with or convicted of offenses against the United States." This duty of care required the Defendant to protect Plaintiff from the exposure to dangerous prison conditions including the corona virus.

46.     BOP COVID-19 Action Plan also required that employees at all BOP facilities, including, SCP Schuylkill, enforce and strictly follow CDC guidelines to prevent the spread of the virus into the facility. SCP Schuylkill and its employees knew or should have known about the risks and dangers of the coronavirus, but failed to do anything to prevent the spread of it into the facility. Based upon information and belief, employees at SCP Schuylkill negligently or intentionally destroyed records that documented staff with related coronavirus type symptoms.

47.     SCP Schuylkill and its employees breached its duty of care by, among other things, failing to provide suitable quarters and provide for the safekeeping, and care of the Plaintiff, including, failing to follow national guidelines in the prevention and testing for COVID-19, and by otherwise failing to adequately protect the Plaintiff from the exposure to dangerous prison conditions including the coronavirus, and negligently or intentionally destroying records that documented employees with coronavirus symptoms.

48.     As a direct and proximate result of the breach, Plaintiff was injured and sustained damages. Plaintiff suffered, and continues to suffer, among other things, loss of sleep, worriation, depression, anxiety, and other known and unknown complications after being exposed to the coronavirus on multiple occasions, while in the Defendant's custody and care.

## COUNT NINE: AGAINST DEFENDANT UNITED STATES
### (Negligent Infliction of Emotional Distress)

49.     Plaintiff adopts and incorporates each and every factual allegation contained in the preceding paragraphs as set-forth herein.

50.     Defendant, SCP Schuylkill, and its employees created a zone of physical danger when it failed to, among other things, follow national guidelines in the prevention and testing for COVID-19, and by otherwise failing to adequately protect the Plaintiff from the exposure to dangerous prison conditions including the coronavirus.

51.     Defendant, SCP Schuylkill, and its employees knew that the Plaintiff was obese, and that he was at a higher risk of severe illness or death if he was exposed to COVID-19. Plaintiff was repeatedly exposed to the coronavirus, and suffered immediate and substantial physical harm.

52.     On March 2, 2021, and September 1, 2021, Plaintiff was exposed to and placed in constant fear of contracting the coronavirus and being infected after multiple outbreaks of the virus at SCP Schuylkill.

53.     Plaintiff sustained severe emotional distress, loss of sleep, worriation, depression, anxiety, mental anguish and continue to be exposed to and placed in constant fear of being infected with the virus that is likely to cause severe physical harm, severe illness, or even death.

## COUNT TEN: AGAINST DEFENDANT UNITED STATES
### (Intentional Infliction of Emotional Distress)

54.     Pleading further and in the alternative, at all times relevant, employees at SCP Schuylkill, deliberately and intentionally destroyed records that documented staff with related coronavirus type symptoms, and then knowingly and willfully failed to follow any CDC guidelines to prevent the spread of the coronavirus into the facility.

55.     At all times relevant, employees at SCP Schuylkill knew that a BMI of 30 or higher puts one in the "obese" category, and that with a BMI of at least 30, Plaintiff was obese, and at risk of getting severely sick. Employees at SCP Schuylkill knew that the Plaintiff was at high risk of severe illness or death if he were to be exposed to the coronavirus.

56.     On December 23, 2020, despite the fact that the main FCI Schuylkill institution was the epic-center of the coronavirus, employees at SCP Schuylkill being fully cognizant of the risks, forced the Plaintiff to the FCI Schuylkill main facility for the sole purpose and with the specific intent of exposing him to the virus so that he could contract the disease and become severely ill or suffer death from the exposure to deadly virus.

57.     This conduct was perpetrated by the agents, servants, and employees of the Defendant within the scope of their employment. Defendant is liable for all of the acts committed by its agents, servants, and employees within the scope of their employment.

58.     Defendant's employees' conduct at SCP Schuylkill as described in the preceding paragraphs was extreme and outrageous and was done intentionally, recklessly, in bad faith and in deliberate disregard of a high degree of probability that emotional distress would result to Plaintiff.

59.     Defendant's employees knew or should have known that their conduct would or could cause emotional distress upon the Plaintiff, and it did cause emotional distress upon Plaintiff.

60.     Defendant's employees' conduct was malicious, willful, deliberate, and intentional and was done for the sole purpose of inflicting severe emotional distress upon the Plaintiff.

61.     As a result, Plaintiff has suffered physical harm due to the defendant's employees' outrageous conduct, including, but not limited to loss of sleep, headaches, severe mental pain, depression and will continue to suffer severe and extreme emotional distress, loss of sleep, headaches, severe mental pain, and depression as a result of the Defendant's employees' conduct.

## DEMAND FOR RELIEF

a)     Plaintiff demands judgment in his favor on his claims against Defendants Wright and Kuechler, jointly and severally, in the amount of Three Hundred Thousand ($300,000) Dollars, as and for compensatory damages.

b)     An award of general and special damages for the Defendants' wrongful acts;

c)     An award of punitive damages for the Defendants' reprehensible and outrageous conduct, and to deter the Defendants' future reprehensible and outrageous conduct;

d)     An award of costs and any reasonable attorney fees incurred in this action; and

e)     For such further and other relief as the Court deems just and proper.

f)     Plaintiff further demands judgment in his favor on his claims asserted against Defendant United States of America, in the amount of Two Hundred Thousand ($200,000) Dollars, as and for compensatory damages.

g)     An award of general and special damages for the Defendant's wrongful acts;

h)     An award of punitive damages for the Defendant's reprehensible and outrageous conduct, and to deter the Defendant's future reprehensible and outrageous conduct;

i)     An award of costs and any reasonable attorney fees incurred in this action; and

j)     For such further and other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on each and every issue triable herein by jury.

Respectfully submitted,


*Joe Johnson*
JOE JOHNSON
POST OFFICE BOX 441572
FORT WASHINGTON, MD   20749

20

Case 2:22-cv-02905-JS   Document 1-2   Filed 07/05/22   Page 1 of 1

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Joe JOHNSON | Linwood Clinton WRIGHT, Jr., Kurt Leonard KUECHLER, and United States of America |

**(b)** County of Residence of First Listed Plaintiff  Prince George's
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Montgomery
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

JUL 5 2022

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☒ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | | PTF | DEF |
|---|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☒ | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*

Brief description of cause:
Malicious Prosecution, Negligence, Defamation, False Arrest, False Imprisonment, and Civil Rights Violation

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. | DEMAND $ 500,000 | CHECK YES only if demanded in complaint: JURY DEMAND: ☒ Yes ☐ No |
|---|---|---|---|

## VIII. RELATED CASE(S) IF ANY

*(See instructions:)*   JUDGE _____   DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| Jun 24, 2022 | *Joe Johnson* |

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

EXHIBIT J

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Statistics*



$ \quad $ ━━━━ SPECIAL REPORT ━━━━

MARCH 2011 $\qquad\qquad\qquad\qquad\qquad\qquad\qquad\qquad\qquad\qquad\qquad$ NCJ 233094

# Punitive Damage Awards in State Courts, 2005

By Thomas H. Cohen, J.D., Ph.D., *BJS Statistician*
and Kyle Harbacek, *BJS Intern*

Punitive damages were sought in 12% of the estimated 25,000 tort and contract trials concluded in state courts in 2005. Punitive damages were awarded in 700 (5%) of the 14,359 trials where the plaintiff prevailed. Among the trials in which punitive damages were requested by plaintiff winners, 30% received these damages. The median punitive damage award for the 700 trials with punitive damages was $64,000 in 2005, and 13% of these cases had punitive awards of $1 million or more.

Damages awarded in civil trial litigation can take the form of compensatory or punitive awards. Punitive damages are not awarded for the purpose of compensating injured plaintiffs, but are almost exclusively reserved for civil claims in which the defendant's conduct was considered grossly negligent or intentional. Punitive damages are intended to serve as a means for punishing the defendant and deterring others from committing similar actions (*Black's Law Dictionary*, 1990).

This BJS special report examines tort and contract cases concluded by bench or jury trial in which punitive damages were sought or granted in a national sample of state trial courts in 2005. The report on punitive damages in civil trials is the

fourth in a series based on data collected from the 2005 Civil Justice Survey of State Courts (CJSSC). The CJSSC examines tort, contract, and real property cases disposed by bench and jury trials in general jurisdiction courts in 2005. Since the CJSSC is based on a 2005 disposition date, many of these cases were filed in prior years, but disposed in 2005. Cases were classified as trials for inclusion in the CJSSC if both litigants appeared at trial, both sides presented contested evidence, at least one litigating party sought monetary damages, and the trial was heard through completion.

The CJSSC provides case-level information about sampled civil trials, such as characteristics of litigants involved in trials, type of trial (i.e., bench or jury), civil trial winners, compensatory and punitive damage awards, and case processing times. The 2005 CJSSC examined tort, contract, and real property trials concluded in a national sample of urban, suburban, and rural jurisdictions. Prior iterations of the CJSSC focused on tort, contract, and real property trial litigation in a sample of the nation's 75 most populous counties. The 2005 CJSSC also represents the first time that information was collected on whether litigants requested punitive damages in civil trial litigation.

---

## HIGHLIGHTS

- Litigants sought punitive damages in 12% of the estimated 25,000 civil trials concluded in 2005.

- Punitive damages were sought in 10% of all tort trials; however, for certain case types including slander or libel, conversion, and intentional tort cases, punitive damages were requested in approximately 30% of trials.

- Punitive damages were awarded in 700 (5%) of the 14,359 trials where plaintiffs prevailed.

- Plaintiffs received punitive damages in 30% of the 1,761 civil trials in which these damages were requested and the plaintiff prevailed.

- The median punitive damage award was $64,000, and 13% of cases with punitive awards had damages of $1 million or more.

- In 76% of the 632 civil trials with both punitive and compensatory damages, the ratio of punitive to compensatory damages was 3 to 1 or less.

- Differences in punitive damages between bench and jury trials were greater in contract cases than in tort cases.

- Litigants filed motions for post-trial relief in nearly half of civil trials with punitive damages and appeals in about a third of civil trials with punitive damages.



## Punitive damages were sought in 12% of civil trials

Punitive damages were sought in 12% of the estimated 25,000 tort and contract trials concluded in the national sample of counties in 2005 (table 1). Real property trials are not analyzed in this report because information on plaintiff winners receiving punitive damages for this case type were not available.

Punitive damages were sought in 10% of the 16,057 tort trials; however, for certain tort case types, such as slander or libel, conversion, and intentional tort cases, punitive damages were requested in approximately 30% of trials. For the more common tort case types, including premises liability, automobile accident, and medical malpractice—which together accounted for 84% of tort trials—litigants requested punitive damages in 7% of these cases.

Punitive damages were sought in 16% of the 8,874 contract trials concluded in the national sample in 2005. For certain contract case types, such as tortious interference, fraud, and employment discrimination cases, punitive damages were sought in more than 30% of trials. In some of the more common contract case types, such as seller plaintiff cases, punitive damages were sought in less than 10% of trials.

The variation in punitive damage claims by case type might be influenced by the legal elements inherent in the CJSSC case categories. Certain civil claims, such as intentional torts (e.g., assault or battery) or slander or libel tend to have elements of willful or intentional behavior that would be expected to support a punitive damages request.[1] Other CJSSC case categories, such as automobile accident or premises liability, typically do not involve elements of intentional or reckless behavior that could be used to support a punitive damages award.

[1]Eisenberg, Theodore; Heise, Michael; Waters, Nicole L.; and Wells, Martin T., The Decision to Award Punitive Damages: An Empirical Study (June 1, 2009). Cornell Legal Studies Research Paper No. 09-011, CELS 2009 4th Annual Conference on Empirical Legal Studies Paper. Available at SSRN: http://ssrn.com/abstract=1412864.

### TABLE 1
**Percentage of civil trials in state courts with litigants seeking punitive damages, by all trials and trials with plaintiff winners, 2005**

| Case type | All civil trials | | Civil trials with plaintiff winners | |
|---|---|---|---|---|
| | Number | Punitive damages sought | Number | Punitive damages sought |
| All cases | 24,929 | 12% | 14,550 | 13% |
| Tort[a] | 16,057 | 10% | 8,645 | 10% |
| Slander/libel | 186 | 33 | -- | -- |
| Conversion | 377 | 31 | -- | -- |
| Intentional tort | 724 | 29 | 429 | 33 |
| Other or unknown tort | 642 | 24 | 305 | 27 |
| Product liability[b] | 350 | 12 | 101 | 4 |
| Professional malpractice | 143 | 15 | -- | -- |
| Medical malpractice | 2,448 | 8 | 591 | 10 |
| Automobile accident | 9,173 | 7 | 6,062 | 7 |
| Premise liability | 1,815 | 5 | 718 | 4 |
| Contract[c] | 8,874 | 16% | 5,904 | 17% |
| Tortious interference | 151 | 42 | -- | -- |
| Fraud | 1,108 | 32 | 665 | 39 |
| Employment[d] | 873 | 32 | 491 | 36 |
| Other or unknown contract | 242 | 21 | 137 | 23 |
| Buyer Plaintiff | 2,574 | 17 | 1,642 | 23 |
| Seller plaintiff | 2,871 | 6 | 2,184 | 4 |
| Rental/lease | 605 | 4 | 342 | 4 |

Note: Information on whether punitive damages were sought indicates formal requests for punitive damages in the complaint or made by parties prior to trial verdict or judgment date. Data on the number of trials in which punitive damages were sought were available for 99.9% of all civil trials and 99.9% of civil trials with plaintiff winners. Several tort and contract case categories are not shown because there were too few cases of such types to obtain statistically reliable estimates. Detail may not sum to total due to rounding.
--Too few cases to obtain statistically reliable estimates.
[a]Includes all tort cases, including those not listed in this table.
[b]Includes asbestos and other product liability cases.
[c]Includes all contract cases, including those not listed in table.
[d]Includes employment discrimination and other employment dispute cases.

---

## Report focuses on punitive damages in the 3% of civil cases concluded by trial

When examining punitive damage awards in civil trial litigation, it is important to consider that the number of cases being analyzed is relatively small compared to the entire universe of potential civil dispositions. The 2005 CJSSC included aggregate counts of civil trial and non-trial dispositions in 116 jurisdictions. In these jurisdictions, an estimated 3% of the 439,341 civil cases were disposed of by bench or jury trial (table 2). Trial rates varied slightly across the primary civil case categories with 4% of tort and 2% of contract cases being resolved through bench or jury trial. Although punitive award figures are available for the 3% of civil cases disposed through trial, no information is available about punitive damages as part of the settlement agreement for civil cases that settled.

### TABLE 2
**Number of trial and non-trial dispositions of civil cases, 2005**

| Case type | Jurisdictions reporting | Total dispositions | Disposition by trial | |
|---|---|---|---|---|
| | | | Number | Percentage |
| All civil cases | 116 | 439,341 | 14,812 | 3.4% |
| Torts | 104 | 140,929 | 4,986 | 3.5 |
| Contacts | 107 | 189,619 | 4,014 | 2.1 |

Note: The percentage of civil cases disposed of by trial were not calculated from all 156 jurisdictions participating in the 2005 CJSSC. A total of 116 jurisdictions were able to provide counts of both trial and non-trial dispositions for all civil cases. The tort and contract case categories will not sum to totals because fewer jurisdictions provided counts of trial and non-trial dispositions for all case types. Data presented only represent counts of dispositions in the reporting counties. They are not weighted to provide national-level estimates.

## Punitive damages were sought in a fifth of trials involving individuals suing government defendants

The CJSSC data allow for an examination of punitive damage claims by the characteristics of plaintiffs and defendants involved in civil trial litigation. In more than 70% of civil trials, individuals sued either other individuals or businesses (table 3). For these trials, punitive damages were requested relatively infrequently. Punitive damages were sought in 10% of trials in which both the plaintiff and defendant were individuals and 16% of trials in which the plaintiff was an individual and the defendant a business. The third most common litigant pairing category involved businesses suing other businesses, and punitive damages were sought in 13% of these cases. Punitive damages were also sought in about 21% of trials with individual plaintiffs and government defendants.

## Litigants sought punitive damages in 25% of trials with compensatory awards exceeding $1 million

Compensatory damages are awarded for the purpose of compensating injured parties for economic (e.g., lost wages and medical expenses) or non-economic (pain and suffering) damages. Litigants sought punitive damages in 12% of civil trials with compensatory awards ranging from $1 to $100,000, and 15% of trials with compensatory awards ranging from $100,001 to $1 million (table 4). Punitive damages were sought in 25% of civil trials with compensatory awards above $1 million.

**TABLE 3**
**Percentage of civil trials in state courts with litigants seeking punitive damages, by litigant pairings and trials with plaintiff winners, 2005**

| | All civil trials | | Civil trials with plaintiff winners | |
|---|---|---|---|---|
| Litigant pairings | Number | Punitive damages sought | Number | Punitive damages sought |
| Individual versus— | | | | |
| Individual | 10,280 | 10% | 6,026 | 10% |
| Business | 7,210 | 16 | 4,356 | 19 |
| Hospital | 1,564 | 9 | 442 | 8 |
| Government | 1,218 | 21 | 458 | 21 |
| Business versus— | | | | |
| Individual | 1,709 | 7% | 1,293 | 4% |
| Business | 2,520 | 13 | 1,650 | 11 |

Note: Information on whether punitive damages were sought indicates formal requests for punitive damages in the complaint or made by parties prior to trial verdict or judgment date. Data on litigant pairings available for 99% of civil trials. Table excludes trials with litigant pairings involving businesses suing governments or governments/hospitals suing various parties because there were too few trials in each category to produce reliable estimates.

**TABLE 4**
**Percentage of civil trials in state courts with litigants seeking punitive damages, by compensatory damage award amounts, 2005**

| Amount of compensatory damages awarded | Number of civil trials | Punitive damages sought |
|---|---|---|
| None | 9,733 | 11% |
| $1 to $50,000 | 9,462 | 12 |
| $50,001 to $100,000 | 2,012 | 12 |
| $100,001 to $250,000 | 1,527 | 15 |
| $250,001 to $1,000,000 | 1,347 | 15 |
| Over $1 Million | 638 | 25 |

Note: Information on whether punitive damages were sought indicates formal requests for punitive damages in the complaint or made by parties prior to the trial verdict or judgment date. Data on compensatory award amounts were available for 99% of civil trials with these damages.

## Punitive damages were awarded in 5% of trials with plaintiff winners

Punitive damages were awarded in 700 (5%) of the 14,359 civil trials in which the judge or jury found for the plaintiff (table 5). By general case type, punitive damages were awarded in a higher percentage of contract trials (8%) than tort trials (3%). Several prevalent case categories, including medical malpractice, automobile accident, and premises liability, recorded punitive damages being awarded in 1% or less of cases.

In comparison to these case categories, several specific case types concluded with relatively higher rates of punitive damage awards. Among torts, punitive damages were awarded in nearly a third of intentional tort cases. For contracts, courts awarded punitive damages in more than a fifth of contractual fraud or employment discrimination cases.

**TABLE 5**
**Plaintiff winners awarded punitive damages in civil trials in state courts, by case type, 2005**

| Case type | Number of trials | Percentage awarded punitive damages[a] |
|---|---|---|
| All cases | 14,359 | 5% |
| Tort[b] | 8,519 | 3% |
|   Intentional tort | 426 | 30 |
|   Other or unknown tort | 299 | 5 |
|   Product liability[c] | 95 | 1 |
|   Medical malpractice | 567 | 1 |
|   Automobile | 5,984 | 1 |
|   Premise liability | 712 | … |
| Contract[d] | 5,840 | 8% |
|   Fraud | 661 | 23 |
|   Employment[e] | 447 | 22 |
|   Other or unknown contract | 132 | 15 |
|   Buyer plaintiff | 1,642 | 8 |
|   Rental/lease | 341 | 2 |
|   Seller plaintiff | 2,175 | 1 |

Note: Table includes only those trials in which one or more plaintiffs prevailed. Data on awarding of punitive damages were available for 98.5% of all trials. Several tort and contract case categories are not shown because there were too few cases to obtain statistically reliable estimates. Detail may not sum to total due to rounding.
[a]Includes some trials in which litigants did not seek but were awarded punitive damages.
[b]Includes all tort cases, including those not listed in table.
[c]Includes asbestos and other product liability cases.
[d]Includes all contract cases, including those not listed in table.
[e]Includes employment discrimination and other employment dispute cases.
…Less than 0.5%.

## Punitive damages were awarded in nearly 1 of every 3 trials in which these damages were requested

The overall percentage of civil trials with plaintiff winners awarded punitive damages increases to 30% when the base of trials is reduced to include only those 1,761 trials in which punitive damages were sought (table 6). Punitive damages were awarded in 23% of tort and 35% of contract trials in which these damages were requested.

## Punitive damages were awarded in 7% of trials involving individual plaintiffs and business defendants

Overall, there was little difference in the percentage of trials with punitive damage awards when categorized by litigant pairings. The percentage of trials with punitive damages ranged from 3% in cases involving business litigants only to 7% in cases involving individual plaintiffs and business defendants (table 7). Among trials in which punitive damages were requested, damages were awarded in a third involving individual plaintiffs and business defendants (33%) (not shown in table).

**TABLE 6**
**Plaintiff winners who requested and were awarded punitive damages in civil trials in state courts, by case type, 2005**

| Case type | Number of trials | Percentage awarded punitive damages |
|---|---|---|
| All cases | 1,761 | 30% |
| Tort | 790 | 23 |
| Contract | 971 | 35 |

Note: Table includes only those trials in which one or more plaintiffs prevailed and sought punitive damages. The number of trials with punitive damage awards in all cases (table 5) will not match the number with punitive damage awards in cases where these damages were requested (table 6). In some instances, statutory rules allow jury or judge to consider awarding punitive damages in cases where no formal request was made. Data on awarding of punitive damages were available for 96.6% of trials in which these damages were formally requested. Detail may not sum to total due to rounding.

**TABLE 7**
**Plaintiff winners awarded punitive damages in civil trials in state courts, by litigant pairings, 2005**

| Litigant pairings | Number of trials | Percentage awarded punitive damages |
|---|---|---|
| Individual versus— | | |
|   Individual | 5,994 | 4% |
|   Business | 4,236 | 7 |
|   Hospital | 432 | 6 |
|   Government | 445 | 5 |
| Business versus— | | |
|   Individual | 1,290 | 5% |
|   Business | 1,638 | 3 |

Note: Table includes only those trials in which the plaintiff prevailed. Table excludes trials with litigant pairings involving businesses suing hospitals or governments or governments/hospitals suing various parties because there were too few trials in these litigant pairing categories to produce statistically reliable estimates. Data on awarding of punitive damages were available for 98.3% of all trials.

**Median punitive damage awards were $64,000**

The median damage amounts awarded to plaintiff winners in the 700 trials with punitive damages was $64,000 (table 8). Nearly 30% of punitive awards equaled or exceeded $250,000 and 13% were $1 million or more. For the general civil case categories, the median punitive awards ranged from $55,000 in tort to $69,000 in contract cases.

**In 76% of trials with punitive damages the ratio of punitive to compensatory awards was 3 to 1 or less**

The relationship between the plaintiff's economic and non-economic losses and the amount of punitive damages awarded, as expressed by the ratio of compensatory and punitive damages, has been an area of interest in Supreme Court jurisprudence. In several cases—culminating in the 2003 decision of *State Farm Automobile Insurance Company*

*v. Campbell* (123 S.Ct. 1513: 1524, April 7, 2003)—the Court held that, "Few awards exceeding a single digit ratio between punitive and compensatory damages…will satisfy due process." Eight percent of trials with punitive damages reported ratios of punitive to compensatory awards of greater than 10 to 1 (not shown in table).

In 76% of the 632 civil trials with both punitive and compensatory awards, the ratio of punitive to compensatory damages was 3 to 1 or less (table 9). In trials with a ratio of punitive to compensatory awards ranging between 1 to 1 and 3 to 1, the median punitive and compensatory awards were similar ($100,000). About 24% of trials with punitive damages registered a ratio of punitive to compensatory awards of more than 3 to 1. In these trials, the median compensatory award was about $22,000, while the median punitive award was $352,000.

**TABLE 8**
**Punitive damage award amounts in civil trials in state courts, by case type, 2005**

| Case type | Number of trials | Median punitive award | Percentage of trials with punitive damage awards | | | | |
|---|---|---|---|---|---|---|---|
| | | | Under $10,000 | $10,000–$49,999 | $50,000–$249,999 | $250,000–$999,999 | $1 million or more |
| All cases | 700 | $64,000 | 15% | 27% | 28% | 16% | 13% |
| Tort | 254 | 55,000 | 23 | 18 | 35 | 7 | 17 |
| Contract | 446 | 69,000 | 10 | 33 | 25 | 22 | 11 |

Note: The 700 trials with punitive damages includes trials in which punitive damages were not formally requested. In some instances, statutory rules allow jury or judge to consider awarding punitive damages in cases where no formal request was made. Medians calculated from only those cases in which punitive damages were awarded. Detail may not sum to total due to rounding.

**TABLE 9**
**Ratio of punitive to compensatory damage awards in civil trials in state courts, 2005**

| Punitive to compensatory awards ratio | Number of trials | Median damage awards | |
|---|---|---|---|
| | | Punitive | Compensatory |
| All civil trials | 632 | $76,000 | $58,000 |
| 1-to-1 ratio or less | 280 | 26,000 | 76,000 |
| >1-to-1 ratio and ≤ 3-to-1 ratio | 200 | 100,000 | 100,000 |
| >3-to-1 ratio | 151 | 352,000 | 22,000 |

Note: The number of trials with punitive and compensatory awards (632) will not equal the total number with punitive damages (700). There were 68 trials with punitive damages in which no compensatory damages were awarded. Medians calculated from only those cases in which both punitive and compensatory damages were awarded. Detail may not sum to total due to rounding.

## Differences in punitive damages between bench and jury trials were greater in contract than tort cases

Juries and judges differ more frequently in contract than in tort cases in terms of punitive damage award activity. Between tort bench and jury trials, no detectable differences were observed between the percent that requested or were awarded punitive damages (table 10). Even when the population of tort cases was restricted to those in which punitive damages were sought, the percentage of litigants awarded these damages in jury and bench trials were identical (22%) (not shown in table).

In contrast to tort cases, punitive damages were sought more frequently and awarded more often in contract jury trials than in contract bench trials. Punitive damages were sought in 28% of jury and 9% of bench trials involving contract claims. In cases with plaintiff winners, punitive damages were awarded in 20% of contract cases adjudicated before juries and 2% of contract cases tried before judges.

**TABLE 10**
**Comparing punitive damages between bench and jury civil trials concluded in state courts, 2005**

| Cases and outcomes | Jury trials | | | Bench trials | | |
|---|---|---|---|---|---|---|
| | | Confidence interval | | | Confidence interval | |
| | Estimate | Lower bound | Upper bound | Estimate | Lower bound | Upper bound |
| **Percent of all trials in which punitive damages were sought[a]** | | | | | | |
| All cases | 13% | 10% | 16% | 11% | 7% | 14% |
| Tort | 10 | 7 | 12 | 15 | 9 | 21 |
| Contract | 28 | 22 | 34 | 9 | 6 | 13 |
| **Percent of trials with plaintiff winners in which punitive damages were sought[b]** | | | | | | |
| All cases | 14% | 10% | 17% | 10% | 6% | 14% |
| Tort | 9 | 6 | 11 | 16 | 8 | 23 |
| Contract | 33 | 26 | 41 | 9 | 5 | 14 |
| **Percent of trials with plaintiff winners awarded punitive damages[c]** | | | | | | |
| All cases | 6% | 4% | 8% | 3% | 2% | 3% |
| Tort | 3 | 2 | 4 | 4 | 1 | 7 |
| Contract | 20 | 12 | 27 | 2 | 1 | 3 |

Note: Confidence intervals were calculated by using a replication method (i.e., jackknife, specifically JKN) available in WESVAR PC. Punitive damages analyses between bench and jury trials excludes jury trials in which the jury presided over the case but did not determine liability or damages including punitive awards. Among jury trials excluded are trials with a directed verdict, judgments notwithstanding the verdict (JNOV), and jury trials for defaulted defendants. The confidence interval is at a 95% level.
[a]The number of jury trials in which punitive damages could have been sought included 14,107 tort and 3,054 contract cases. The number of bench trials in which punitive damages could have been sought included 1,593 tort and 5,682 contract cases.
[b]The number of jury trials with plaintiff winners in which punitive damages could have been sought included 7,491 tort and 1,899 contract cases. The number of bench trials with plaintiff winners in which punitive damages could have been sought included 985 tort and 3,948 contract cases.
[c]The number of jury trials with plaintiff winners in which punitive damages could have been awarded included 7,376 tort and 1,838 contract cases. The number of bench trials with plaintiff winners in which punitive damages could have been awarded included 982 tort and 3,944 contract cases. The numbers in footnotes b and c differ because information on punitive damage awards was missing from 2% of civil trials.

## Post-trial motions were filed in nearly half of trials with punitive damages

After a trial reaches final verdict or judgment, litigants can file post-trial motions seeking to modify or overturn the trial court outcome. These motions include motions for judgments notwithstanding the verdict, or motions for a new trial, to modify the award, or for some other form of relief. Overall, litigants filed post-trial motions in nearly half (47%) of the 700 civil trials with punitive damage awards (table 11). In comparison, post-trial motions were filed in about 30% of the 14,550 civil trials with plaintiff winners, including those with and without punitive awards (not shown in table).

**TABLE 11**
**Post-trial motions filed in civil trials with punitive damages awarded to plaintiff winners in state courts, by case type, 2005**

| Case type | Number of trials | Percentage with post-trial motions |
|---|---|---|
| All cases | 700 | 47% |
| Tort | 254 | 50 |
| Contract | 446 | 45 |

Note: Post-trial relief includes motions for judgment notwithstanding the verdict (JNOV), new trial, award modification, or some other form of relief. Information on post-trial activity was available for all civil trials with punitive damage awards. Detail may not sum to total due to rounding.

## Litigants filed appeals in nearly a third of trials with punitive damages

Filing a notice with the trial court to take an appeal to the state's intermediate appellate court or court of last resort represents another option for litigants seeking to overturn or modify a verdict or judgment that they believe does not comply with state law. Notices of appeal were filed with the trial court by one or both parties in 29% of the 700 civil trials with punitive damage awards (table 12). Among the 14,550 civil trials with plaintiff winners, the percent in which an appeal was filed by one or both parties was 17% (not shown in table). Notices of appeal were filed in a fifth of tort and a third of contract cases with punitive damages.

**TABLE 12**
**Notices of appeal filed in civil trials with punitive damages awarded to plaintiff winners in state courts, by case type, 2005**

| Case type | Number of trials | Percentage of trials appealed |
|---|---|---|
| All cases | 700 | 29% |
| Tort | 254 | 21 |
| Contract | 446 | 33 |

Note: Appeals encompass cases in which the litigant filed a notice with the trial court judge to take an appeal. Information on appellate activity was available for all civil trials with punitive awards. Detail may not sum to total due to rounding.

## Methodology

The Civil Justice Survey of State Courts (CJSSC) examines tort, contract, and real property trials disposed of in general jurisdiction courts. The 2005 CJSSC contained two sampling frames. First, the sample was designed so that inferences could be made about general civil trials litigated in the nation's 75 most populous counties. The 75 most populous counties design was maintained in order to compute trends in civil trial litigation. The sample design for the 75 most populous counties sample was the same as the ones used for the 2001, 1996, and 1992 BJS civil trial studies.

### Selection of counties

The sample is a stratified sample with 46 of the 75 most populous counties selected. The 75 most populous counties were divided into five strata: four were based on civil disposition data obtained in 1992 through telephone interviews with court staff in the general jurisdiction trial courts, and one stratum was added in 2001 to reflect population changes. Stratum 1 consisted of the 14 counties with the largest number of civil case dispositions. Every county in stratum 1 was selected with certainty. Stratum 2 consisted of 13 counties with 11 chosen for the sample. From strata 3, 10 of the 18 counties were selected. Nine of the 26 counties in stratum 4 were included in the sample. Stratum 5 was added to the 2001 sample to replace Norfolk County, Massachusetts, a stratum 4 site that participated in the 1992 and 1996 studies but that fell out of the 75 most populous counties in the 2000 census. Mecklenburg County, North Carolina, and El Paso County, Texas, were randomly selected from the four counties whose population increased sufficiently that they joined the ranks of the 75 most populous counties.

In addition to sampling civil trial litigation in the nation's 75 most populous counties, a sample of counties from which to estimate the civil trial litigation outside the 75 most populous was developed. The sample of civil trial litigation outside the nation's 75 most populous counties was constructed by first forming 2,518 primary sampling units (PSUs) from 3,066 counties—3,141 U.S. counties total minus the 75 counties from the 2001 CJSSC. The PSUs were formed through use of the following criteria: (1) they respected state lines, (2) they were based on one or more contiguous counties, and (3) they required a minimum estimated 2004 population of 10,000 persons. The average number of counties in each PSU was 1.22, with a maximum of 5 counties per PSU.

The 2,518 PSUs were stratified into 50 strata according to census region, levels of urbanization, and population size, which was based on the square root of the estimated 2004 population in each of these PSUs. Two PSUs were selected with equal probability within each of the fifty strata for a total of 100 PSUs and 110 counties in the supplemental sample. Hence, a total of 156 counties, 46 representing the nation's 75 most populous and 110 representing the remainder of the nation, were used for the sample. All PSUs selected for the CJSSC either participated or substitutes were found for non-responsive units from a shadow sample; therefore, non-response adjustments were not needed for this survey.

### Selection of cases

The second stage of the sample design generated lists of cases for coding. Each participating jurisdiction identified cases disposed of by jury trial or bench trial between January 1, 2005, and December 31, 2005. Some jurisdictions produced a list covering 12 months of trials for a fiscal year. Trial cases sampled met the following criteria for jury and bench trials: both litigants appeared at trial, both sides presented contested evidence, at least one litigating party sought monetary damages, and the trial was heard through completion. These criteria excluded many cases initially classified as bench or jury trials from the sample. Civil trials in state courts of limited jurisdiction and small claim cases were also excluded.

### Weighting

For the sample of civil trials occurring in the nation's 75 most populous counties, data on 7,682 civil trials met the study criteria. When these trials are weighted to the nation's 75 most populous counties, they represent 10,813 civil trials. For the sample of civil trials occurring outside the nation's 75 most populous counties, data on 1,190 civil trials met the study criteria. When these trials are weighted, they represent 16,135 civil trials disposed in counties outside the nation's 75 most populous (appendix table 1).

The weighted estimate of 26,948 civil trials represents a small percentage of the reported 7.5 million civil cases filed in all unified/general jurisdiction state courts nationwide in 2005. This nationwide count comprises all tort, contract, real property, small claims, probate/estate, mental health cases, and other civil cases filed in state courts of unified/general jurisdiction. Although no nationwide counts of tort and contract filings in state courts are available, the National Center for State Courts Court Statistics Project reports 425,611 tort cases being filed in the unified/general jurisdiction courts of 32 states and 1,121,979 contract cases being filed in the unified/general jurisdiction courts of 28 states in 2005 (LaFountain, R., Schauffler, R., Strickland, S., Raftery, W., & Bromage, C., *Examining the Work of State Courts, 2006; A National Perspective from the Court Statistics Project* (National Center for State Courts 2007)).

### Confidence of intervals

Because the data come from a sample, a sampling error and confidence intervals are associated with each reported number. Confidence intervals and standard errors for several key variables are reported in table 10 and appendix table 2. These confidence intervals show where the reported CJSSC numbers would fall 95% of the time in repeated sampling. BJS statisticians examined the distribution of unweighted outcome statistics and the sampling error, confidence

PUNITIVE DAMAGE AWARDS IN STATE COURTS, 2005

intervals, and coefficients of variation associated with each to identify outcome statistics most prone to sampling error. Those statistics with a coefficient of variation twice the estimated mean were deemed to be statistically unreliable and were not included in this report.

*Collection of counts of all civil dispositions*
In conjunction with collecting detailed case level information on general civil trials, the counties participating in this survey were asked to complete a survey instrument constructed in a spreadsheet format that contained information on all general civil cases disposed in 2005. Frequency counts were obtained for trial and non-trial dispositions in these counties. The non-trial dispositions included cases dismissed for want of prosecution, granted default or summary judgments, settled or withdrawn prior to trial, settled through mediation or another method of alternative dispute resolution, or transferred to another court. This secondary data collection was used to gather disposition outcomes in trial and non-trial cases by case types.

## GLOSSARY

*Tort claims terms*
**Torts**—Claims arising from personal injury or property damage caused by negligent or intentional acts of another person or business.

**Automobile accident**—Personal injury or death caused by the negligent operation of a motor vehicle (not boat or airplane).

**Conversion**—Personal injury or property damage caused by the unauthorized use or control of another's personal property.

**Intentional tort**—Personal injury, death, or property damage caused by another's intentional act.

**Medical malpractice**—Personal injury or death caused by a medical professional's negligent care.

**Other professional malpractice**—Personal injury, death, or property damage caused by the negligent act of a non-medical professional.

**Other negligent acts**—Negligence for an act not represented by other case categories.

**Premises liability**—Personal injury or death caused by dangerous condition of residential or commercial property.

**Product liability**—Personal injury or damage caused by the negligent manufacture or design of a product or exposure to toxic substances.

**Slander, Libel, or Defamation**—Damage caused to the career or reputation of an individual due to false accusations, comments, or statements made by another.

*Contract cases terms*
**Contracts**—Cases that include all allegations of breach of contract.

**Buyer plaintiff**—Buyer claims no delivery or delivery of incomplete, incorrect, or poor quality goods or services.

**Employment discrimination**—Firing, failure to promote, or failure to hire due to age, race, gender, or religion. Also, any dispute between employer and employee not based on an allegation of discrimination.

**Fraud**—Claim of negligent or intentional misrepresentation of the nature of a person, product, or service within a legal contract.

**Other contract claim**—Any contractual dispute other than the case categories used in this study, such as stockholder claims.

**Rental/lease agreement**—A dispute between a landlord and a tenant over the terms of a lease or rental property.

**Seller plaintiff**—Any debt collection for delivery of goods or services, including lenders seeking payment of money owed by a buyer or borrowers.

**Tortious interference**—Dispute alleging a defendant's intentional procuring of breach of a commercial or contractual relationship and damages.

*Damage award terms*
**Compensatory damages**—Damages awarded to compensate plaintiffs for financial losses, pain, suffering, or emotional distress resulting from defendants' negligence. Compensatory damages include both economic and non-economic damages:

**Economic damages**—Economic damages are awarded for actual financial losses (e.g., medical costs, lost wages, lost future earnings, property damages) suffered by litigant.

**Non-economic damages**—Non-economic damages are awarded for pain and suffering, emotional distress, or loss of consortium.

**Punitive damages**—Punitive damages are awarded as a punishment for intentionally or grossly negligent behavior. They are awarded for the purposes of punishment rather than compensation.

**APPENDIX TABLE 1**
**2005 Civil Justice Survey of State Courts sampling framework**

| Sampling frame | 75 most populous counties | Outside the 75 most populous counties |
|---|---|---|
| Number of U.S. counties with population of 10,000 or more | 75 | 2,518 |
| Counties sampled | 46 | 110 |
| Cases meeting study criteria | 7,682 | 1,190 |
| Weighted cases | 10,813 | 16,135 |
| Average weight | 1.41 | 13.56 |

Note: Cases meeting study criteria will not match those in appendix table 3 because real property and bifurcated trials involving liability claims were included in this table, but excluded throughout this report.

**APPENDIX TABLE 2**
**Standard errors and confidence intervals for civil trials in which punitive damages were requested or awarded, by selected characteristics, 2005 Civil Justice Survey of State Courts**

| Cases and outcomes | Estimate | Standard error | Lower bound | Upper bound |
|---|---|---|---|---|
| **Percent of trials in which punitive damages were sought** | | | | |
| All cases | 12% | 1.2% | 10% | 14% |
| Tort | 10 | 1.2 | 8 | 13 |
| Contract | 16 | 1.6 | 13 | 19 |
| **Percent of trials with plaintiff winners in which punitive damages were sought** | | | | |
| All cases | 13% | 1.3% | 10% | 15% |
| Tort | 10 | 1.1 | 7 | 12 |
| Contract | 17 | 2.1 | 13 | 21 |
| **Percent of trials in which plaintiff winners were awarded punitive damages** | | | | |
| All cases | 5% | 0.6% | 4% | 6% |
| Tort | 3 | 0.6 | 2 | 4 |
| Contract | 8 | 1.3 | 5 | 10 |
| **Percent of trials with punitive awards from trials where punitive damages were sought** | | | | |
| All cases | 30% | 4.0% | 22% | 38% |
| Tort | 23 | 5.3 | 13 | 34 |
| Contract | 35 | 5.6 | 24 | 46 |
| **Median punitive damage awards** | | | | |
| All cases | $64,000 | $18,000 | $28,000 | $98,000 |
| Tort | 55,000 | 19,000 | 23,000 | 97,000 |
| Contract | 69,000 | 42,000 | 25,000 | 193,000 |

Note: Standard errors were calculated by using a replication method (i.e., jackknife, specifically JKN) available in WESVAR PC. Confidence interval is at 95% level.

**APPENDIX TABLE 3**
**Percentage of civil trials in state courts with litigants seeking punitive damages, by the sampled CJSSC jurisdictions, 2005**

| Sampled counties | All civil trials Number | All civil trials Punitive damages sought | Civil trials with plaintiff winners Number | Civil trials with plaintiff winners Punitive damages sought |
|---|---|---|---|---|
| **Sample of counties in 46 of nation's 75 most populous** | 7,373 | 8% | 3,889 | 9% |
| Fulton, GA | 36 | 36 | 22 | 46 |
| Franklin, OH | 131 | 32 | 93 | 23 |
| Santa Clara, CA | 51 | 31 | 25 | 36 |
| Los Angeles, CA | 354 | 27 | 189 | 32 |
| Contra Costa, CA | 25 | 24 | 10 | 30 |
| Bexar, TX | 75 | 24 | 33 | 39 |
| Honolulu, HI | 18 | 22 | 10 | 30 |
| Fairfax, VA | 166 | 21 | 102 | 23 |
| Mecklenburg, NC | 38 | 21 | 29 | 14 |
| San Francisco, CA | 116 | 21 | 64 | 19 |
| Orange, CA | 254 | 20 | 129 | 25 |
| San Bernardino, CA | 70 | 17 | 40 | 15 |
| St. Louis, MO | 141 | 16 | 82 | 13 |
| Ventura, CA | 71 | 16 | 35 | 11 |
| Alameda, CA | 167 | 14 | 98 | 19 |
| Dupage, IL | 81 | 12 | 53 | 13 |
| Maricopa, AZ | 238 | 11 | 116 | 15 |
| El Paso, TX | 40 | 8 | 27 | 11 |
| Fairfield, CT | 70 | 7 | 47 | 2 |
| Jefferson, KY | 110 | 6 | 45 | 13 |
| Bergen, NJ | 155 | 6 | 57 | 7 |
| Cuyahoga, OH | 230 | 6 | 124 | 5 |
| Prima, AZ | 75 | 5 | 46 | 7 |
| Hartford, CT | 75 | 5 | 44 | 5 |
| Dade, FL | 201 | 5 | 125 | 4 |
| Orange, FL | 69 | 4 | 37 | 8 |
| New York, NY | 346 | 4 | 161 | 4 |
| Milwaukee, WI | 117 | 4 | 73 | 3 |
| Harris, TX | 506 | 4 | 259 | 6 |
| Philadelphia, PA | 608 | 4 | 357 | 5 |
| Middlesex, NJ | 207 | 4 | 78 | 4 |
| Hennepin, MN | 167 | 4 | 93 | 5 |
| Essex, NJ | 129 | 3 | 59 | 3 |
| Dallas, TX | 199 | 3 | 85 | 2 |
| Allegheny, PA | 216 | 3 | 114 | 4 |
| Marion, IN | 126 | 2 | 85 | 2 |
| Fresno, CA | 51 | 2 | 35 | 3 |
| Oakland, MI | 147 | 2 | 76 | 1 |
| Middlesex, MA | 103 | 2 | 27 | 0 |
| Palm Beach, FL | 113 | 2 | 73 | 3 |
| Cook, IL | 681 | 2 | 365 | 3 |
| Essex, MA | 55 | 2 | 16 | 6 |
| Suffolk, MA | 125 | 2 | 37 | 3 |
| King, WA | 182 | 2 | 126 | 2 |
| Worcester, MA | 69 | 0 | 18 | 0 |
| Wayne, MI | 169 | 0 | 70 | 0 |
| **Sample of counties outside nation's 75 most populous** | 1,103 | 15% | 665 | 16% |

Note: Sample of counties outside the 75 most populous were combined because many of these counties had fewer than 10 trials, which precludes the generation of statistically reliable estimates. For a comprehensive view of civil trials concluded in the national sample of 156 counties, see Civil Bench and Jury Trials in State Courts, 2005 at http://www.ojp.usdoj.gov/bjs/abstract/cbjtsc05.htm. Detail may not sum to total due to rounding.

**APPENDIX TABLE 4**
**Punitive damages awarded in civil trials in state courts,**
**by the sampled CJSSC jurisdictions, 2005**

| Sampled counties | Number of trials with plaintiff winners | Percentage with punitive damage awards |
|---|---|---|
| **Sample of counties in 46 of nation's 75 most populous** | 3,813 | 4% |
| Bexar, TX | 33 | 18 |
| Santa Clara, CA | 24 | 17 |
| Jefferson, KY | 44 | 14 |
| Alameda, CA | 98 | 10 |
| Contra Costa, CA | 10 | 10 |
| Fairfax, VA | 102 | 10 |
| St. Louis, MO | 82 | 10 |
| Fulton, GA | 22 | 9 |
| Los Angeles, CA | 187 | 9 |
| Franklin, OH | 92 | 9 |
| Ventura, CA | 35 | 9 |
| San Francisco, CA | 64 | 8 |
| Orange, CA | 129 | 8 |
| El Paso, TX | 27 | 7 |
| Essex, MA | 16 | 6 |
| Dupage, IL | 53 | 6 |
| Cuyahoga, OH | 123 | 5 |
| Allegheny, PA | 110 | 5 |
| Hennepin, MN | 90 | 4 |
| Harris, TX | 258 | 4 |
| Wayne, MI | 51 | 4 |
| Mecklenburg, NC | 28 | 4 |
| Maricopa, AZ | 114 | 4 |
| Dallas, TX | 85 | 4 |
| Milwaukee, WI | 68 | 3 |
| Orange, FL | 36 | 3 |
| Palm Beach, FL | 72 | 3 |
| Suffolk, MA | 37 | 3 |
| Dade, FL | 125 | 2 |
| Hartford, CT | 44 | 2 |
| Prima, AZ | 46 | 2 |
| Fairfield, CT | 47 | 2 |
| Essex, NJ | 59 | 2 |
| Cook, IL | 338 | 2 |
| Middlesex, NJ | 78 | 1 |
| Oakland, MI | 75 | 1 |
| Philadelphia, PA | 357 | 1 |
| King, WA | 126 | 1 |
| New York, NY | 159 | 1 |
| **Sample of counties outside nation's 75 most populous** | 656 | 5% |

Note: Sample of counties outside the 75 most populous were combined because many of these counties had fewer than 10 trials, which precludes the generation of statistically reliable estimates. For a comprehensive view of civil trials concluded in the national sample of 156 counties, see *Civil Bench and Jury Trials in State Courts, 2005* at http://www.bjs.gov/bjs/abstract/cbjtsc05.htm. Not all 46 of the nation's 75 most populous counties are shown in list because several reported no punitive damage awards. These counties were combined and included in the sub-total. Detail may not sum to total due to rounding.

U.S. Department of Justice
Office of Justice Programs
Bureau of Justice Statistics

Washington, DC 20531

Official Business
Penalty for Private Use $300



N C J 2 3 3 0 9 4

PRESORTED STANDARD
POSTAGE & FEES PAID
DOJ/BJS
Permit No. G-91

**Office of Justice Programs • Innovation • Partnerships • Safer Neighborhoods • http://www.bjs.gov**

The Bureau of Justice Statistics is the statistical agency of the U.S. Department of Justice. James P. Lynch is the director.

This report was written by Thomas H. Cohen and Kyle Harbacek under the supervision of Duren Banks. Ron Malega verified the report. Nicole L. Waters, Ph.D. of the National Center for State Courts provided comments.

Catherine Bird and Jill Thomas edited the report, Barbara Quinn produced the report, and Jayne Robinson prepared the report for final printing under the supervision of Doris J. James.

March 2011, NCJ 233094

This report in portable document format and in ASCII and its related statistical data and tables are available at the website: http://www.bjs.gov/index.cfm?ty=pbdetail&iid=2376.

Query   Reports   Utilities   Help   Log Out